UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PETER J. SANTIAGO, Jr. | ) |
| Petitioner | ) |
|  | ) |
| v. | ) |
|  | ) |
| STEVEN O'BRIEN, | ) |
| Respondent | ) |

2007 FEB 21  A II: 28

U.S. DISTRICT COURT
DISTRICT OF MASS

Civil Action No. 4:05-CV-40158

## PETITIONER'S MOTION TO ENLARGE TIME
## FOR FILING MEMORANDUM

Now comes the Petitioner, Peter J. Santiago, Jr., and moves this court to enlarge the time within which he is to file his memorandum from Friday, January 26, 2007 to Friday, February 23, 2007. In support of this motion, Santiago states that counsel was unable to meet the current deadline due to an overwhelming number of simultaneous professional commitments and the necessity of conferring with his client before finalizing and filing the memorandum. The enlargement sought will not prejudice the Respondent.

Peter Santiago,
Petitioner,

by his attorney,

20 February 2007

Donald K. Freyleue
BBO# 549822
Six Highland Avenue
Ipswich, MA 01938
(978) 356-4739

### CERTIFICATE OF SERVICE

I, Donald K. Freyleue, attorney for Peter J. Santiago, Jr., hereby certify that on this date I served the foregoing on Susanne G. Reardon, Assistant Attorney General, One Ashburton Place, Boston, MA 02108.

20 February 2007

Donald K. Freyleue

FILED
**UNITED STATES DISTRICT COURT** ICE
**DISTRICT OF MASSACHUSETTS**

2007 FEB 21  A 11: 29

| | |
|---|---|
| PETER J. SANTIAGO, Jr. ) | |
| Petitioner ) | U.S. DISTRICT COURT |
| ) | DISTRICT OF MASS |
| v. ) | Civil Action No. 4:05-CV-40158 |
| ) | |
| STEVEN O'BRIEN, ) | |
| Respondent ) | |

## CERTIFICATE OF SERVICE

I, Donald K. Freyleue, attorney for Peter J. Santiago, Jr., hereby certify that on this date I served the Petitioner's Memorandum on Susanne G. Reardon, Assistant Attorney General, One Ashburton Place, Boston, MA 02108.

20 February 2007

Donald K. Freyleue
BBO# 549822
Six Highland Avenue
Ipswich, MA 01938
(978) 356-4739

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETER J. SANTIAGO, Jr.          )
    Petitioner                )
                      )
v.                              )          Civil Action No. 4:05-cv-40158
                      )
STEVEN O'BRIEN,                 )
    Respondent                )

## PETITIONER'S MEMORANDUM

### PROCEDURAL HISTORY

On December 12, 1997, a Franklin County grand jury returned an indictment against Peter Santiago ("Santiago"), charging him under G.L. c. 94C, §32E (b) (4) with trafficking in two hundred or more grams of cocaine.

On February 24, 1998, defense counsel filed a Motion for Informant Information, requesting the following:

1.    The identity of the informant;

2.    The dates, times, places that the informant communicated with the police concerning defendant or drug sales at all places and times described in Commonwealth's Affidavit dated November 28, 1997, and the substance of each such communication.

3.    All promises, rewards, or inducements of any kind made to the informant;

4.    The date, time, and location of all controlled drug buys made by the informant at all places and times described in Commonwealth's Affidavit dated November 28, 1997, or from defendant, the type and quantity of drugs purchased and the amounts spent.

5.    The date, time and location of all other drug buys made by the informant at all places and times described in Commonwealth's Affidavit dated November 28, 1997, or from defendant, the type and quantity of drugs purchased, and the amount spent.

Appendix at A.4b-5

On April 22, 1998, with the assent of the Commonwealth, the trial court allowed the Motion for Informant Information. A.2[1]  The Commonwealth did not produce the information as ordered, and defense counsel failed to pursue the matter.

On June 15, 1998, the trial court denied Santiago's pretrial motion to suppress the evidence seized pursuant to a November 26, 1997 warrant authorizing the search of an apartment unit in Sunderland, Massachusetts. A.2.

On October 6-7, 1998, Santiago was tried to a jury in the Franklin Superior Court. Following a *voir dire* hearing at the outset of trial, the trial court issued an order barring Santiago from introducing, as a declaration against penal interest, the proffered testimony of one Fanta Saradeth ("Fanta"), that his deceased brother, Oley Saradeth ("Oley"), had stated to him in private conversation that the drugs for which Santiago had been arrested and charged actually belonged to Oley.  Fanta and another witness were also to testify that on the day of his death, Oley asked his brother to contact Santiago and tell him that he was sorry.  The trial court offered the following rationale for its ruling:

> I do not find that the statement or the circumstances to which Mr. Saradeth testified in any way subjected the declarant to criminal liability, in as much [sic] as it was made to his brother.  As the witness testified, there was no contemplation that it would be related to the authorities.
>
> And finally, there's no corroboration except for the second statement, which I don't find to be a circumstance clearly indicating his trustworthiness.  So that's my conclusion, and the statement is excluded from this trial.

---

[1] The docket entry in question states as follows:  "Motions #5-14 and #7-21 are Assented to, ALLOWED." (emphasis included).  Motion #14 refers to the Motion for Informant Information.

2

A.6-7.

On October 7, 1998, a Franklin County jury returned a verdict of guilty, and on the same day Santiago was sentenced to a prison term of fifteen to fifteen years and one day. A.2.

On appeal, Santiago argued that the trial court erred in denying his motion to suppress the fruits of the apartment search and abused its discretion in refusing to allow him to introduce Fanta Saradeth's testimony. In addition to the arguments he made in the trial court concerning the content of the search warrant affidavit, Santiago argued that the affidavit was invalid because it lacked an executed jurat and bore an execution date of November 28, 1997, two days after the date of the application and the warrant itself.

The Appeals Court affirmed the trial court judgment, and the Supreme Judicial Court denied his application for further appellate review.

On September 8, 1999, prior to the appointment of appellate counsel, and without consultation with his client, Attorney Richard M. Howland filed what purported to be a Rule 30 motion, but which contained no argument or identifiable issues. A.42-44 The Superior Court denied this motion on November 2, 1999.   A.3. On April 12, 2000, Santiago filed his brief in the Appeals Court, under docket No. 00-P-15.

On May 31, 2001, the Appeals Court affirmed Santiago's conviction. On May 31, 2001, Santiago filed an Application for Further Appellate Review. The Supreme Judicial Court denied further appellate review on July 30, 2001.

On October 2, 2001, Santiago filed a *pro se* Motion for Release from Unlawful Restraint, citing, among other things, the Commonwealth's noncompliance with the

3

discovery order and trial counsel's inexcusably negligent failure to seek enforcement of the order. A.45-49. The Superior Court denied the motion, stating that "[e]ach of the issues raised by this motion could have been raised on the Defendant's appeal from his conviction in this case." A.4a Notwithstanding the docket entry indicating otherwise, the motion judge also stated that "[a]s to the motion for the identity of the informant which the Defendant alleges was allowed it is clear that the motion WAS NOT allowed." A.4a. The Superior Court further declared that "[i]n any event this issue was not a trial issue and even if the motion had been allowed, the failure to pursue this issue was not ineffective assistance of counsel." A. 4a.

The court denied Santiago's Motion for Reconsideration, and Santiago appealed, without success.

## STATEMENT OF FACTS

On November 26, 1997, Detective John W. Newton of the Greenfield Police Department applied to the Greenfield District Court for a warrant authorizing the search of Apartment K8, Cliffside Apartments, Sunderland, Massachusetts. A.8. The application stated on its face that the facts supporting probable cause were set forth on an attached affidavit. The First Assistant Clerk of the Greenfield District Court issued the warrant on the same day. A.8. On November 28, 1997, two days after the issuance of the warrant, Detective Newton executed an Affidavit in Support of Application for Search Warrant. A.10-41. The jurat form on the final page of the affidavit was left completely blank. A.41.

To establish a nexus between the activities under investigation and the premises to be searched, Detective Newton and his fellow investigators relied exclusively on

4

information supplied by a single, unnamed informant. A.29-37. To demonstrate this informant's veracity, Detective Newton stated that on one occasion the informant supplied information that was incorporated into a search warrant affidavit, and that the ensuing search resulted in an arrest. A.30.31. Detective Newton did not include any particulars, such as the identity of the arrestee, the date and location of the search, the content of the information supplied and how it related to the premises searched, and whether the search survived any court challenges.

Detective Newton also stated that the unnamed informant, following an arrest for possession of cocaine with intent to distribute, admitted to being an occasional distributor of cocaine, and that the cocaine found in his possession was for resale. Detective Newton offered no further details. A.30-31.

The only facts in the affidavit suggesting a nexus between Santiago's alleged cocaine trafficking and Apartment K8 consisted of the unnamed informant's statement that Santiago lived there, A.32, and Detective Newton's one-time observation of Santiago exiting the building. The affidavit does not describe any attempt by investigators to confirm the informant's representation that Santiago resided in Cliffside Apartments.

The affidavit described three controlled buys, which the unnamed informant had conducted under police supervision. On each occasion, the informant entered the building with money supplied by investigators and returned with a small quantity of cocaine base. Investigators did not observe which unit, if any, the informant entered once inside the building. At no time did investigators observe any interaction between Santiago and the informant. On one occasion, Detective Newton observed Santiago exit the building shortly after a controlled buy had taken place. A.33-37.

5

On November 26, 1987, Detective Newton and others executed the warrant, and seized more than 200 grams of powder cocaine, along with some related paraphernalia, U.S. currency, and items of personal property.

The Commonwealth's case-in-chief consisted of testimony by the officers who conducted the search as to what they found and how they found it, and evidence of chemical analysis of the seized substances.

Testifying on his own behalf, Santiago stated that the cocaine and related paraphernalia, along with some other items, including a cell phone and a pair of jeans in which investigators found a substantial amount of cash, belonged to his sometime roommate, Oley Saradeth. In her summation, the prosecuting attorney pointedly referred to the absence of evidence corroborating Santiago's attribution of these items to Oley.

## GROUNDS FOR HABEAS RELIEF

1.    The Franklin Superior Court deprived Santiago of his Sixth
Amendment rights in refusing Santiago's proffer of Fanta
Saradeth's testimony that his deceased brother had stated to
him that he was the owner of the cocaine for which Santiago
had been arrested and charged.

2.    The November 26, 1997 search of Santiago's apartment
violated the Fourth Amendment, having been conducted
pursuant to a procedurally and substantively invalid search
warrant.

3.    Santiago received ineffective assistance of counsel by reason of
his trial attorney's failure to follow up on a motion for
informant information after the motion had been allowed.

## ARGUMENT

1.    The Franklin Superior Court deprived Santiago of his Sixth
Amendment rights in refusing Santiago's proffer of Fanta
Saradeth's testimony that his deceased brother had stated to
him that he was the owner of the cocaine for which Santiago
had been arrested and charged.

    a.    The trial court erred in ruling as a matter of law
that a statement does not qualify as being against
the declarant's penal interest where it is made in
confidence to a trusted family member.

"Few rights are more fundamental than that of an accused to present witnesses in
his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  Thus, the
erroneous application of state hearsay rules to bar the defense from offering evidence
extrajudicial statements acknowledging the declarant's guilt and exculpating the
defendant violates the Sixth Amendment and warrants reversal and a new trial where
"'the omitted evidence [evaluated in the context of the entire record] creates a reasonable
doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th
Cir. 2006), *quoting from Washington v. Schriver*, 255 F.3d 45, 57 (2nd Cir. 2001).  In this

7

case, the Franklin Superior Court erroneously ruled that the testimony of Fanta Saradeth that his brother, Oley Saradeth, on two occasions admitted to him that the drugs found in the apartment her shared with Santiago belonged to him and not to Santiago, did not qualify as a statement against penal interest because it was uttered in private to a close relative.   The judge also found that the statement lacked sufficient circumstantial corroboration.  The Superior Court was wrong in both respects, as a matter of law.

     **b.**     **That a statement was uttered in private conversation to a confidante does not disqualify it as a statement against penal interest.  Such as circumstance is, in fact, one of the well-established "particularized guarantees of trustworthiness" often cited in support of the admissibility of hearsay statements in Confrontation Clause jurisprudence, and is regarded as superior to mere evidentiary corroboration as grounds for admission.**

The trial judge turned the case law in its head with his inexplicable ruling that a private statement to a family member cannot, by virtue of that very circumstance, qualify as a statement against penal interest.  It appears that the judge wrongly assumed that statements against penal interest must have been uttered in a context of actual and immediate risk of arrest and prosecution for having made the statement.  This is simply not the law, in Massachusetts or federal jurisprudence.

Courts all over the country, including the United States Supreme Court and the Massachusetts Supreme Judicial Court, have stated time and again that the fact that a statement acknowledging criminal liability was made in a private setting to a close friend or relative with no expectation that it would be repeated to law enforcement authorities is a strong indicator of inherent trustworthiness, sufficient to satisfy the stringent standards of the Confrontation Clause of the Sixth Amendment.  *See, e.g.*, ***Chambers v.***

*Mississippi*, 410 U.S. 284, 301 (1973)(confession made spontaneously to a close acquaintance); *Green v. Georgia*, 442 U.S. 95, 97 (1979)(same); *United States v. Morgan*, 385 F.3d 196, 209 (2ⁿᵈ Cir. 2004)(letter written by declarant to her boyfriend, with "no reason to expect that it would ever find its way into the hands of the police."); *United States v. Boone*, 229 F.3d 1231, 1234 (9ᵗʰ Cir. 2000)(declarant confessed privately to girlfriend); *United States v. Robbins*, 197 F.3d 829, 840 (7th Cir. 1999) (spoken to fiancée); *Commonwealth v. Galloway*, 404 Mass. 204, 209 (1989)(confession to mother is "a strong indication in the circumstances of the trustworthiness of [the] statements."). The trial judge clearly erred in ruling that the private, confidential circumstances of Oley's statements to Fanta meant that they were not against his penal interest. It is the *content* of the statement, not its *context*, which determines whether it is against the declarant's penal interest. The context is merely a factor is the assessment of the statement's reliability, with the context of the statements at issue in this case favoring their reliability. The relationship between the witness and the declarant, and the circumstances in which the declarant speaks, "ha[ve] no relevance to the determination whether the statement was against the declarant's penal interest." *United States v. Bagley*, 537 F.2d 162, 165 (5ᵗʰ Cir. 1976). The exception for declarations against penal interest "does not require that the declarant be aware that the statement subjects him to immediate prosecution." *United States v. Lang*, 589 F.2d 92, 97 (2ⁿᵈ Cir. 1978). The trial court's running was

9

    **c.**    **Oley Saradeth's admissions to his brother, Fanta Saradeth, that the cocaine seized in the search of the apartment he shared with Santiago belonged to him and not to Santiago, bore particularized guarantees of trustworthiness that the trial court improperly failed to consider in ascertaining the statements' reliability.**

The trial judge also found that Oley Saradeth's admissions lacked sufficient "circumstantial corroboration" to warrant admission under the exception for statements against penal interest. It is evident, however, that the trial judge did not even consider the surrounding circumstances of the statements in his calculus. Had he done so, and applied the correct legal standard, he would have found ample grounds for a determination of reliability and trustworthiness in support of admissibility, even under the higher standard applicable when the state wishes to introduce extrajudicial statements against penal interest that also inculpate the defendant.

Where the prosecution seeks to introduce extrajudicial admissions of guilt uttered by an unavailable declarant that also inculpate the defendant, the confrontation clause of the Sixth Amendment mandates rigorous scrutiny of the statements' surrounding circumstances to ascertain whether there are certain "particularized guarantees of trustworthiness" present in the circumstances surrounding the declaration. This standard is higher than the standard of evidentiary corroboration typically applied to utterances that exculpate the accused while inculpating the declarant. *See Lilly v. Virginia*, 527 U.S. 116, 138 (1999); *Idaho v. Wright*, 497 U.S. 805, 819-824 (1990). In *Wright*, the Court held that statements bearing such particularized guarantees are so inherently trustworthy that corroborating evidence would be, like cross-examination of the declarant, of "marginal utility." 497 U.S. at 823. In the *Wright* Court's view,

corroborating evidence does not speak the reliability of the statement itself[2], and is useful only in determining whether any error in admitting such a statement to inculpate the defendant was harmless. 497 U.S. at 823. Thus, when a statement possesses such "particularized guarantees of trustworthiness," it may be admitted to inculpate a defendant, even if it is not corroborated by any other evidence, notwithstanding the constraints on the state imposed by the Confrontation Clause. In a case in which the defense is offering a hearsay statement to *exculpate* the accused, a situation in which the Constitution *favors* admissibility of such evidence in the absence of compelling reasons to bar it, the presence of "particularized guarantees of trustworthiness" should also suffice without an additional requirement of evidentiary corroboration. It makes no sense to impose such a requirement in a situation in which the Constitution favors admissibility, when no such requirement is imposed in a parallel situation in which the Constitution *dis*favors admissibility.

In determining whether to admit a proffered statement as a declaration against penal interest, "[t]he question is 'not whether the [trial] judge is satisfied that the statement is actually true as to the fact it is adduced to prove,' . . ., but whether, in light of the other evidence already adduced or to be adduced, there is some reasonable likelihood that the statement could be true." ***Commonwealth v. Drew***, 397 Mass. 65, 75-76 (1986), *quoting* ***United States v. MacDonald***, 688 F.2d 224, 234 n.2 (4th Cir. 1982)(Murnaghan, J., concurring). "[T]he judge should not base his determination on an assessment of the

---

[2] "[T]he use of corroborating evidence to support a hearsay statement's 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility." 497 U.S. at 823.

11

proffered witness's credibility." 397 Mass. at 79. "If the issue of . . . corroboration is close, the judge should favor admitting the statement. In most such instances, the good sense of the jury will correct any prejudicial impact" 397 Mass. at 75 n.10.

The purpose of the corroboration requirement is to minimize the possibility of fabrication. *United States v. Thomas*, 571 F.2d 285, 290 (5th Cir. 1978). "[B]ehind the corroboration requirement . . . lurks a suspicion that a reasonable man might admit to a crime that he did not commit." *Commonwealth v. Drew*, 397 Mass. at 74 n.8. In this case, the Commonwealth did not suggest, and the trial court did not find, that Oley might have had a motive to fabricate in speaking to his brother as he did.

The fact that Oley spoke to a close family member in the privacy of a bedroom is, itself a strongly corroborating circumstance. *Commonwealth v. Galloway*, 404 Mass. at 209. It is a sign of a self-inculpatory statement's trustworthiness that the declarant spoke, without coercive pressure, to "an intimate and confidante, in the private recesses of a home . . . , " and that the declarant therefore "had no reason to expect that the admission would ever be disclosed to the authorities." *United States v. Matthews*, 20 F.3d 538, 546 (2nd Cir. 1994). In light of the corroborating context of Oley's declaration, and the lack of even a bare suggestion of a motive to fabricate, the trial judge's conclusion that Oley's statement was inadmissible for want of corroboration is simply unsustainable. The trial court should have deferred to "the good sense of the jury" and admitted the testimony. Such fundamental error cannot be shrugged off as a mere exercise of discretion.

"If potentially exculpatory evidence was erroneously excluded, we must look to whether the omitted evidence [evaluated in the context of the entire record] creates a

12

reasonable doubt that did not otherwise exist." *Hawkins v. Costello*, 460 F.3d 238, 244 (2nd Cir. 2006); *see also United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006). In this case, the trial court seriously misread and misapplied Massachusetts evidentiary law in excluding Fanta Saradeth's testimony. There is no question that Fanta Saradeth's testimony that his brother admitted to his guilt, thereby exculpating Santiago, seen in light of the entire record, created a reasonable doubt that would have justified an acquittal had the jury been permitted to hear the evidence. Indeed, the cocaine found at the Sunderland apartment was essentially the Commonwealth's entire case against Santiago. Had the jury been allowed to hear Fanta Saradeth's testimony, and found it credible, an acquittal would surely have followed.

Even if the trial court's ruling was not in error in a technical sense, it nevertheless was "unconstitutionally arbitrary or disproportionate" inasmuch as it seriously "infringed upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). This "weighty interest" happened to be Santiago's Sixth Amendment right to present witnesses in his favor. "A [criminal] defendant is entitled to present evidence tending to show that someone else committed the crime for which he stands accused." *Commonwealth v. Galloway*, 404 Mass. at 207. "Evidence that someone other than the defendant . . . identified [himself] as the criminal is not only probative but *critical* to the issue of the defendant's guilt. *Pettijohn v. Hall*, 599 F.2d 476, 480 (1st Cir. 1979)(emphasis supplied).

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the [government's] accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Hence, "[i]n the context of a criminal trial, the

13

sixth amendment severely restricts a trial judge's discretion to reject such relevant evidence." *Pettijohn v. Hall*, 599 F.2d at 480; *see also Blaikie v. Callahan*, 691 F.2d 64, 67 (1st Cir. 1982)(Sixth Amendment is implicated when "evidentiary rules [prevent] a defendant from presenting his view of the facts."). "Once a Sixth Amendment right is implicated, the [government] must offer a sufficiently compelling reason to justify [the exclusion of exculpatory evidence]." *Pettijohn v. Hall*, 599 F.2d at 481. "[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers v. Mississippi*, 410 U.S. at 302. Irrespective of the technical hearsay questions, the trial court's decision to keep the jury ignorant of such critically material, exculpatory evidence was an indefensibly mechanistic exercise, devoid of any truly compelling rationale. The mere presentation of al alternative theory of third-party guilt would not have confused or muddled the issues in the minds of the jury. A reasonably competent juror would have had no trouble whatsoever evaluating this evidence and according it its due weight. There was no compelling rationale for disregarding the rule favoring inclusion in close cases and barring Peter Santiago for offering his strongest defense. The trial court indefensibly trampled on Peter Santiago's fundamental constitutional right to defend himself.

14

2.    **The November 26, 1997 search of Santiago's apartment
violated the Fourth Amendment, having been conducted
pursuant to a procedurally and substantively invalid search
warrant.**

a.    **The affidavit in support of the November 26, 1997
search warrant was executed two days after the
issuance of the warrant.**

The affidavit that Detective Newton purportedly attached to his November 26,

1997 search warrant application is dated November 28, 1997, two days *after* the date the

warrant was issued and executed.  Since the preprinted application form expressly calls

for the facts in support of probable cause to be set forth in an attached *affidavit*, it follows

that the application must be accompanied by a separately and timely executed affidavit,

not a mere recitation of facts that can be appended at any time.  Such a requirement is a

sensible means of ensuring that the Commonwealth can readily demonstrate that a given

search and seizure was based upon probable cause. *See **Commonwealth v. Monosson**,*

351 Mass. 327, 330 (1966).  Hence, the Commonwealth's claim that the date on the

application applies to the separate affidavit and trumps a different date appearing on the

affidavit is without merit.  The argument that the date discrepancy can be ignored as a

mere clerical error is also unavailing.  The Commonwealth has never sought correction of

the purported error under Mass. R. Crim. P. 42.  Moreover, because a change in the date

of the affidavit from November 28 to November 26 means the difference between a

warrant issued without probable cause and one issued with probable cause, such a change

is a matter of substance, which lies beyond the reach of Rule 42.  *See **Commonwealth v.
Miranda**,* 415 Mass. 1, 5 (1993).  The November 26, 1997 search warrant was issued

without proof of probable cause in the form of a timely executed affidavit.  The trial court

should have suppressed the fruits of the illegal search of the apartment unit by properly applying Massachusetts statutory and common law governing the issuance of warrants.

**b.      The November 28, 1997 affidavit lacked an executed jurat.**

General Laws c. 276, §2B mandates that the "facts, information, and circumstances" contained in an affidavit in support of a search warrant application be sworn to before a "Justice or Special Justice, Clerk or Assistant Clerk. An affidavit that does not indicated by a *signed* and dated jurat that it was sworn to before an appropriate officer is facially inadequate as the basis for a search warrant. ***Commonwealth v. Dozier***, 5 Mass. App. Ct. 865 (1977). "The legislative purpose [behind these statutory requirements] was to make sure that the Commonwealth could demonstrate by a writing that any given search and seizure was reasonable and based upon probable cause." ***Commonwealth v. Monosson***, 351 Mass. at 330. "[A]ll violations of the statutory probable cause requirements are substantial . . .," and therefore must be enforced by an exclusionary rule. ***Commonwealth v. Sheppard***, 394 Mass. 381, 389 (1985).

Lacking an executed jurat, Detective Newton's affidavit does not appear on its face to have been sworn to before an appropriate court officer. The affidavit therefore does not meet the statutory probable cause requirements, was constitutionally invalid, and any evidence seized pursuant to the warrant should have been suppressed. ***Commonwealth v. Sheppard***, 394 Mass. at 389.

16

    c.    **The search warrant affidavit was insufficient on its face to support a finding of probable cause.**

        i.    **The affidavit did not adequately establish the unnamed informant's veracity.**

### Information leading to prior arrest

The search warrant affidavit purports to establish the unnamed informant's veracity by referring in general terms to an occasion on which the informant supplied information upon which a search warrant was issued, and that execution of the warrant led to the seizure of drugs and U.S. currency.  The lack of particulars, however, renders Detective Newton's assertion useless as proof of veracity.  "A naked assertion that in the past the informant had provided information which led to a prior arrest is insufficient by itself to establish the informant's veracity."  *Commonwealth v. Rojas*, 403 Mass. 483, 486 (1988).

### Statements against penal interest

In the context of a search warrant application, "[i]n order for a statement to be considered by a magistrate to be a statement against penal interest, there must be information in the affidavit which tends to show that the informant would have had a reasonable fear of prosecution at the time that he made the statement."  *Commonwealth v. Melendez*, 407 Mass. 53, 56 (1990).  "Courts . . . should assess in a . . . careful fashion, preferably upon a full disclosure by the police of all relevant circumstances, what the significance of that admission is in the context of the particular case."  *Id.* 407 Mass. at 56.  The affidavit in this case fails to meet these critical tests.  It contains no information about the circumstances of the informant's arrest, the strength of the evidence against the

informant, or anything else that might indicate the potential effect of the statements on the prosecutability of the crime charged, or other possible criminal charges.[3]

## Connection to targeted premises

A search warrant affidavit must "contain enough information for an issuing magistrate to determine that the items sought . . . reasonably may be expected to be located in the place to be searched." *Commonwealth v. Cinelli*, 389 Mass. 197, 213 (1983). The search warrant affidavit in this case fails, within its four corners, to supply facially reliable information that Santiago had any connection to the apartment complex beyond what could be inferred from Detective Newton's single observation of Santiago exiting one of the buildings. The only evidence that Santiago resided in the targeted unit came from the unnamed informant, whose veracity had not been adequately established. This information was wholly insufficient to establish the requisite nexus between the activities under investigation and the targeted premises. The issuing magistrate could not properly have determined that the targeted unit was reasonably likely to be a regular locus of cocaine distribution by Peter Santiago, such that accoutrements of the cocaine trade belonging to Santiago were reasonably likely to be found there. The search warrant was invalid, and the search of Santiago's Sunderland apartment violated the Fourth Amendment. The fruits of the search should have been suppressed.

---

[3] It bears noting that the emphasis on context in *Melendez* has no bearing on Santiago's argument concerning statements against penal interest offered at trial. Such statements as might appear in a search warrant affidavit are typically made to law enforcement officers, and are therefore inherently tainted with a likelihood of fabrication. The particular context within the larger context is essential to distinguish among inherently unreliable statements. An admission made to a police officer exposing the declarant to a realistic threat of prosecution, while less reliable than the same statement made outside the law enforcement context, is nevertheless more reliable than if made to a police officer under less legally perilous circumstances.

18

**3.    Santiago received ineffective assistance of counsel by reason of his trial attorney's failure to follow up on a motion for informant information after the motion had been allowed.  The motion judge, having failed to conduct an appropriate factual inquiry, clearly erred in ruling that trial counsel's failure to pursue the Commonwealth's compliance with an order to produce informant information was not ineffective assistance of counsel within the meaning of the Sixth Amendment.**

The motion judge found that Santiago's Motion for Informant Information, the allowance of which forms the underlying basis of his claims, had not, in fact, been allowed.  According to the trial court docket, however, the court allowed Motion No. 14, *i.e.*, the Motion for Informant Information, on April 22, 1998.  "Docket entries are prima facie evidence of the facts recorded therein."  ***Commonwealth v. MacDonald***, 435 Mass. 1005, 1007 (2001); *see also* ***Commonwealth v. Mattos***, 404 Mass. 672, 677 (1989). Notwithstanding the docket entry, the Appeals Court concluded that the motion judge's finding was not clearly erroneous because certain extrinsic evidence suggested that the docket entry might have been a scrivener's error.   The motion judge clearly erred, however, in finding the docket entry to be inaccurate without first having held an evidentiary hearing under Rule 30(c)(3) of the Massachusetts Rules of Criminla Procedure.  Given that on the face of it, Santiago did indeed receive ineffective assistance in connection with the motion for informant information, the court's failure to conduct a proper inquiry is inexcusable.

Rule 30(c)(3) provides that a motion judge may decide a motion under the rule "without further hearing if no substantial issue is raised by the motion or affidavits." Whether to hold an evidentiary hearing on a Rule 30 motion is a matter typically left to the discretion of the motion judge, particularly where the motion judge also served as

19

trial judge. *Commonwealth v. Downey*, 58 Mass.App.Ct. 591, 594-595 (2003). "However, even if the motion judge presided over the trial, [an appellate court] will require an evidentiary hearing if the defendant's motion and affidavits adequately demonstrate a serious issue of constitutional significance." *Id.*, 58 Mass.App.Ct. at 595. The motion papers need not prove the issue, and will satisfy this standard as long as they "have enough qualitative heft to them to warrant further exploration of the issues." *Commonwealth v. Goodreau*, 58 Mass.App.Ct. 552, 554 (2003).

Santiago's Rule 30 motion and supporting papers certainly warranted "further exploration of the issues." The docket, a copy of which Santiago submitted with his motion, clearly shows that the Motion for Informant Information had been allowed. According to Santiago's filings, the Commonwealth never produced any such informant information, and defense counsel not only failed to seek to enforcement of the discovery order, but lied to Santiago by telling him that the motion had been denied. These factual contentions, "if true, raise serious issues as to the adequacy of . . . trial counsel's interest in preparing and conducting the defense." *Commonwealth v. Licata*, 412 Mass. 654, 660 (1992). The conflict between the docket and the various items of extrinsic evidence relied upon by the Commonwealth is a substantial fact issue requiring a full evidentiary hearing. Santiago deserved the opportunity to cross-examine the authors of the documents in question and to challenge their credibility and the accuracy of their recollections. Moreover, this hardly appears to be a case in which counsel's omission can be attributed to "arguably reasoned tactical or strategic judgments..." *Commonwealth v. Rondeau*, 378 Mass. 408, 413 (1979). Hence, any finding as to the reasonableness of

20

counsel's failure to pursue discovery of the requested informant must be based on a thorough examination of the facts by way of an evidentiary hearing.

### a.    Santiago did not waive his ineffective assistance claim by failing to raise it on direct appeal.

In denying Santiago's Motion for Release from Unlawful Restraint, the state court motion judge stated that "[e]ach of the issues raised by this motion could have been raised on the Defendant's appeal from his conviction in this case." A.4. This statement is flatly incorrect.  Santiago's claim of ineffective assistance of trial counsel was not at all suitable for resolution on direct appeal.

"The occasions when a court can resolve an ineffective assistance claim on direct appeal are exceptional, and our case law strongly disfavors raising ineffective assistance claims on direct appeal" *Commonwealth v. Zinser*, 446 Mass. 807, 809 n. 2 (2006). "'A claim of ineffective assistance of counsel may be resolved on direct appeal of the defendant's conviction [only] when the factual basis of the claim appears indisputably on the trial record.'" *Commonwealth v. Elmes*, 43 Mass.App.Ct. 903, 904 (1997), *quoting from Commonwealth v. Adamides*, 37 Mass.App.Ct. 339, 344 (1994).  As a general rule, "appellate courts decline to decide 'constitutional arguments . . . based on factual questions that are best left for resolution in the first instance by the trial judge on a motion for new trial.'" *Commonwealth v. Elmes*, 37 Mass.App.Ct. at 904, *quoting from Gibney v. Commonwealth*, 375 Mass. 146, 148 (1978).  "Appellate courts are not fact finders." *Dir. of Div. of Employment Sec. v. Mattapoisett*, 392 Mass. 858, 862 n.5 (1984). *See generally Massaro v. United States*,

The motion judge's ruling that Santiago's ineffective assistance claim was waived

for failure to raise it on direct appeal therefore can survive scrutiny *only* if it is *indisputable* that all the necessary factual determinations could have been made *solely* with reference to the record on direct appeal.  The motion judge's ruling did not meet this strict standard.

Evaluation of the merits of a claim of ineffective assistance of counsel requires "a discerning examination and appraisal of the specific circumstances of the given case..." ***Commonwealth v. Saferian***, 366 Mass. 89, 96 (1974).  Because of the unique nature of ineffective assistance claims, however, the trial record is rarely sufficient to support such a "discerning examination" of the facts material to the claim.  "[A] defendant claiming ineffective assistance of counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial." ***Massaro v. United States***, 538 U.S. 500, 505 (2003); *see generally **Strickland v. Washington***, 466 U.S. 668 (1984).  It is only in "rare instances" that the trial record by itself will disclose the facts necessary to address those issues.  *Id.*, 538 U.S. at 507.  Santiago's case does not present such an instance.  The trial record does not disclose whether the defense could have benefited from pursuit of the informant information in question, because it does not disclose the information itself.  Moreover, the trial record sheds no light on the possible reasons underlying counsel's acts and/or omissions.  Hence, Santiago's claim of ineffective assistance of trial counsel could not have been resolved on direct appeal.

The Commonwealth cannot establish waiver merely by conclusorily asserting that its interpretation of the conflicting evidence is the only reasonable one.  The Commonwealth must demonstrate that the record on direct appeal by itself conclusively settles the issue in the Commonwealth's favor.  To achieve this end, the Commonwealth

22

must show that any contrary interpretation of the record would be clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 792 (1986), *quoting from United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). If a lower court's finding "'is plausible in light of the record viewed in its entirety, [an appellate court] may not reverse it even though they are convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Care and Protection of Olga*, 57 Mass. App. Ct. 821, 824-825 n.3 (2003), *quoting from Anderson v. Bessemer City*, 470 U.S. 564, 573-574 (1985). It is perfectly within a judge's factfinding discretion to favor the *prima facie* effect of an unambiguous, uncontradicted docket entry over a mere inference based on the parties' subsequent conduct that the docket entry must have been a scrivener's error. Such a finding cannot be clearly erroneous.

As to the questions of prejudice and tactical choices, Santiago wishes to emphasize that he had repeatedly informed his counsel from the outset that he had no knowledge of the drug transactions detailed in the search warrant affidavit, and that the drugs found in his apartment belonged to his roommate, the late Oley Saradeth. The trial court prevented Santiago from raising this defense by barring the testimony of Oley Saradeth's brother that Saradeth had confided in him that he owned the drugs. Without this evidence, the defense was very significantly weakened. Hence, any evidence that might have strengthened a pretrial suppression motion based on intentional or reckless

23

falsehoods contained in the search warrant affidavit took on correspondingly greater value to the defense.

Since the informant information was never produced, either directly or for *in camera* review by the court, *see Commonwealth v. Amral*, 407 Mass. 511, 521-523 (1990), it is impossible to identify with particularity the prejudice resulting from trial counsel's failure to insist on its production. In a situation where probable cause for a search warrant rests on the reliability of and statements attributed to a particular confidential informant, about whom no information has been disclosed, "the defendant lacks access to the very information that [*Franks v. Delaware*, 438 U.S. 154 (1978)] requires for a threshold showing." *Commonwealth v. Amral*, 407 Mass. at 520. "There is . . . no requirement that a defendant, denied access to evidence that might prove helpful in his defence, must make a specific showing of just what the evidence would have proved and how far he was prejudiced by the withholding." *Commonwealth v. Johnson*, 365 Mass. 534, 547 (1974).

It also bears noting that in its written opposition to Santiago's Rule 30 motion, the Commonwealth argued that Santiago was not prejudiced by counsel's failure to pursue the informant information because he could have obtained affidavits from the police officers named in the search warrant affidavit providing him with information concerning "the time of the controlled buys and what was stated by the confidential informant about the sales." The obvious flaw in this argument is that Santiago requested this very information in his Motion for Informant Information, and the Commonwealth never complied.   This assertion is also remarkable in that it directly contradicts the Commonwealth's prior position, first put forward two months after the docket indicated

24

that the Motion for Informant Information had been allowed with the Commonwealth's assent, that this information falls within the privilege against disclosure of the confidential informant's identity. The ease with which the Commonwealth reversed itself on this point negates the Commonwealth's argument that for it to have assented to production of the information requested is so inherently bizarre and unthinkable as necessarily to imply a scrivener's error.

It is clear that there are far too many open questions of material fact for Santiago's ineffective assistance claim to have been resolved on direct appeal. The state court finding of waiver was error.

**b.    Santiago did not waive his ineffective assistance claim for failure to include it in a pre-appeal Rule 30 motion, ineptly prepared by incompetent counsel. To charge Santiago with a waiver in this instance would be manifestly unjust and subvert the purposes of the waiver rule.**

In its ruling upholding the denial of Santiago's new trial motion, Appeals Court charged Santiago with waiver under Rule 30(c) (2) for having omitted his claim of ineffective assistance of counsel from a Rule 30 motion that had been filed and disposed of shortly before the direct appeal was entered in the Appeals Court, and having failed to argue in his second, *pro se* motion that the omission was itself due to ineffective assistance of counsel. To charge Santiago with a waiver in this instance, however, is manifestly unjust and subverts the purposes of the waiver rule.

The waiver rule was not intended to function, as it has in this case, as hidden obstacle to trip up an unwary defendant who has diligently pursued his claims in a timely and expeditious fashion. What happened in this instance is that a new attorney stepped into the case while the record on direct appeal was still being assembled, and filed a

hastily drawn Rule 30 motion that had no hope of being heard, let alone allowed, due to its complete lack of supporting fact or argument. The motion appears to challenge the sufficiency of the search warrant affidavit, pursuant to which the Commonwealth acquired the evidence used to secure Santiago's conviction. This issue had already been litigated in the trial court on a suppression motion, and was set to be, and in fact was, addressed on direct appeal. The first Rule 30 motion was, at best, duplicative of the prior suppression motion, and concerned an issue that, but for a rather substantial delay in production of the transcript, would by then have passed out of the jurisdiction of the trial court.

One of the principal objectives of the waiver provisions under Rule 30(c)(2) is to encourage defendants to bring their claims without undue delay. *See Commonwealth v. Pisa*, 397 Mass. 136, 142 (1986). By holding Santiago to have waived his ineffective assistance claim for failing to include it in his initial Rule 30 filing, however, the Appeals Court is penalizing Santiago not for being too late, but for being *too early*. Santiago's counsel at the time jumped the gun and filed a motion invoking Rule 30 to assert a claim that was headed for direct appeal anyway. The motion might have been redundant and without substance, but it was not dilatory. The motion consumed minimal judicial resources; the Commonwealth offered no opposition and the court would have needed all of ninety seconds to read the papers, note their facial inadequacy, and reach an appropriate disposition. If ever there was a case for granting discretionary relief from a technical waiver, this is it.

Santiago raised his ineffective assistance claim by a timely post-appeal motion because he wanted to exhaust it in state proceedings, thereby enabling him to include it in

26

a planned federal habeas action. He was obviously unaware of the possible preclusive effect of the pre-appeal motion. Should Santiago be saddled with a procedural default based on prior counsel's ill-considered filing of a redundant Rule 30 motion, thereby losing the benefit of the tolling that he was counting on to keep his federal habeas action within the one-year limitation period under 28 U.S.C. §2254, will serve only to punish Santiago for his conscientious effort to comply with the rules. Santiago's failure to raise in his post-appeal Rule 30 motion a claim that he received ineffective assistance of counsel in connection with the pre-appeal motion does not mitigate the manifest injustice of subverting the clear intent of the waiver rule in this manner.

## CONCLUSION

For the above reasons, the Petitioner, Peter Santiago, respectfully requests that this court grant his petition for writ of habeas corpus.

Peter Santiago,
Defendant-Appellant,

by his attorney,

Dated: 2/16/07

Donald K. Freyléue
BBO# 549822
Six Highland Avenue
Ipswich, MA 01938
(978) 356-4739

27

# **APPENDIX**

84114

FRANKLIN, SS.

**SUPERIOR COURT, CRIMINAL**

NO. 97 069

**COMMONWEALTH**

VS.    PETER . SANTIAGO JR.

| OFFENSE | PLACE | | COUNSEL FOR DEFENDANT |
|---|---|---|---|
| Trafficking Cocaine (over 200 grams) (94C/32E(b)(4)) | SUNDERLAND | Mary Lou Szulborski | F. Michael Joseph 2 Mattoon Street Springfield, MA (413)737-3549 |

**DOCKET ENTRIES**

| DATE | |
|---|---|
| 1997, Dec 12 | (1)Indictment returned. |
| 1998  Jan 07 | Defendant pleads Not Guilty. Bail set at $25,000 cash/surety. Drug rights given. |
| | (2)Notice of Appearance - Commonwealth - Mary Lou Szulborski, filed. (3)Notice |
| | of Appearance - Defendant - F. Michael Joseph filed. (4)Special Mittimus issued |
| | Attorney's PreTrial Conference set for 2/25/98 at 2 PM. |
| Feb 24 | (5)Notice of Motion filed. (6)Defendant's Motion to be furnished with Statements |
| | of Promises, Inducements or Rewards filed. (7)Defendant's Motion for Bill of |
| | Particulars filed. (8)Motion to Preserve Commonwealth's Notes filed. (9)Motion |
| | for Statements of Commonwealth's Witnesses filed. (10)Motion to Inspect Evidence |
| | filed. (11)Motion to Produce all Statements of the Defendant filed. (12)Motion |
| | regarding Trial Witnesses filed. (13)Information regarding Prior and Subsequent |
| | Bad Acts of Defendant filed. (14)Motion for Informant Information filed. |
| Mar 04 | (15)PreTrial Conference report filed. (16)Note filed. |
| 30 | (17)Notice of Motion filed. (18)Motion for Access to Criminal Records filed. |
| | (19)Defendant's Motion to be Furnished with Statements of Promises, Inducements or |
| | Rewards filed. (20)Motion of Defendant for Reports of the Probation Department |
| | filed. (21)Motion for Copies of Tests & Reports or Physical Evidence and Scientific |

A. 1

| DATE | DOCKET ENTRIES—CONTINUED |
|------|--------------------------|
| 1998 Mar 30 | Evidence filed. |
| Apr 17 | (22)Commonwealth's Compliance with Defendant's Request for Discovery filed. |
|        | (23)Commonwealth's List of Witnesses filed. |
| 22 | Motions #5-14 and #7-21 are Assented to, ALLOWED. Motion to Suppress to be filed by 5/14/98. 97-069 Trial in August. 97-070 Trial in June. Carhart, J |
| May 18 | (24)Defendant's Motion to Suppress Evidence filed. (25)Memorandum in Support of Defendant's Motion to Suppress Evidence filed. |
| Jun 15 | Motion to Suppress Hearing - Taken under Advisement. Sept 1998 Trial. |
|        | (26)Commonwealth's Memorandum of Law in Opposition to the Defendant's Motion to Suppress filed. (27)Commonwealth's Memorandum of Law in Opposition to the Defendant's Motion for Informant Information filed. Carhart, J. |
| Aug 24 | Motion #24 Denied Carhart, J. (parties notified) |
| Oct 06 | Trial began. Jurors impaneled and sworn in: R.Joly, foreperson, B.Sheffield, B.Bruce, K.Richardson, C.Krouse, S.Spencer, K.Kurtyka, R.Liebowitz, G.Stange, C.Dodge, S.Emond, B.Doyle, W.KEssler and S.Henry. (28)Commonwealth's Motion In Limine to Preclude testimony of Fanta Saradeth filed. (29)Request of Defendant Peter J Santiago Jr for Instructions to the jury filed. Carhart,J |
| 07 | Trial continues. (3)Jury returns Verdict of GUILTY. Defendant sentenced to not less than 15 years and not more than 15 years, 1 day MCI-Cedar Junction. Assessed $60 victim witness fee, all other fees waived. (31)Warrant issued and returned with service. Carhart, J. |
| 07 | (32)Appeal from Sentence to MCI-Cedar Junction filed. |
| 13 | Copy of Appeal to Appellate Court for review of Sentence, Indictment & docket entries mailed to Suffolk County Superior Court. (copies sent). |

A.2

02/11/03   15:25 FAX                                                      ☒004

FRANKLIN, SS.

**SUPERIOR COURT, CRIMINAL**

**COMMONWEALTH**          VS.     Peter Santiago Jr.

**NO.   97-069**
**page 2**

| OFFENSE | PLACE | | COUNSEL FOR DEFENDANT |
|---|---|---|---|
| Trafficking Cocaine (over 200 grams) (94C/32E(b)(4)) | Sunderland | Mary Lou Szulborski ADA | F. Michael Joseph, PC 2 Mattoon Street Springfield, MA 413-737-3549 Richard Howland 413-253-0869 |

| DATE | DOCKET ENTRIES |
|---|---|
| 1998 Oct 14 | (33)Motor Vehicle Abstract filed. |
| 22 | Received $60 check from MCI-Concord for Victim Witness fee. |
| Nov 02 | (34)Notice of Appeal filed.  (Justice notified) |
| 03 | (35)Order of Transcript entered, Carhart, J. |
| 1999 Jun 21 | Notice received of Petition of Appeal of Sentence withdrawn.  Appellate Div. |
| Jul 21 | (36)Notice of Appearance of Richard Howland for Defendant filed. |
| Sep 08 | (37)Motion Pursuant to Mass. R. Crim. Pro. Rule 30 filed. |
| Nov 02 | Motion #37 - DENIED.  Carhart, J. |
| 16 | (38)Motion to be Appointed as Counsel on Appeal & Motion for Payment of Trial Transcript Costs filed. |
| 2000 Jan 03 | Motion #38 - ALLOWED.  Carhart, J.  (39)Notice of Assignment of Counsel filed. |
| | "Notice of Assmeblyof record on Appeal sent to Clerk of Appeals Court together with two certified copies of the Indictment and Docket sheets, two copies of the transcript and a list of exhibits."  (parties notified) |
| 04 | (40)Notice of Assignment of Counsel filed - Donald Freyleue for Appeal. |
| 05 | Notice received of entry in Appeals Court. |

A.3

| DATE | DOCKET ENTRIES—CONTINUED |
|------|--------------------------|
| 2000 Jan 19 | (41)Notice of Appearance of Donald K. Frevleue for Defendant filed. |
| 2001 May 09 | ORDER: Judgments Affirmed. Appeals Court |
| Aug 09 | (42)Motion for Issuance of a Subpoena Duces Tecum for Production of Documents field. |
| Oct 02 | (43)Motion for Appointment of Counsel filed. (44)Marking Motion for a Hearing on Motion for Release from Unlawful Restraint filed. (45)Defendant's Motion for Release from Unlawful Restraint filed. (46)Defendant's Affidavit in Support of Motion for Release from Unlawful Restraint filed. (47)Defendant's Memorandum of Law in Support of His Motion for Release from Unlawful Restraint filed. |
| Dec 21 | (48)Commonwealth's Request for Additional Time to Respond filed. |
| 2002 Jan 09 | (49)Commonwealth's Response to Defendant's Motion for a New Trial filed. |
| 16 | Motion #45 DENIED Each of the issues raised by this motion could have been raised on the defendant's appeal from his convictions in this case. As to the motion for the identity of the informant, which the defendant alleges was allowed, it is clear that the motion WAS NOT allowed. In any event this issue was not a trial issue and even if the motion had been allowed, the failure to pursue this issue was not ineffective assistance of Counsel. Carhart, J.  1/17/02 copies mailed. |

A.4/a

EXHIBIT "B"     **COMMONWEALTH OF MASSACHUSETTS**

**FRANKLIN, ss.**                           **SUPERIOR COURT DEPT.**
                                            **CIVIL ACTION NO. 97-070**

|  |  |
|---|---|
| **COMMONWEALTH** | ) |
|  | ) |
| **vs.** | ) |
|  | ) |
| **PETER J. SANTIAGO, JR.** | ) |
|  | ) |

### MOTION FOR INFORMANT INFORMATION

The Defendant moves this Court to order the Commonwealth to provide him with the following information:

1.   The identity of the informant;

2.   The dates, times and places that the informant communicated with the police concerning defendant or drug sales at all places and times described in Commonwealth's Affidavit dated November 28, 1997, and the substance of each such communication;

3.   All promises, rewards, or inducements of any kind made to the informant;

4.   The date, time, and location of all controlled drug buys made by the informant at all places and times described in Commonwealth's Affidavit dated November 28, 1997, or from defendant, the type and quantity of drugs purchased and the amounts spent;

5.   The date, time, and location of all other drug buys made by the informant at all places and times described in Commonwealth's Affidavit dated November 28, 1997, or from defendant, the type and quantity of drugs purchased, and the amount spent.

As grounds for this Motion, the defendant states that his information is relevant and helpful to the defense, and is essential to a fair determination of this case

4/22/98
motion assented to.
_____  n Moore

A.4h

<u>Roviaro v. United States</u> 353 U.S. 53 (1957);  Mass.R.Crim.P. 14(a)(1)(c).

THE DEFENDANT
PETER J. SANTIAGO, JR.

by _____
F. Michael Joseph, Esquire
Two Mattoon Street
Springfield, MA 01105
(413) 737-3549
BBO# 254560

## CERTIFICATE OF SERVICE

I, F. Michael Joseph, Esquire, hereby certify that on February 20, 1998, I have made service of the foregoing Defendant's Motion, by delivering a copy postage prepaid to Mary Lou Szulborski, Assistant District Attorney, District Attorney's Office, 238 Main Street, Greenfield, Massachusetts 01301.

_____
F. Michael Joseph, Esquire

A.5

92

1    Peter J. Santiago, Jr.  And the rent was basically

2    coming in as follows.

3        Also, Your Honor, there was on the box that I

4    described with purple and green -- it was

5    addressed to a Johnny R. Sontiago, with an "O"

6    C-L-E-F-F-side with some spelling errors.  And

7    there was a birth certificate from the City of New

8    York that indicates that the defendant's full name

9    is Peter John Santiago. There's other evidence

10   too, but that's just a summary, Your Honor.

11       THE COURT:  Thank you.  Well, I've

12   considered the statements, plural, and I think

13   that under the test both in Judge Liacos Treatise

14   and the explanation of the exception of the

15   hearsay rule in Commonwealth vs. Drew, I balance

16   the idea that it's such a close issue that the

17   jury should make a decision as to credibility.

18   And I'm not to pass on credibility at this point.

19       I'm to apply the test, the three-part test.

20   The first part is the witness must be unavailable.

21   That's not an issue here, he's unavailable.  But

22   the second is the statement is so far from the

23   subject to the declarant to criminal liability

TOWER SQUARE
1500 Main St., Suite 1514
Springfield, MA 01115

PHILBIN & ASSOCIATES, INC.

(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588

Serving the legal community of Massachusetts for over fifty years

93

1       that a reasonable man in his position would not

2       have made the statement unless he believed it to

3       be true.  And third, the statement proffered to

4       exculpate the accused must be corroborated by

5       circumstances clearly indicating trustworthiness.

6           I do not find that either of those two

7       prerequisites to the admissibility of the

8       statement have been met.  I think that both of

9       them have not been met, and I so find.  I do not

10      find that the statement or the circumstances to

11      which Mr. Saradeth testified in any way subjected

12      the declarant to criminal liability, in as much

13      as it was made to his brother.  As the witness

14      testified, there was no contemplation that it

15      would be related to the authorities.

16          And finally, there's no corroboration except

17      for the second statement, which I don't find to be

18      a circumstance clearly indicating his

19      trustworthiness.  So that's my conclusion, and the

20      statement is excluded from this trial.

21          I'll note your objection, Mr. Joseph, to my

22      ruling to save your client's rights.  That's the

23      ruling in the case.

TOWER SQUARE
1500 Main St., Suite 1514
Springfield, MA 01115

**PHILBIN & ASSOCIATES, INC.**

(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588

Serving the legal community of Massachusetts for over fifty years

A.7

# SEARCH WARRANT

### G.L. c. 276, §§ 1-7

TRIAL COURT OF MASSACHUSETTS

_____ District _____ COURT DEPARTMENT

_____ Greenfield _____ DIVISION

SEARCH WARRANT DOCKET NUMBER

---

## TO THE SHERIFFS OF OUR SEVERAL COUNTIES OR THEIR DEPUTIES, ANY STATE POLICE OFFICER, OR ANY CONSTABLE OR POLICE OFFICER OF ANY CITY OR TOWN, WITHIN OUR COMMONWEALTH:

Proof by affidavit, which is hereby incorporated by reference, has been made this day and I find that there is **PROBABLE CAUSE** to believe that the property described below:

- [ ] has been stolen, embezzled, or obtained by false pretenses.
- [ ] is intended for use or has been used as the means of committing a crime.
- [ ] has been concealed to prevent a crime from being discovered.
- [x] is unlawfully possessed or concealed for an unlawful purpose.
- [x] is evidence of a crime or is evidence of criminal activity.
- [ ] other (specify) _____

**YOU ARE THEREFORE COMMANDED** within a reasonable time and in no event later than seven days from the issuance of this search warrant to search for the following property:

~~Cocaine, and (1) Utensiles such as pots, pans, filters, heat lamps or similar heat sources;~~

~~(2) Tools, instruments and paraphernalia such as knives, razors, mirrors, cutting agents such as lnositol, baking soda, etc. and scales; (3) Packaging materials such as plastic baggies or portions thereof, plesine bags or waxyn paper folds; (4) United States currency which is the proceeds from the illegal sale of cocaine, safes, bank accounts and records, safety deposit box keys, stocks, bonds or other securities; (5) Personal records and documents such as telephone bills, notations, etc.; (6) paperwork showing occupancy, custody and control of Apartment K8 Cliffside Apartments, or other place of residence of Peter J. SANTIAGO~~

[x] at:

Apartment K8 Cliffside Apartments. Cliffside Apartments is located on the northerly side of Rte 116 in the Town of Sunderland, MA. Upon entering the eastermost driveway off of Rte 116, a large three-story building on the westerly side of this driveway contains 48 individual apartments separated into four blocks beginning with "I" block closest to Rte 116, then "J", "K", and finally "L" block. Large letters for each block are above each main door. In "K" block, Apartment 8 is on the middle or second floor and has the number "8" on the door which is occupied by and/or in the possession of: ~~Peter J. SANTIAGO Jr.~~ *HAVING A DOG...* */26/95 As CONFIRMED BY CLIFFSIDE Apartments MANAGMENT(?)*

[x] on the person or in the possession of:

You [ ] are [x] are not  also authorized to conduct the search at any time during the night.

You [x] are [ ] are not  also authorized to enter the premises without announcement.

You [ ] are [x] are not  also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

**YOU ARE FURTHER COMMANDED** If you find such property or any part thereof, to bring it, and when appropriate, the persons in whose possession it is found before the _Greenfield_ ____ Division of the __ _District_ ____ Court Department.

| TE ISSUED 11-26-97 | SIGNATURE OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK x _Margaret E. Casmeri_ |
| --- | --- |
| IST OR ADMINISTRATIVE JUSTICE **ITNESS:** _HERBERT H. HODOS_ | PRINTED NAME OF JUSTICE, CLERK-MAGISTRATE OR ASSISTANT CLERK |

-1 (7/89)

A.8

# APPLICATION FOR SEARCH WARRANT
### G.L. c. 276, §§ 1-7

**TRIAL COURT OF MASSACHUSETTS**

NAME OF APPLICANT

John W. NEWTON

_____District_____ COURT DEPARTMENT

_____Greenfield_____ DIVISION

POSITION OF APPLICANT

Detective

SEARCH WARRANT DOCKET NUMBER

I, the undersigned **APPLICANT**, being duly sworn, depose and say that:

1. I have the following information based upon the attached affidavit(s), consisting of a total of __53__ pages, which is (are) incorporated herein by reference.

2. Based upon this information, there is **PROBABLE CAUSE** to believe that the property described below:

   ☐ has been stolen, embezzled, or obtained by false pretenses.
   ☐ is intended for use or has been used as the means of committing a crime.
   ☐ has been concealed to prevent a crime from being discovered.
   ☒ is unlawfully possessed or concealed for an unlawful purpose.
   ☒ is evidence of a crime or is evidence of criminal activity.
   ☐ other (specify) _____

3. I am seeking the issuance of a warrant to search for the following property (describe the property to be searched for as particularly as possible):

   Cocaine, and (1) Utensiles such as pots, pans, filters, heat lamps or similar heat sources;

   (2) Tools, instruments and paraphernalia such as knives, razors, mirrors, cutting agents such as Inostitol, baking soda, etc. and scales; (3) Packaging materials such as plastic baggies or portions thereof, glasine bags or waxy paper folds; (4) United States currency which is the proceeds from the illegal sale of cocaine, safes, bank accounts and records, safety deposit box keys, stocks, bonds or other securities; (5) Personal records and documents such as telephone bills, notations, etc.; (6) paperwork showing occupancy, custody and control of Apartment K8 Cliffside Apartments, or other place of residence of Peter J. SANTIAGO

4. Based upon this information, there is also probable cause to believe that the property may be found (check as many as apply):
   ☒ at (identify the exact location or description of the place(s) to be searched):
   Apartment K8 Cliffside Apartments. Cliffside Apartments is located on the northerly side of Rte 116 in the Town of Sunderland, MA. Upon entering the easternmost driveway off of Rte 116, a large three-story building on the westerly side of this driveway contains 48 individual apartments separated into four blocks beginning with "I" block closest to Rte 116, then "J", "K", and finally "L" block. Large letters for each block are above each main door. In "K" block, Apartment 8 is on the middle or second floor and has the number "8" on the door.
   which is occupied by and/or in the possession of: Peter J. SANTIAGO Jr. HAVING A DOB OF 11/05/76 AS CONFIRMED BY CLIFFSIDE Apartments MANAgemen~

   ☒ on the person or in the possession of (identify any specific person(s) to be searched):

   Peter J. SANTIAGO Jr.

   ☐ on any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered.

**THEREFORE**, I respectfully request that the court issue a Warrant and order of seizure, authorizing the search of the above described place(s) and person(s), if any, to be searched, and directing that such property or evidence or any part thereof, if found, be seized and brought before the court, together with such other and further relief that the court may deem proper.
   I ☐ have previously submitted the same application.
   I ☒ have not previously submitted the same application.

PRINTED NAME OF APPLICANT

John W. NEWTON

SIGNED UNDER THE PENALTIES OF PERJURY

X _____
Signature of Applicant

SWORN AND SUBSCRIBED TO BEFORE

X _____
Signature of Justice, Clerk-Magistrate or Assistant Clerk

11/26/97
DATE

A.9

# THE COMMONWEALTH OF MASSACHUSETTS



**FRANKLIN, SS.**                                                    **DISTRICT COURT**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

**Your affiant is John W. NEWTON, being duly sworn I hereby depose and state:**

1.  Your affiant is a police officer for the Town of Greenfield, MA., so employed for approximately
    eight years. For approximately seven years prior to that time I was a police officer for the Town of
    Deerfield, MA. My current assignment is to the Narcotics Division of the Greenfield Police
    Department's Detective Bureau, having been so assigned for seven years.

2.  Based on this affiant's training and field experience I am familiar with the appearance and
    characteristics of various controlled substances including marijuana, hashish, cocaine, heroin,
    psilocybin mushrooms, lysergic acid diethylamide (LSD) and methamphetamine. I am also familiar
    with the varied forms in which said controlled substances are maintained, used, manufactured,
    cultivated, harvested, or otherwise produced, packaged, and distributed. I am additionally familiar
    with the implements and related paraphernalia used for the ingestion, cultivation, harvesting,
    packaging, and/or distribution of said controlled substances. I have acted in an undercover capacity,
    and have made numerous street level purchases of narcotics. I have conducted numerous
    investigations of violations of law, many of which have pertained to violations of narcotics laws
    resulting in the issuance of more than 55 search warrants and numerous arrests and convictions for
    related violations of law. Said Controlled Substance Act violations have included simple possession
    of narcotics to manufacturing, dispensing, and trafficking in controlled substances. I have presented
    controlled substance cases in both State courts as well as Federal District Court levels. I have been
    allowed to testify to and give my opinion in those courts as to the manner and means by which
    various narcotics are commonly prepared, packaged and distributed. I am involved in narcotics
    related investigations in both Franklin and Hampshire counties.

A.10

3.  Your affiant has attended the Massachusetts Criminal Justice Training Academy for police officers receiving training pertaining to controlled substance identification and investigation. I have attended a 40 hour Drug Enforcement Training program presented by the Mass. Criminal Justice Training Council which pertained to controlled substance identification, understanding the means used to grow, harvest, manufacture, or otherwise prepare controlled substances for use or distribution as well as investigative techniques pertaining to Controlled Substance Act violations. I have also attended numerous seminars and conferences presented by the Narcotic Enforcement Officers Association, the Massachusetts Committee on Criminal Justice, the Commonwealth Police Service, as well as the Massachusetts State Police addressing such topics as raid operations, search warrant preparation, updates of court decisions, search and seizure, search operations, use of informants, case initiation, asset forfeiture, surveillance techniques, and undercover operations.

4.  On **03 August 1994** this affiant supervised a controlled purchase conducted in the parking lot of **Bayberry Court** in the **Leyden Woods** development. Conducting the controlled purchase was a confidential and reliable informant whose identity is known to me who at that time stated that it had worked for the Springfield, MA. Police Department narcotic unit in the past, and specifically then Detective John **DELANEY**. I had contacted **DELANEY** to verify that this individual had in fact provided information and assistance to that agency. I was advised that it had in fact provided information and assistance to that agency which had directly led to the issuance of not less than **four (4)** search warrants resulting in not less than **seven (7)** arrests and subsequent convictions for violations of the Controlled Substances Act, as well as the seizure of controlled substances on each occasion. Said convictions were in the District Court in Springfield, MA. This individual also admitted that it was a user of crack cocaine, heroin, and marijuana. Based on these facts this individual may be considered a confidential and reliable informant. I will hereafter refer to this individual as **CRI 94-0105**. As previously mentioned, on **03 August 1994 CRI 94-0105** was met by this affiant and its person searched to ensure that it had no monies or controlled substances. At this time I provided **CRI 94-0105** with an amount of United States currency in sufficient amount to purchase a specific amount of crack cocaine at which time it placed the currency into its right shirt pocket. After leaving my presence, **CRI 94-0105** was observed to go into the eastern parking lot area of **Bayberry Court** near a dumpster outside of the area of number **2 Bayberry Court.** Standing near an older model yellowish **Toyota sedan** was an individual known to **CRI 94-0105**

A. 11

to be Peter **SANTIAGO**, as I was later told. **CRI 94-0105** was observed to approach **SANTIAGO** and engage in conversation with him briefly. After a short conversation, **CRI 94-0105** was observed to remove something from its right shirt pocket and hand it to **SANTIAGO**. I was later told by **CRI 94-0105** that the item was in fact the currency which I had provided it with shortly prior. After accepting the item from **CRI 94-0105 SANTIAGO** was observed to briefly go into his vehicle through the driver's side door, then exit the vehicle and hand **CRI 94-0105** something which **CRI 94-0105** then placed into its right shirt pocket. After a brief conversation **CRI 94-0105** was observed to leave **SANTIAGO's** presence and then walk directly back to a pre-arranged location where I met with it. I was then handed a knotted plastic baggie corner which contained an amount of crumbled tan chunky material whose appearance and characteristics were consistent with those of crack cocaine based on this affiant's training and field experience. I later subjected a small sample of this material into a standard NIK-brand field test kit designed to presumptively identify for the presence of cocaine. The result was a **positive** indication for the presence of cocaine. The material was subsequently tested by the University of Massachusetts (Amherst) Food and Drug Laboratory and found to weigh **0.20 grams** and contain **cocaine, a class B controlled substance** as defined under **Massachusetts General Laws Chapter 94C § Section 31**. A copy of the laboratory analyses is attached hereto and incorporated herein by reference marked as *ATTACHMENT 1.*

5.    During the first week of **October 1995** this affiant was advised by a confidential and reliable informant whose identity is known to me, who I will hereafter refer to as **CRI 94-0103** that a young Hispanic male known to it only as **"Peter"** was distributing crack cocaine in allegedly large quantities in the Town of Greenfield. **CRI 94-0103** may be considered a confidential and reliable informant based on the facts that it had provided a large amount of information in the past concerning Controlled Substance Act violations which had been corroborated by either unrelated confidential and reliable informants or through observations of your affiant. **CRI 94-0103** had also provided information and assistance which directly led to the issuance of **two (2)** search warrants seeking controlled substances. The result of each search warrant was the seizure of controlled substances and the arrest of **one (1)** individual on each occasion. Said individuals have since defaulted on their respective court appearances and the cases remain open. **CRI 94-0103** was also responsible for providing information and assistance which led to the arrest of one individual on an active arrest warrant as well as street arrests based on probable cause of two individuals, a Weldon

A. 12

YARBOROUGH, and a Christian BOWENS (also known as Chris BROWN) who were charged with **Possession with Intent to Distribute Class B Cocaine.** This incident also yielded the seizure of an amount of suspected crack cocaine which was individually packaged into **thirteen (13)** knotted plastic wraps. **CRI 94-0103** advised me that it believed that **Peter** was staying in the Harco Rooms apartments on Main Street in Greenfield. This affiant knew that this building was numbered **132 Main Street. CRI 94-0103** stated that it could make a controlled purchase of crack cocaine from this individual. This affiant was further advised by **CRI 94-0103** that it knew that **Peter** was then driving an older model yellowish Toyota which was often parked in front of the Harco Room/132 Main Street area. This affiant had observed this vehicle on numerous occasions in the recent past and had further observed it to be frequently driven by a young Hispanic male. This vehicle was registered to a Rose **SANTIAGO** of **85 Northwood Apartments** in Sunderland, MA. This male was frequently observed by this affiant to be standing in front of the entry door to 132 Main Street, the Harco Rooms.

6.  On **25 October 1995** this affiant met with **CRI 94-0103. CRI 94-0103** advised this affiant that "Peter" had a nice new car, a white Ford Probe and that it was usually parked where the yellowish Toyota had been on Main Street. I had noticed this vehicle during the second week of **October 1995** and further noted it to bear Massachusetts registration **219 WXP.** This registration plate was listed to Rose **SANTIAGO** having an address of **85 Northwood Apartments** in **Sunderland, MA.** The vehicle was listed as a **1994 Ford Probe** color white with the effective date of the registration being **10 October 1995. CRI 94-0103** went on to tell this affiant that it had spoken with the young male known to it as **Peter** on Main Street who had allegedly told it that he could **"hook it up"** but that he would not do it on the street. **CRI 94-0103** stated that **Peter** told it that he would meet it on School Street, and that it's friend knew where. At that time **fifty dollars** in United States currency was given by this affiant to **CRI 94-0103.** It was then observed by this affiant and Det. DT **BLAKE** to meet with a female, whose identity is known to me to be Susan **PALMER.** Both **CRI 94-0103** and **PALMER** then walked from Main Street to **81 School Street** where both entered into the building through the front door. Several minutes later **PALMER** was observed to leave the building and **CRI 94-0103** remained inside for approximately another 15 to 20 minutes. After this time **CRI 94-0103** was observed to leave the building and walk directly to a pre-arranged meeting spot where I met with it and it turned over a knotted plastic wrap containing an amount of chunky tan substance which had the appearance and characteristics of crack cocaine based on my training and field

A.13

experience. **CRI 94-0103** stated that it had met with the Hispanic male known to it as **Peter** inside of **81 School Street**. It went on to state that it observed him to be "breaking up" a larger quantity of what it knew to be crack cocaine into smaller chunks and packaging them in the plastic wraps preparing them for sale. This affiant subsequently introduced a small sample of the chunky material sold to **CRI 94-0103** by **Peter** into an **NIK-brand** field test kit designed to presumptively identify for the presence of cocaine. The result was a **positive** indication for the presence of cocaine. The material in the previously described plastic wrap was subsequently tested by the University of Massachusetts (Amherst) Food and Drug Laboratory and found to weigh **0.22 grams** and contain **cocaine, a class B controlled substance** as defined under **Massachusetts General Laws Chapter 94C § Section 31**. A copy of the laboratory analyses is attached hereto and incorporated herein by reference marked as ***ATTACHMENT 2***.

7.  In the following month (**November 1995**), two confidential and reliable informants whose identities are known to this affiant told me on several occasions that a Peter **SANTIAGO** was selling large amounts of crack cocaine and that he was living in the Harco Rooms on Main Street (in Greenfield, MA.)

8.  In the following months, I noted that the young male who had become known to me to be Peter **SANTIAGO** seemed to me to drive this **1994 white Ford Probe** exclusively. During the evenings in the winter months when the Town parking ban was in effect, this white **Ford Probe** was commonly found parked in a public parking lot behind the then Rite-Aid Pharmacy, which is adjacent to **136 Main Street** where **SANTIAGO** appeared to be living. This vehicle was frequently observed in the Greenfield area parked either in front of the area of **132/136 Main Street,** in the aforementioned parking lot located to the rear of the Rite-Aid Pharmacy, or being operated around Greenfield by the male known to me to be Peter **SANTIAGO**.

9.  On **11 January 1996** Off. V. **BOBE** and Sgt. DF **GUILBAULT** of the Greenfield Police Department had occasion to interview Kevin Richard **KING** who has a date of birth of **09 October 1959**. At this time **KING** gave a detailed three page signed statement, against his penal interest, in which he detailed in pertinent part what he purported to be his personal knowledge pertaining to a Hispanic male known to him as **Peter** who drove a 1994/1995 white Ford Probe and who lived next

*Page 5 of 32 of this Affidavit*

A.14

to the Harco Rooms on Main Street in Greenfield. This **Peter** was known to me to be one and the same Peter **SANTIAGO**. **KING's** statement also included information relative to an Afro-American male known to him as **"Flip"** who lived on Conway Street in Greenfield across from Calls Corner. This affiant knew that the male known to **KING** as **"Flip"** was one Tarrod **DOBBINS** of **123 Conway Street**. **DOBBINS** resided at this location with his parents. **KING** described carrying **"bricks"** (or **one-quarter pounds/4 ounces**) of powder cocaine from **Peter's** apartment to **Flip's** (**DOBBINS'**) where **KING** states that he knows the powder cocaine was "cooked" (transformed into crack cocaine) on a hot plate on the second floor or third floor attic space. **KING** describes the involvement of a second floor apartment at **10 Devens Street**, specifically David **PREST** and Charles **JOHNSON** with **Peter**, as well as other pertinent information. A copy of this statement is attached hereto and incorporated herein by reference marked as *ATTACHMENT 3*.

10.    On **23 January 1996** a confidential and reliable informant whose identity is known to me conducted a controlled purchase of crack cocaine inside of David **PREST's** apartment at **10 Devens Street, second floor-rear**. This individual is an admitted past user of crack cocaine and is currently an occasional user of marijuana. This individual may be considered a confidential and reliable informant based on the fact that it has provided information and assistance to narcotics unit detectives at the **Pittsfield Police Department**, particularly Detective **McGUIRE**, in the past which has led to the issuance of not less than **four (4)** search warrants seeking controlled substances, the seizure of controlled substances on each occasion, and the arrest and conviction of not less than **six (6)** individuals on charges pertaining to **violations** of the **Controlled Substances Act**. This individual will hereafter be referred to as **CRI 95-0108**. **CRI 95-0108** had told me some time prior that it knew David **PREST** and had been told in conversation with **PREST** in the recent past that he (**PREST**) got his crack cocaine supply from **Peter** who drives a white **Probe**. **CRI 95-0108** had met **Peter** on one occasion while at **PREST's** apartment and had been told by **PREST** that **"that's my man"** referring to Peter **SANTIAGO** and meaning that he (**PREST**) obtained his crack cocaine from him (**SANTIAGO**). On this previously noted date **CRI 95-0108** was checked to ensure that it had no monies or controlled substances on its person. I then provided **CRI 95-0108** with **fifty ($50.00) dollars** in United States currency which was to purchase a "rock" of crack cocaine. **CRI 95-0108** was then observed by this affiant to go directly to the apartment door of **10 Devens Street, second floor-rear**. **CRI 95-0108** was observed to knock on this door and then be allowed access to said apartment. A short time later **CRI 95-0108** was observed to exit said apartment and return

A-15

directly to a previously arranged location where I met with it and was given a knotted plastic wrap which was subsequently weighed at approximately **0.6 grams** of chunky tan material whose appearance and characteristics were consistent with those of crack cocaine based on my training and field experience. The material was subsequently tested by the University of Massachusetts (Amherst) Food and Drug Laboratory and found to weigh **0.33 grams** and contain **cocaine, a class B controlled substance** as defined under **Massachusetts General Laws Chapter 94C § Section 31**. **CRI 95-0108** stated that it had been sold the previously described material by David **PREST**. A copy of the laboratory analyses is attached hereto and incorporated herein by reference marked as *ATTACHMENT 4*.

11.     On **14 February 1996, CRI 95-0108** again met with this affiant to later attempt to conduct a controlled purchase of crack cocaine from the **10 Devens Street, second floor-rear** apartment. On this date **CRI 95-0108** was again checked to ensure that it had no monies or controlled substances on its person. I then provided **CRI 95-0108** with another **fifty ($50.00) dollars** in United States currency which was to purchase a "rock" of crack cocaine. **CRI 95-0108** was then observed by this affiant to go directly to the same apartment door of **10 Devens Street, second floor-rear**. **CRI 95-0108** was observed to knock on this door and again be allowed access to said apartment. A short time later **CRI 95-0108** was observed to exit said apartment and return directly to a previously arranged location where I met with it and was given a knotted plastic wrap containing approximately **0.5 grams** of chunky tan material whose appearance and characteristics were consistent with those of crack cocaine based on my training and field experience. This material was subsequently sent to the Massachusetts Food and Drug laboratory at Amherst for testing and it was determined that the material weighed **0.36 grams** and was in fact **cocaine, a Class B** controlled substance as defined under **Massachusetts General Laws Chapter 94C § 31**. **CRI 95-0108** stated that it had been sold this previously described material again by David **PREST** however Peter **SANTIAGO** was in fact observed to be present in the apartment per **CRI 95-0108**. A copy of the laboratory analyses is attached hereto and incorporated herein by reference marked as *ATTACHMENT 5*.

12.     On **17 February 1996** Michael V. **DONAIS** provided a voluntary statement against his penal interest in regards to an incident in which he had been part earlier that date. In pertinent part **DONAIS** admitted to having gone to David **PREST's** residence at **10 Devens Street** on two (2)

A.16

occasions on the evening of **17 February 1996** with another male known to him as Ian **BARRAN** for the purpose of purchasing crack cocaine. **DONAIS** admits that crack cocaine was in fact purchased on both occasions by Ian **BARRAN** from within this apartment, the second time **DONAIS** knew that a male about 5'5" in height, 120 pounds, light complected with dark hair who drives a white **Probe** sold the crack cocaine to **BARRAN** in the apartment's bedroom. This description is consistent with that of Peter **SANTIAGO**. A copy of this statement is attached hereto and incorporated herein by reference marked as *ATTACHMENT 6.*

13.    On **07 March 1996** this affiant called the Customer Service Department of **General Motors Acceptance Corporation** who was the lien holder on the **1994 Ford Probe** registered to Rose **SANTIAGO.** I was advised that their records indicated that Peter **SANTIAGO** Jr. was the **primary borrower** and Rose **SANTIAGO** was the co-signer. I was further advised that the original amount borrowed on this vehicle was **$18,816,30** with monthly payments of **$348.55**. At that time **four (4)** payments had been made on the loan leaving a current balance of **$17,422.10**.

14.    On **03 Apr 1996 CRI 95-0108** met with this affiant and advised me that it had a beeper number for Peter **SANTIAGO. CRI 95-0108** was then instructed to call this beeper number and attempt to arrange for Mr. **SANTIAGO** to sell it a **$50.00** "rock" of crack cocaine. After calling the beeper number, several minutes passed by after which time **CRI 95-0108** received a return phone call. The individual on the phone was heard by this affiant to ask **CRI 95-0108** how it got the beeper number and who it was. **CRI 95-0108** responded and was then told by the individual that he had **Peter's** beeper because he was out of town and that he would take care of **CRI 95-0108. CRI 95-0108** was then asked by the individual how much it wanted, to which **CRI 95-0108** responded **"a fifty dollar rock",** and was then told by the individual to meet him across from Calls Corner on **Conway Street** in five minutes. I then checked to ensure that **CRI 95-0108** had no monies or controlled substances on its person. I then provided **CRI 95-0108** with **fifty ($50.00) dollars** in United States currency which was to purchase a "rock" of crack cocaine. **CRI 95-0108** was then observed by this affiant to go directly to the **West Street** side of **Call's Corner.** After several minutes I observed an Afro-American male known to me to be Tarrod **DOBBINS** exit the front left side door of **123 Conway Street** where I knew Tarrod **DOBBINS** to reside. **DOBBINS** ran directly across the street and met with **CRI 95-0108** and after a short conversation I observed **CRI 95-0108** hand **DOBBINS** an item

A.17

and in return **DOBBINS** looked at the item and then handed **CRI 95-0108** another item. I then observed **DOBBINS** to run back across **Conway Street** and into the left side door to **123 Conway Street** again. I then observed **CRI 95-0108** return directly to me at which time it handed me a knotted plastic wrap containing approximately **0.6 grams** of tan chunky material whose appearance and characteristics were consistent with those of crack cocaine based on my training and field experience. A small sample of this material was subsequently introduced into a standard **NIK**-brand field test kit designed to presumptively identify for the presence of cocaine. The result was a **positive** indication for the presence of cocaine. The material was subsequently tested by the University of Massachusetts (Amherst) Food and Drug Laboratory and found to weigh **0.45 grams** and contain **cocaine, a class B** controlled substance as defined under **Massachusetts General Laws Chapter 94C § Section 31**. A copy of the laboratory analyses is attached hereto and incorporated herein by reference marked as *ATTACHMENT 7*.

15. On **12 April 1996** an incident took place on **Main Street** in Greenfield involving Peter J. **SANTIAGO** Jr. This incident involved an allegation by a citizen that after a verbal incident escalated between himself and Mr. **SANTIAGO**, that **SANTIAGO** allegedly then produced a small semi-automatic handgun from his waistband area and threatened the individual with it. During the course of the investigation Lt. Roy **VAUGHN** of the Greenfield Police Department spoke with Mr. **SANTIAGO**. As a result, a Colt .380 caliber semi-automatic handgun was seized from Mr. **SANTIAGO's** person then kept in a holster inside of his waistband. Additionally, a number of firearms were secured from inside of Mr. **SANTIAGO's** apartment located in **136 Main Street** as well as Mr. **SANTIAGO's** license to carry firearms. All of these items were subsequently ordered returned by the court. Lt. **VAUGHN** during the ensuing conversation inquired of Mr. **SANTIAGO** what his address was, to which Mr. **SANTIAGO** stated that he resided at **85 Sugarloaf Estates** in **Sunderland, MA.** (formerly **Northwood Apartments**) but that he was in Greenfield frequently because he was a student at **Greenfield Community College**. Det. DT **BLAKE** subsequently made a written inquiry to the Registrar's office at the **Greenfield Community College** and was subsequently advised in writing in a letter dated **18 April 1996** that Peter J. **SANTIAGO** having a Social Security Number of **071589592** and a Date of Birth of **11/1/75** had **not** been enrolled at that facility since the **1993 Spring Semester (01-28-93 - 05-21-93)**. The letter was signed Lawrence A. **DEAN**, Registrar.

*Page 9 of 32 of this Affidavit*                    A.18

16. On **two (2)** occasions between the second week of **July 1996** and the second week of **August 1996** one Richard Anthony **SCIALDONE** was arrested for Controlled Substance Act violations in the Town of Montague, MA. by officers of the Montague Police Department and troopers assigned to the Massachusetts State Police Narcotics Unit. According to Sgt. JE **CONLEY** and then-Trooper Micahel **HABEL** of the State Police Narcotics Unit, **SCIALDONE** made statements on both occasions against his penal interest admitting that Peter **SANTIAGO**, residing in Monatgue, MA. at that time was his supplier of cocaine. Trooper **HABEL** further states that at his trial in the Greenfield Superior Court **SCIALDONE** admitted under oath on the stand that he had purchased cocaine from Peter **SANTIAGO**.

17. During the months of **February** through **August 1996** an individual whose identity is known to your affiant provided me with continuous and on-going information relative to individuals known to it as distributors of controlled substances in the Town of Greenfield. This individual is an admitted user and occasional distributor of both marijuana and crack cocaine. This individual has provided a substantial amount of information pertaining to persons known to be involved in the illegal sales of controlled substances. The vast majority of this information has been corroborated via other confidential and reliable informants or through the observations of myself, Det. DT **BLAKE** or Sgt. DF **GUILBAULT** of the Greenfield Police Department. This individual has made statements against its penal interest on two occasions relative to others that it was involved in the distribution of controlled substances to include crack cocaine. This individual has conducted not less than **fourteen (14)** controlled purchases of either crack cocaine or marijuana for this affiant during this previously detailed time frame. This individual has provided information and assistance to this affiant which has directly led to the issuance of a search warrant within the past three months resulting in the arrest and subsequent indictment of one individual on charges of **Possession of Cl. B and Cl. D Controlled Substances with Intent to Distribute within 1000' of a School property**, in the Franklin Superior Court as well as the indictment of a second individual in the Franklin Superior Court for identical charges, further resulting in the seizure of a substantial quantity of both marijuana and crack cocaine as well as an amount of United States currency on which forfeiture proceedings have been initiated. Based on these facts this individual may be considered a confidential and reliable informant and I will hereafter refer to it as **CRI 96-0102**. **CRI 96-0102** has told me on numerous occasions during the previously detailed months that it knows from direct

*Page 10 of 32 of this Affidavit*

A. 19

observation and personal involvement that a number of persons are involved together at varying levels as distributors of crack cocaine. Some of these individuals are:

a.   Peter **SANTIAGO** a Hispanic male whom **CRI 96-0102** knew to reside in an apartment building next to the **Harco Rooms** on Main Street in Greenfield and drives a white Ford **Probe** whom **CRI 96-0102** states is a **"really big"** dealer of crack and powder cocaine with sources in Springfield and New York City;

b.   Tarrod **DOBBINS** an Afro-American male whom **CRI 96-0102** knew to reside at his fathers residence across from **Call's Corner** on Conway Street in Greenfield who **CRI 96-0102** knows to be partners with Peter **SANTIAGO**;

c.   Nigel **DOBBINS** an Afro-American male who **CRI 96-0102** knows to be the brother of Tarrod **DOBBINS**;

d.   David **PREST** a white male residing at **10 Devens Street second floor-rear** apartment who **CRI 96-0102** knows to be a frequent purchaser of crack cocaine from Peter **SANTIAGO**;

e.   Charles **JOHNSON**, an Afro-American male whom **CRI 96-0102** knew to reside commonly at **10 Devens Street second floor-rear,** then later at an address on School Street in Greenfield, then after that frequently at **10 Devens Street second floor-front** who **CRI 96-0102** knows to be a frequent purchaser of crack cocaine from Peter **SANTIAGO**;

f.   Jason **BYRD**, a young Afro-American male whom **CRI 96-0102** knew to be related to the **DOBBINS** family and to use in recent weeks **10 Devens Street second floor-front** to sell crack cocaine out of.

g.   Todd **STREETER** a white male who had rented and moved into **10 Devens Street second floor-front** who **CRI 96-0102** knows to be a frequent purchaser of crack cocaine from Peter **SANTIAGO.**

**CRI 96-0102** throughout this time made continued and on-going admissions that:

A. 20

a.   ·   it was involved in the distribution of crack cocaine with Charles **JOHNSON**;

b.   it and Charles **JOHNSON** both frequently purchased crack cocaine for re-sale, and typically from Peter **SANTIAGO** but occasionally from Tarrod **DOBBINS** whom **CRI 96-0102** knew to be partners with **SANTIAGO**;

c.   it knew from personal involvement with David **PREST** that he was a frequent crack cocaine customer of Peter **SANTIAGO** and Tarrod **DOBBINS**, and would re-sell the crack cocaine purchased from these individuals as well as allow both Peter **SANTIAGO** and Tarrod **DOBBINS** to use his apartment at **10 Devens Street second floor-rear** to sell crack cocaine. **CRI 96-0102** admitted to having purchased crack cocaine from **PREST** on numerous occasions. This information was initially provided to this affiant on **02-17-96** when **CRI 96-0102** made an admission against its penal interest that it had purchased **two (2) $50.00 rocks** of crack cocaine from Peter **SANTIAGO** while inside of David **PREST's** apartment at **10 Devens Street second floor-rear** which it subsequently was apprehended with by Off. SD **McCARTHY** of this department;

d.   it knew that in recent weeks that Todd **STREETER** was also a frequent crack cocaine customer of Peter **SANTIAGO** and Tarrod **DOBBINS**, and would re-sell the crack cocaine purchased from these individuals as well as allow Charles **JOHNSON** and Jason **BYRD** (also known as "**Jay-Bird**") to sell crack cocaine from this apartment at **10 Devens Street second floor-front**.

**CRI 96-0102** admitted to frequently purchasing crack cocaine from Peter **SANTIAGO**. **CRI 96-0102** states that **SANTIAGO** was more comfortable with selling to Charles **JOHNSON** than to it, however when **SANTIAGO** would sell to it he (**SANTIAGO**) would meet it at various places in Greenfield. The more common spots for such meets were either the car wash located on **Silver Street** near the **Wells Street** intersection or in the parking lot of the building located at **107 Conway Street**. **CRI 96-0102** stated that as of about the latter part of **May 1996** Peter **SANTIAGO** has been driving a newer nice red Honda, rather than the white Ford Probe that he had been driving to that point. This was substantiated by this affiant as well as several other Greenfield Police officers who had noticed Mr. **SANTIAGO** was driving such a vehicle bearing Massachusetts registration 904

A.21

WEE. In checking this registration plate through the Massachusetts registry of Motor Vehicles records it was determined that the vehicle was a **1990 Honda Accord** sedan color red, to bear Massachusetts plate **904 WEE** registered on **24 May 1996** and was registered to Peter **SANTIAGO** having a date of birth of **01 November 1975**, listing an address of **85 Sugarloaf Estates** in **Sunderland, MA.** And appeared to have no liens on it indicating that the vehicle was most probably owned outright.

18. On **03 May 1996** Det. DT **BLAKE** of the Greenfield Police Department contacted the Greenfield Post Office in regards to the person(s) currently and routinely receiving mail at **136 Main Street, Apartment 2 (third floor).** This is the address where myself, Det. **BLAKE**, and Sgt. **GUILBAULT** strongly believed Peter J. **SANTIAGO** Jr. was residing and not the **85 Sugarloaf Estates, Sunderland** address as he had purported and to which his vehicle was registered. Det. **BLAKE** was advised that Peter J. **SANTIAGO** and Delilah C. **MARTINEZ** were both in fact commonly receiving mail at this address.

19. On **16 May 1996** this affiant supervised a controlled purchase made by **CRI 96-0102** at **10 Devens Street, second floor-front** apartment. On this date I met with **CRI 96-0102** and checked its person to ensure that **CRI 96-0102** had no monies or controlled substances on its person. I then provided **CRI 96-0102** with **fifty ($50.00) dollars** in United States currency which was to purchase a "rock" of crack cocaine. **CRI 96-0102** was then observed by this affiant to go directly to the **10 Devens Street, second floor-front** apartment and knock on the door. **CRI 96-0102** was allowed access to said apartment, where it remained inside for approximately **5 minutes.** Upon exiting said apartment this affiant observed **CRI 96-0102** to walk directly to a pre-arranged location where I met with it and was given a knotted plastic wrap with whitish/tan material inside of it whose appearance and characteristics were consistent with that of powder cocaine. **CRI 96-0102** stated that a heavy set black male known to it as Nigel **DOBBINS** made the sale of cocaine to it, and had stated that **"Peter was out of rock right now".** I later introduced a small sample of this material into a standard NIK-brand field test kit designed to presumptively identify for the presence of cocaine. The result was a **positive** indication for the presence of cocaine. This sale of cocaine made by Nigel **DOBBINS** to **CRI 96-0102** serves to corroborate the statement in paragraph 17, sub-paragraph **c** of this affidavit that **CRI 96-0102** knew that Nigel **DOBBINS** is a distributor of controlled substances.

*Page 13 of 32 of this Affidavit*

A.22

20.  On **10 July 1996** this affiant met with **CRI 96-0102** who advised that it knew that **SANTIAGO** was currently residing in Turners Falls, outside of town. This was corroborated by this affiant and other officers of the Greenfield Police Department who had become aware through occasional surveillance of **SANTIAGO's** activities that he had in fact moved to a house on Millers Falls Road in Turners falls, located on its north side and being approximately the fifth house down Millers Falls Road, a blue residence with a detached garage. This affiant as well as Det. DT **BLAKE** and then-Sgt. DF **GUILBAULT** had followed Mr. **SANTIAGO** to this address on numerous occasions, had seen his red Honda Accord sedan bearing Massachusetts registration **904 WEE** parked there on numerous occasions as well as a red Yamaha Razz motor scooter, and had also observed a teal colored vehicle known to be owned by Tarrod **DOBBINS** frequent this address on several occasions. **CRI 96-0102** had spoken with Peter **SANTIAGO** some time prior at which time **SANTIAGO** had asked it when it wanted to "**get something**" (which **CRI 96-0102** knew referred to crack cocaine). **CRI 96-0102** had told **SANTIAGO** that possibly later in the morning if it could come up with some money. **CRI 96-0102** wanted to know if I wanted it to conduct a controlled purchase of crack cocaine from **SANTIAGO.** I advised that I did and told **CRI 96-0102** to call **SANTIAGO** back and determine what time and where he wanted to meet with **CRI 96-0102. CRI 96-0102** subsequently advised me of the time and place that **SANTIAGO** had told it he would be at. I then met with **CRI 96-0102** and checked its person to ensure that **CRI 96-0102** had no monies or controlled substances on its person. I then provided **CRI 96-0102** with **fifty ($50.00) dollars** in United States currency which was to purchase a "rock" of crack cocaine. **CRI 96-0102** was then observed by this affiant to go directly to the parking lot adjacent to **107 Conway Street** where **SANTIAGO** had told **CRI 96-0102** he would meet it at and sit on the steps to this building facing the parking lot. Approximately **10 minutes** after **CRI 96-0102** arrived this affiant observed the red **Honda Accord** sedan bearing Massachusetts registration **904 WEE**, driven by the male known to me to be Peter **SANTIAGO** travel slowly southward past this location on **Conway Street. SANTIAGO** continued southerly on **Conway Street** to just past the **Devens Street** intersection in a maneuver consistent with checking to see if anyone or anything out of the ordinary was in the area. At this time **SANTIAGO** turned his vehicle around in the roadway and drove northerly back to the area where **CRI 96-0102** was waiting. At this time **SANTIAGO** pulled into the parking lot located on the south side of this building which loops around the rear of said building and exits again onto **Conway Street. SANTIAGO** stopped his vehicle along the south side of the aforementioned building and stopped.

A. 23

CRI 96-0102 was observed to then stand up, look around and walk across the parking area and approach the driver's door of **SANTIAGO's** vehicle. Here a brief conversation took place and **CRI 96-0102** was then observed to lean into the open window of **SANTIAGO's** vehicle. Shortly thereafter **CRI 96-0102** stood back up at which time **SANTIAGO** drove away traveling behind the aforementioned building and going back onto **Conway Street** traveling in a northerly direction. **CRI 96-0102** was then observed by this affiant to go directly to a pre-arranged location where I met with it and was given a knotted plastic wrap containing several pieces of a tan chunky material whose appearance and characteristics were consistent with those of crack cocaine based on my training and field experience. I then re-checked **CRI 96-0102's** person to ensure that it had no monies or controlled substances. I later introduced a small sample of this material into a standard **NIK**-brand field test kit designed to presumptively identify for the presence of cocaine. The result was a **positive** indication for the presence of cocaine.

21.    On **12 July 1996** this affiant met with **CRI 95-0108** as previously described. **CRI 95-0108** asked if I wanted it to contact **Peter** and see if a controlled purchase of crack cocaine could be arranged for. I advised that I did want it to do so and **CRI 95-0108** then beeped Peter **SANTIAGO** using a number given to it by **SANTIAGO** along with a two digit code number. Some time later **SANTIAGO** called back and asked **CRI 95-0108** how much it wanted. **CRI 95-0108** replied he wanted **"a fifty"**, referring to a **fifty dollar-sized** rock of crack cocaine. **SANTIAGO** then told **CRI 95-0108** that he would not come to Greenfield for that little and that the least that he would come for was **"one dollar's worth"** which **CRI 95-0108** and this affiant understood to mean **one hundred dollars worth** of crack cocaine. **CRI 95-0108** then said OK in acknowledgment of the amount for which **SANTIAGO** would come from Turners Falls to Greenfield to sell. **SANTIAGO** obviously mistook this as an ascension by **CRI 95-0108** to purchase that amount of crack cocaine as **SANTIAGO** then told **CRI 95-0108** that he would meet it at a specific location on **Conway Street** and that he was on his way at which time **SANTIAGO** hung up with **CRI 95-0108.** For logistical reasons I decided not to allow **CRI 95-0108** to consummate the controlled purchase of crack cocaine with **SANTIAGO** and instead, for intelligence purposes set up a position of surveillance and obtained the assistance of other officers of the Greenfield Police Department. Approximately **15 minutes** after **SANTIAGO** stated that he was on his way and hung up with **CRI 95-0108,** his red Honda Accord bearing Massachusetts registration **904 WEE** was observed by this affiant to be

A. 24

traveling southbound on **Conway Street** in the area just north of **Grove Street**. I observed that the male known to me as Peter **SANTIAGO** was then driving the vehicle and that no one else appeared to be in his vehicle. Mr. **SANTIAGO** drove southerly on **Conway Street** and appeared to be going to the pre-arranged meeting location that it had given to **CRI 95-0108** several minutes prior. I then lagged behind so as to avoid being conspicuous to **SANTIAGO** and was then advised by Off. P. **HILL** that **SANTIAGO** had in fact arrived at the pre-arranged location and appeared to be looking for **CRI 95-0108**. After several minutes of obvious searching for **CRI 95-0108** Off. Hill stated that **SANTIAGO** had gotten back into his vehicle and left the area onto **Main Street**. I subsequently observed his red Honda Accord bearing Massachusetts registration **904 WEE** to be parked on the south side of **Main Street** across from the area of his old apartment at **136 Main Street**. I then went back to meet with **CRI 95-0108** during which time approximately **20 minutes** after **SANTIAGO's** vehicle was observed parked on **Main Street**, a phone call was received on the phone from which **CRI 95-0108** had originally called **SANTIAGO**. The caller at this time was Peter **SANTIAGO** according to **CRI 95-0108** who wanted to know where **CRI 95-0108** had been and why it was not at the arranged meeting.

22.     On **31 August 1996** at about **1815 hrs.** then-Sgt. DF **GUILBAULT** observed the red **Honda Accord** of Peter **SANTIAGO's** bearing Massachusetts registration **904 WEE** being driven by Peter **SANTIAGO Jr.** operating westerly on **Devens Street** in Greenfield. Sgt. **GUILBAULT** knew that a valid arrest warrant was in effect for Mr. **SANTIAGO** so he requested a marked cruiser to assist and subsequently stopped Mr. **SANTIAGO's** vehicle on **Forbes Court** in the **Greenfield Gardens** development located off of **Elm Street** in Greenfield. Mr. **SANTIAGO** was subsequently placed under arrest by Sgt. **GUILBAULT**. Officers JT **CLARK** and SD **McCARTHY** arrived to assist Sgt. **GUILBAULT**. Off. **McCARTHY** then conducted an inventory of Mr. **SANTIAGO's** vehicle for the protection of Mr. **SANTIAGO** and the Greenfield Police Department, with the intention of bringing valuable items to the station with Mr. **SANTIAGO** for safe keeping and return on his release. While checking the passenger side rear area of the vehicle Off. **McCARTHY** moved a large bottle of laundry detergent which was resting on top of a number of cassette tapes and other items at which time he observed a baggie corner on the floor of the vehicle with whitish/brown chunky material inside of it. This material was consistent with the appearance of crack cocaine based on Off. **McCARTHY's** training and field experience. This baggie corner was then brought to Sgt.

*Page 16 of 32 of this Affidavit*

A. 25

GUILBAULT's attention by Off. McCARTHY at which time Sgt. GUILBAULT concurred that the material contained within the baggie was in fact consistent with the appearance of crack cocaine based on his (GUILBAULT's) training and field experience. This material was seized by Sgt. GUILBAULT who subsequently caused Off. PJ SKERRITT to subject a small sample of the material into a standard NIK-brand narcotics field test kit designed to presumptively identify for the presence of cocaine. The result, a **positive** indication for the presence of cocaine. This material was then weighed by Off. SKERRITT. The gross weight of material and packaging as reported by Off. PJ SKERRITT was 3.90 grams. This material was subsequently packaged by Off. SKERRITT to be sent to the Massachusetts State Food and Drug Laboratory at Amherst, MA. for testing. The material, subsequently tested by the University of Massachusetts (Amherst) Food and Drug Laboratory and found to weigh **2.95 grams** and contain **cocaine, a class B controlled substance** as defined under **Massachusetts General Laws Chapter 94C § Section 31**. A copy of the laboratory analyses is attached hereto and incorporated herein by reference marked as *ATTACHMENT 8*.

23. Your affiant has been assigned to the Narcotics Unit of the Greenfield Police Department for approximately **seven (7)** years. During this period I have overseen or been involved in several hundred controlled purchases of controlled substances including crack cocaine. I have also interviewed many admitted users of controlled substances including crack cocaine. I know, based on my field experience and such interviews that the common quantities of crack cocaine purchased for personal consumption is generally what are termed **thirty dollar ($30.00) rocks** or **fifty dollar ($50.00) rocks**. I know that an amount of crack cocaine which would cost a typical user **thirty dollars ($30.00)** in the **Franklin/Hampshire County** area will commonly weigh anywhere between **0.2 grams and 0.3 grams** inclusive of the packaging material and actual material weight between **0.10 grams** and **0.20 grams** considering that the knotted plastic wrap commonly weighs approximately **0.10 grams** by itself. The material weight may occasionally be slightly less, yet ·seldom in excess of these weights. I also know that an amount of crack cocaine which would cost a typical user **fifty dollars** in the **Franklin/Hampshire County** area will commonly weigh anywhere between **0.5 grams and 0.6 grams** inclusive of the packaging material and actual material weight between **0.40 grams** and **0.50 grams** considering that the knotted plastic wrap commonly weighs approximately **0.10 grams** by itself. The weight may occasionally be slightly less, yet seldom in excess of these weights. This being the case, it is my opinion, based on my training and

A.26

field experience that the previously described amount of crack cocaine weighed at **2.95 grams** seized from Peter J. **SANTIAGO's** vehicle is wholly inconsistent with an amount intended for personal use, but is rather consistent with an amount intended for distribution. Based on my field experience, it is common for a distributor of cocaine to sell cocaine in what is commonly known as an **"eight-ball"**, which is a term referring to one-eighth of an ounce. Where an **ounce** is equivalent to approximately **28 grams, one eighth of an ounce** is therefore equal to approximately **3.5 grams**. Obviously therefore, the quantity of crack cocaine seized from within Mr. **SANTIAGO's** vehicle is approximately consistent with an **"eight-ball"**.   This being the case, consider that an average **fifty dollar ($50.00)** "rock" of crack cocaine has an approximate actual weight of between **0.40 grams** and **0.50 grams,** which would be a large "rock" by street standards, the previously described **2.95 grams** of actual material (crack cocaine) would translate to between **six (6)** and **seven (7) - fifty dollar ($50.00) "rocks"** of crack cocaine, not inclusive of its packaging. The same **2.95 grams** of crack cocaine  would translate to between **ten (10)** and **fourteen (14) - thirty dollar ($30.00) "rocks"** of crack cocaine, not inclusive of its packaging. Using the fewest number of packages of crack cocaine possible to be derived from the **2.95 grams** of original material, the simple mathematics of either **six (6) fifty dollar ($50.00) rocks,** or **ten (10) thirty dollar ($30.00) rocks** would translate into a gross profit of not less than **three hundred ($300.00) dollars** to the distributor. Using the greatest number of packages of crack cocaine probable to be derived from the **2.95 grams** of original material, the simple mathematics of either **seven (7) fifty dollar ($50.00) rocks,** or **fourteen (14) thirty dollar ($30.00) rocks** would translate into a gross profit of between **three hundred and fifty ($350.00) dollars** for a low to **four hundred and twenty ($420.00) dollars** at a high to the distributor.

24.    Sgt. DF **GUILBAULT** discussed the **2.95 gram** quantity of crack cocaine seized from Mr. **SANTIAGO** with Sgt. James **CONLEY**, supervisor of the Massachusetts State Police Narcotics Unit who rendered his professional opinion that this **2.95 grams** of crack cocaine is inconsistent with an amount for personal use and definitely consistent with an amount intended for distribution for further re-sale based on his years of training and field experience.

25.    Between **10 February 1997** and **04 March 1997** Off. KJ **ROWELL** of the Greenfield Police Department reports to this affiant that he was in contacted on **seven (7)** separate occasions by Delilah

A.27

C. **MARTINEZ** who has a date of birth of **10-03-76**. Ms. **MARTINEZ** initiated this contact on each occasion. Ms. **MARTINEZ** was known to Off. **ROWELL** as well as your affiant to have been the long-time live-in girlfriend of Peter **SANTIAGO**. During each of these **seven (7)** times, Ms. **MARTINEZ** provided a substantial amount of information to Off. **ROWELL** which she states she personally knows because of her long term on-going relationship with Peter J. **SANTIAGO**. Of particular concern to this affiant was the information provided by Ms. **MARTINEZ** to Off. **ROWELL** on **02 March 1997** as can be noted on the third page of Off. **ROWELL's** attached report. In pertinent part Ms. **MARTINEZ** states that **SANTIAGO** stated to her words to the effect that **"If the shit goes down, it's really going to go down"**. Additionally in the same paragraph in the report Ms. **MARTINEZ** also states that **SANTIAGO** said to her that he would not give up all of his things and asked her in effect if she thought that he was stupid enough to give up all of his **"things"**. Ms. **MARTINEZ** remarks that she knew what **SANTIAGO** meant by **"things"**, and that was his guns. Ms. **MARTINEZ** went on to state that **SANTIAGO** never turned in all of his guns from the beginning, even the first time he was required to do so. Off. **ROWELL** generated a written report concerning the information provided during these **seven (7)** meetings with Ms. **MARTINEZ** which is attached hereto and incorporated herein by reference marked as *ATTACHMENT 9*. The following information provided by Ms. **MARTINEZ** was corroborated independently.

a.      Ms. **MARTINEZ** states that Peter **SANTIAGO** and John **SEIN** were stopped in **Manhattan, N.Y.** because they matched the description of persons suspected of committing Attempted Murder. Pursuant to the stop, a handgun was allegedly found after which Peter **SANTIAGO** may have gone to a bail bondsman for **$4,000.00** in bail. Your affiant subsequently spoke to arresting officer Robert **HANRATTY** of the **46th Precinct Anti-Crime Unit** in New York City. Off. **HANRATTY** subsequently forwarded copies of arrest records for Peter **SANTIAGO** and John **SEIN** from **12 October 1996** at **2141 hrs.** at which time the two were arrested. Off. **HANRATTY** confirms that he stopped the vehicle operated by Peter John **SANTIAGO** Jr., and occupied by John **SEIN** because it matched the description of vehicle and occupants wanted from a radio broadcast for an attempted murder involving a handgun earlier that evening. Off. **HANRATTY** confirms that during the stop, a loaded 9mm handgun containing **seven (7)** live rounds of ammunition was found and both

A. 28

SANTIAGO and SEIN were arrested. The handgun seized was also reported to have been stolen in New York City. Off. HANRATTY states that SANTIAGO made bail, but was unsure of the exact amount imposed and that the case was to be indicted soon.

b.    Ms. MARTINEZ stated that SANTIAGO's current address at that time was **23 Coolidge Avenue** in Turners Falls, MA. This was confirmed by your affiant both through information obtained by **two (2)** other confidential and proven reliable informants as well as by having checked this address on numerous occasions observing Mr. SANTIAGO's vehicle present and himself on several occasions.

This corroborated information lends a substantial amount of credibility to the information as a whole provided by Ms. MARTINEZ.

26.    On **12 February 1997**, during one of the aforementioned contacts with Off. KJ ROWELL, Delilah C. MARTINEZ provided a handwritten statement pertaining to some of what she states is her personal knowledge regarding Peter J. SANTIAGO Jr.'s relationship with her and his narcotics-related activities in which she admits to being privy to and knowingly aware of. A copy of this statement is attached hereto and incorporated herein by reference marked as *ATTACHMENT 10*.

27.    During the last week of **January 1997**, your affiant had occasion to come into contact with an individual, whose name is known to me and who at that time was under arrest for **Possession of Class B Cocaine with Intent to Distribute**. This individual will hereafter be referred to as **CRI 97-0103**. This individual made statements, some against its own penal interest, then being in fear of being prosecuted on other related charges relating the following facts:

a.    it admits to being a past user of marijuana, cocaine and crack cocaine;

b.    it admits, against its penal interest to currently being an occasional distributor of cocaine and crack cocaine;

A.29

c.  it admits that the cocaine with which it was found to be in possession of was in fact for sale to another individual whom it declined to identify, and not for its own personal use;

d.  it provided a statement in regards to when, where and from whom it obtained the cocaine with which it was found to be in possession of on this date. This information was corroborated by this affiant and Det. DT **BLAKE** of the Greenfield Police Department as we had received information from a confidential and proven reliable informant whose identity is known to your affiant (**CRI 96-0101**) that **CRI 97-0103** was going at a specific time to a specified location to purchase cocaine. Det. **BLAKE** and your affiant subsequently established a surveillance upon **CRI 97-0103** and were able to observe it leave its residence at approximately the time specified by **CRI 96-0101**, go directly to the location specified by **CRI 96-0101** and meet with an individual known to Det. **BLAKE** and myself as a distributor of controlled substances, primarily cocaine who had been identified previously by **CRI 96-0101**. Det. **BLAKE** observed **CRI 97-0103** meet with this identified individual, engage in conversation at **CRI 97-0103's** vehicle during which time the known individual leaned into the passenger's side of **CRI 97-0103's** vehicle briefly in what was believed to be the consummation of a money/drug transaction. **CRI 97-0103** then parted company with this known individual and was subsequently stopped by Greenfield officers to include Det. **BLAKE**. **CRI 97-0103** was arrested on an unrelated criminal charge and found to be in possession of an amount of cocaine which it later admitted to having purchased just prior, describing in details consistent with Det. **BLAKE's** previously noted observations.

e.  it admits to purchasing larger amounts of cocaine on a regular basis from an individual who resides in **Charlemont, MA**. This individual was identified by name and its residence from which **CRI 97-0103** states it purchased cocaine was described in specific detail. This information was subsequently initially verified pertaining to the name given and the description of the residence in question by your affiant. The information provided regarding this individual's identity, location of residence and its being a large scale distributor of cocaine was subsequently confirmed by a confidential and proven reliable informant providing information and assistance to troopers assigned to the Massachusetts State Police Narcotics Unit, according to Sgt. JE **CONLEY** of that unit. Subsequently, detailed

A 30

information provided to your affiant regarding this individual was used to bolster other information of the aforementioned confidential and reliable informant provided to Tpr. J **CUMMINGS** of the Massachusetts State Police Narcotics Unit within the **three (3)** weeks preceding this affidavit and application for search warrant. This information, along with information provided by the aforementioned confidential and reliable informant working with Tpr. **CUMMINGS** was used by him to establish probable cause in an affidavit in support of an application for a search warrant for this location and the identified individual which was authorized in the Greenfield District Court. As a result of the execution of this search warrant, Tpr. **CUMMINGS** reports that he and assisting troopers seized a quantity of cocaine and an amount of United States currency. The target of this investigation made statements against its own penal interest admitting that it was a distributor of cocaine.

f.    it admits to purchasing cocaine and crack cocaine from, among other distributors of controlled substances, a Hispanic male known to it to be Peter J. **SANTIAGO** Jr. on numerous occasions over the past several years up to and including the present time, commonly having purchased said cocaine for re-sale to other individuals.

Based on this information, some of which was given against this individuals' penal interest **CRI 97-0103** clearly has a solid and current basis of knowledge pertaining the possession and distribution of controlled substances as well as regarding Peter **SANTIAGO's** activity in this regard. **CRI 97-0103** also has credibility based on the facts that it has made specific statements against its own penal interest knowing it was in imminent jeopardy of prosecution as detailed in **paragraph 26, sub-paragraphs *d* and *e*** of this affidavit.

28.    On **17 July 1997** this affiant had another occasion to interview **CRI 97-0103**. As a result of an investigation conducted by Lt. DF **GUILBAULT** of the Greenfield Police Department in which your affiant and Det. DT **BLAKE** were involved, **CRI 97-0103** was found to be in possession of an amount of cocaine. This investigation had again been the result of information initially provided to Lt. **GUILBAULT** by **CRI 96-0101**, an individual whose identity is known to your affiant and who has proven credible and reliable in the past, most recently by providing the information as previously related in **paragraph 27 sub-paragraph *d*** of this affidavit. Again, **CRI 96-0101** told Lt.

A 31

**GUILBAULT** that it knew that **CRI 97-0103** was leaving at a specific time to go to a specified individual at their residence to purchase a specified amount of cocaine. **Det. BLAKE** and your affiant subsequently established a surveillance of **CRI 97-0103** at the direction of Lt. **GUILBAULT**, observing it to leave its residence at approximately the time specified by **CRI 96-0101**. **CRI 97-0103** was observed to travel directly to the residence of the individual identified by **CRI 96-0101**. **CRI 97-0103** was observed to enter the residence, exit approximately **fifteen (15)** minutes later and begin travel back toward its residence. The vehicle was stopped in the interim by Lt. **GUILBAULT** and other Greenfield officers and an amount of cocaine was subsequently found on **CRI 97-0103's** person.    The amount of cocaine seized had been previously predicted accurately to Lt. **GUILBAULT** by **CRI 96-0101**. **CRI 97-0103** voluntarily detailed the events surrounding this incident in a statement against its penal interest. **CRI 97-0103** specified the time that it left to purchase the cocaine, the amount which it purchased and the price that it paid for the cocaine as well as identifying the individual from whom it had purchased the cocaine and particularly describing the place at which it had purchased the cocaine.    **CRI 97-0103** then went on to provide additional information in regards to what it purports to know about the activities of other distributors of cocaine.    **CRI 97-0103** again included information pertaining to what it purports to know from personal experience and contact with Peter **SANTIAGO** and his distribution of cocaine.    During the following months, **CRI 97-0103** provided a substantial amount of information which it states is personal knowledge gained from involvement with not less than **three (3)** individuals, each known to your affiant as a distributor of controlled substances.    Much of this information relative to identities, current locations of residence and locations where each distributes controlled substances from was independently verified by your affiant and Lt. DF **GUILBAULT**. **One (1)** of the **three (3)** aforementioned individuals was Peter **SANTIAGO**. **CRI 97-0103** admitted on several occasions during this time to having purchased cocaine from Peter **SANTIAGO** for other persons, not for itself. **CRI 97-0103** provided information relative to where Mr. **SANTIAGO** appeared to it to be staying during this time which was in at least **two (2)** different locations. **CRI 97-0103** most recently provided information that it knew that Peter **SANTIAGO** was staying in **Apartment K-8** at **Cliffside Apartments** off of Rte 116 in Sunderland, MA. **CRI 97-0103** states that it has been into this apartment on not less than **five (5)** occasions within the **three (3)** months preceding this affidavit and application for search warrant for various reasons, both social and for the purpose of purchasing cocaine. **CRI 97-0103** states that on the occasions that it has been visiting Mr. **SANTIAGO**, that

A.32

it noted that he is extremely cautious in regards to persons at his door. It states that on not less than **three (3)** occasions it has noted that Mr. **SANTIAGO** will not open the door until he is positive who is requesting entry by asking who is knocking and also by looking out through the security peek hole in the door. **CRI 97-0103** states that Mr. **SANTIAGO** also treats it in the same manner, when knocking on the door Mr. **SANTIAGO** asks who it is first and will not open the door until he is sure that he knows the person(s) requesting entry. **CRI 97-0103** states that from appearances, conversations with Mr. **SANTIAGO** as well as observations made that it believes that **SANTIAGO** resides in this apartment alone. **CRI 97-0103** describes the general appearance of this apartment. Your affiant knows that the apartments in the **Cliffside Apartments** complex are similar to each other in general lay-out. I know this because I have had occasion to assist officers of the Sunderland Police Department in a mutual aid capacity on numerous occasions in the **Cliffside Apartments** complex while employed by the Deerfield Police Department. The interior lay-out and description of what it believes to be Peter **SANTIAGO's** apartment is consistent with what I recall other apartments to have been. Since the latter part of **October 1997 CRI 97-0103** has performed not less than **three (3)** controlled purchases of cocaine under the direction and supervision of your affiant assisted by officers of the Greenfield Police department and troopers assigned to the Massachusetts State Police Narcotics Unit. Each controlled purchase is detailed as follows:

a.      the first of the aforementioned controlled purchases of cocaine occurred within the **four (4)** weeks prior to the current date of this affidavit. At this time, **CRI 97-0103** was met in a specified location by your affiant and its person and passenger compartment of its vehicle were checked to ensure that it possessed no money or controlled substances. At this time, **CRI 97-0103** was provided with an amount of United States currency by your affiant in what it stated it knew to be sufficient amount to purchase a specific quantity of cocaine from Peter **SANTIAGO**. **CRI 97-0103** was then followed to the immediate area of **Cliffside Apartments** in Sunderland by your affiant and Off. Todd **CLARK** of the Greenfield Police Department. Tpr. TV **NARTOWICZ** and Sgt. JE **CONLEY** of the Massachusetts State Police Narcotics Unit had already taken up positions of surveillance in the general area of **Cliffside Apartments**. I was advised by Sgt. **CONLEY** and Tpr. **NARTOWICZ** that they both could see **CRI 97-0103** entering the **Cliffside Apartments** lot and begin to approach the area of **"K"** building, at which time I left the area to ensure that Mr. **SANTIAGO** would

A.33

not see me. Both Sgt. **CONLEY** and Tpr. **NARTOWICZ** observed **CRI 97-0103** to park its vehicle in the immediate area of the doorway for the **"K"** apartments in **Cliffside. CRI 97-0103** was then observed to enter the door to said **"K"** apartments and remain inside said building for approximately five minutes. In exiting the building, **CRI 97-0103** was observed to go directly to its vehicle by Tpr. **NARTOWICZ** enter said vehicle and leave the apartment. Sgt. **CONLEY** then followed **CRI 97-0103** back to a previously decided upon location where it met with your affiant and Off. **CLARK.** At this time **CRI 97-0103** turned over a plastic sandwich baggie containing an amount of chunky tan material whose appearance and characteristics were consistent with those of cocaine, based on your affiant's training and field experience. The amount of material was subsequently weighed and found to be consistent with the amount which **CRI 97-0103** had stated it could purchase from Mr. **SANTIAGO** for the specified amount of United States currency. Your affiant checked both **CRI 97-0103** and the passenger compartment of its vehicle again to ensure that it had no money or controlled substances and was advised that Mr. **SANTIAGO** was home and several other individuals known to **CRI 97-0103** were then visiting him. It stated that after giving the amount of United States currency provided to it by your affiant, **SANTIAGO** went into what it believed to be his bedroom and returned shortly thereafter with the previously described plastic baggie at which time **SANTIAGO** handed it to **CRI 97-0103** and it left the apartment after brief conversation. A small sample of this material was subsequently introduced into an NIK-brand field test kit designed to presumptively identify for the presence of cocaine. The result was a **strongly positive** indication for the presence of cocaine, a controlled substance as defined under **Massachusetts General Laws Chapter 94C § 31.**

b.    a second of the aforementioned controlled purchases of cocaine occurred within the **two (2)** weeks prior to the current date of this affidavit. At this time, **CRI 97-0103** was met in a specified location by your affiant and its person and passenger compartment of its vehicle were again checked to ensure that it possessed no money or controlled substances. At this time, **CRI 97-0103** was provided with an amount of United States currency by your affiant in what it stated it knew to be sufficient amount to purchase a specific quantity of cocaine from Peter **SANTIAGO. CRI 97-0103** was then followed to the immediate area of **Cliffside**

A.34

**Apartments** in Sunderland by your affiant and Det. DT **BLAKE** of the Greenfield Police Department. Tpr. J. **CUMMINGS** and Sgt. JE **CONLEY** of the Massachusetts State Police Narcotics Unit had already taken up positions of surveillance in the general area of **Cliffside Apartments**. I was advised by Sgt. **CONLEY** and Tpr. **CUMMINGS** that they both could see **CRI 97-0103** entering the complex and approach the area of "K" building in **Cliffside Apartments**, at which time I left the area to ensure that Mr. **SANTIAGO** would not see me. Both Sgt. **CONLEY** and Tpr. **CUMMINGS** observed **CRI 97-0103** to park its vehicle in the immediate area of the doorway for the "K" apartments in **Cliffside Apartments**. **CRI 97-0103** was then observed to enter the door to said "K" apartments and remain inside said building for between **five (5) and eight (8)** minutes. In exiting the building, **CRI 97-0103** was observed to go directly to its vehicle by Sgt. **CONLEY** and Tpr. **CUMMINGS** enter said vehicle and leave the apartment. Sgt. **CONLEY** and Tpr. **CUMMINGS** then followed **CRI 97-0103** back to a previously decided upon location where it met with your affiant and Det. **BLAKE**. At this time **CRI 97-0103** turned over a plastic sandwich baggie containing an amount of chunky tan material whose appearance and characteristics were consistent with those of cocaine, based on your affiant's training and field experience. The amount of material was subsequently weighed and found to be consistent with the amount which **CRI 97-0103** had stated it could purchase from Mr. **SANTIAGO** for the specified amount of United States currency. A small sample of this material was subsequently introduced into an NIK-brand field test kit designed to presumptively identify for the presence of cocaine. The result was a **strongly positive** indication for the presence of cocaine, a controlled substance as defined under **Massachusetts General Laws Chapter 94C § 31**. Your affiant checked both **CRI 97-0103** and the passenger compartment of its vehicle again to ensure that it had no money or controlled substances and was advised that Mr. **SANTIAGO** was home alone at that time. It stated that after giving the amount of United States currency provided to it by your affiant, **SANTIAGO** went into what it believed to be his bedroom and returned shortly thereafter with the previously described plastic baggie at which time **SANTIAGO** handed it to **CRI 97-0103** and it left the apartment after brief conversation. **CRI 97-0103** stated that it saw Mr. **SANTIAGO** to be in possession of what it believed to be another plastic baggie of what it recognized to be cocaine in a quantity it estimated to be one half of an ounce based on its prior knowledge and personal experience with the packaging of various



quantities of cocaine.

c.    a third and most recent of the aforementioned controlled purchases of cocaine occurred within the **three (3)** days prior to the date of this affidavit and application for search warrant. At this time, **CRI 97-0103** was met in a specified location by your affiant and its person and passenger compartment of its vehicle were checked to ensure that it possessed no money or controlled substances. At this time, **CRI 97-0103** was provided with an amount of United States currency by your affiant in what it stated it knew to be sufficient amount to purchase a specific quantity of cocaine from Peter **SANTIAGO**. **CRI 97-0103** was then followed to the immediate area of **Cliffside Apartments** in Sunderland by your affiant and Lt. DF **GUILBAULT** of the Greenfield Police Department. Tpr. TV **NARTOWICZ** and Sgt. JE **CONLEY** of the Massachusetts State Police Narcotics Unit had already taken up positions of surveillance in the general area of **Cliffside Apartments**. I was advised by Tpr. **NARTOWICZ** that he could see **CRI 97-0103** entering the **Cliffside Apartments** lot and begin to approach the area of "K" building, at which time Lt. **GUILBAULT** and I left the area to ensure that Mr. **SANTIAGO** would not see us. Both Sgt. **CONLEY** and Tpr. **NARTOWICZ** observed **CRI 97-0103** to park its vehicle in the immediate area of the front of "K" apartments in **Cliffside**. **CRI 97-0103** was then observed to enter the door to said "K" apartments and remain inside said building for approximately six to eight minutes. In exiting the building at about the same time a Hispanic male known to be Peter **SANTIAGO** did, **CRI 97-0103** was observed to go directly to its vehicle by Tpr. **NARTOWICZ** enter said vehicle and leave the apartment. **SANTIAGO** went to a white Infinity G-20 sedan registered to his mother Rose **SANTIAGO** of 85 Sugarloaf Estates at which time he left and drove easterly toward the Amherst, MA. area. Your affiant and Lt. **GUILBAULT** then followed **CRI 97-0103** back to a previously decided upon location where it met with your affiant and Lt. **GUILBAULT**. At this time **CRI 97-0103** turned over a plastic sandwich baggie containing an amount of chunky tan material whose appearance and characteristics were consistent with those of cocaine, based on your affiant's training and field experience. The amount of material was subsequently weighed and found to again be consistent with the amount which **CRI 97-0103** had stated it could purchase from Mr. **SANTIAGO** for the specified amount of United States currency. Your affiant checked both **CRI 97-0103** and

A, 36

the passenger compartment of its vehicle again to ensure that it had no money or controlled substances and was advised that Mr. **SANTIAGO** was home and several other individuals known to **CRI 97-0103** had come and gone while it was present. It stated that after giving the amount of United States currency provided to it by your affiant, **SANTIAGO** went into what it believed to be his bedroom and returned shortly thereafter with the previously described plastic baggie at which time **SANTIAGO** handed it to **CRI 97-0103** and it as well as Mr. **SANTIAGO** left the apartment after brief conversation. A small sample of this material was subsequently introduced into an NIK-brand field test kit designed to presumptively identify for the presence of cocaine. The result was a **strongly positive** indication for the presence of cocaine, a controlled substance as defined under **Massachusetts General Laws Chapter 94C § 31.**

29.     Each of the **three (3)** previously detailed controlled purchases took place after the hour of **ten o'clock p.m.**

30.     Based on my training and field experience this affiant knows the following facts to be true about the distribution of cocaine and of those persons who distribute cocaine:

a.      Crack cocaine must be manufactured from cocaine hydrochloride therefore utensils suitable to cook, filter and dry the precipitate must be used to produce crack cocaine including common household pots, pans, coffee or similar filters, as well as heat sources such as heat lamps, ovens, stoves or other similar burners;

b.      Tools, instruments and related paraphernalia are used to facilitate the manufacture and distribution of cocaine including knives, razors, mirrors, cutting agents such as inositol, baking soda (or many other varied powdered water soluble materials), and scales.

c.      Cocaine is packaged when it is sold. The packaging material used commonly includes plastic, glasine bags or waxy paper folds.

d.      The illegal distribution of cocaine yields high profits and is generally a cash business. The nature of this business requires distributors of cocaine to maintain amounts of cash sufficient

A.37

to make future purchases of cocaine. Also, distributors of cocaine receive cash in exchange for cocaine.

e.    Monies and proceeds from the illegal sale of cocaine are concealed in numerous ways. Such proceeds may be kept in safes, bank accounts, safety deposit boxes or may be transferred into stocks, bonds or other securities. Evidence of bank deposits are commonly found where distributors conduct their transactions or under their control. Evidence of safety deposit boxes may be detected via bank records maintained by the distributor or through the existence of safety deposit box keys.

f.    Records, telephone bills and other documents and notations which indicate the distribution and sale of cocaine are maintained by distributors of cocaine. Such records often indicate telephone calls made to persons purchasing cocaine, or to persons from whom cocaine is purchased, identities of people to whom cocaine is sold, from whom cocaine is purchased, amounts of monies owed to the distributor by persons who have obtained cocaine from said distributor, or projected profits from the illegal sale of cocaine.

31.    There is therefore probable cause to believe that Peter J. **SANTIAGO** is and has been since at least **1994** a distributor of cocaine and there is also probable cause to believe that cocaine is being sold out of **Apartment K8 Cliffside Apartments** in Sunderland, MA., and that the following items will be found inside of said apartment:

a.    Cocaine, a controlled substance as defined under **Massachusetts General Laws Chapter 94C § 31**;

b.    utensils suitable to cook, filter and dry crack cocaine including common household pots, pans, coffee or similar filters, as well as heat sources such as heat lamps, ovens, stoves or other similar burners;

c.    tools, instruments and related paraphernalia used to facilitate the manufacture and distribution of cocaine including knives, razors, mirrors, cutting agents such as inositol, baking soda (or many other varied powdered water soluble materials), and scales;

A.38

d.    packaging material to include plastic, glasine bags or waxy paper folds;

e.    United States currency which is the proceeds from the illegal sale of cocaine, and means or evidence of a means to secure such proceeds to include safes, bank accounts, safety deposit boxes, stocks, bonds, other securities, or safety deposit box keys;

f.    records, telephone bills and other documents and notations which indicate the purchase, distribution and sale of cocaine, and;

g.    paperwork showing occupation, custody and control of the premises at **Apartment K8 Cliffside Apartments** located on Rte 116 in Sunderland, MA.

32.    *Wherefore*, I respectfully request that the court issue a warrant and order of seizure, authorizing the search of unit **K8 Cliffside Apartments** in Sunderland, MA. directing that if any items as previously described in **paragraph 31** as well as its **sub-paragraphs *a* through *g***, or any part thereof be found that it be seized and brought before the court. **Cliffside Apartments** lie on the northerly side of Route 116 in Sunderland, MA. As one travels easterly on Rte 116, the second or easternmost entryway to **Cliffside Apartments** would be used to gain access to the area of the building which houses the "K" block. Upon turning into this easternmost driveway to **Cliffside Apartments**, a building exists on one's left which is on the westerly side of this driveway. This building is a three-story brick structure with **four (4)** separate entry doors. Over each door is a large black colored letter beginning with "I" which lies closest to Rte 116, next being "J", "K", and lastly "L" lying on the northernmost portion of this building. Once inside the main entry door, access is gained to **twelve (12)** individual apartments numbered "1" through "12". Apartments 1 through 4 lie on the uppermost floor, apartments 5 through 8 lie on the second or middle floor, and apartments 9 through 12 lie on the bottom floor. Each individual apartment door has its own black colored number on it just above a security peek hole. There is a black number "8" on the door to **Apartment K8**.

33.    This affiant additionally requests authorization to:

a.    Execute said search warrant at **any time of the day or night,** based on the fact that all of the **three (3)** previously detailed controlled purchases conducted at **Unit K8 Cliffside**

A, 39

**Apartments** occurred after the hour of **ten o'clock, p.m.** as stated previously in **paragraph 29** of this affidavit;

b.  Enter Unit **K8 Cliffside Apartments** <u>without first knocking and announcing</u> the presence of executing officers. I request this authorization based on the following facts:

   i.  Mr. **SANTIAGO** is known to own not less than **six (6)** assorted firearms, as they have been turned into the Greenfield Police Department on **two (2)** occasions in the past;

   ii.  Mr. **SANTIAGO** is known to have lawfully carried a concealed firearm on his person in the past as noted in **paragraph 15** of this affidavit;

   iii.  a named source, being Delilah C. **MARTINEZ** who had a long term live-in relationship with Peter **SANATIAGO** states that **(1)** Peter **SANTIAGO** alleged to her that he would never give up all of his **"things"**, which she knew to mean his guns and she goes on to state that he has in fact not turned in all of his guns even when ordered to by the court, **(2)** she also states that he has made a statement to the effect that **"if the shit goes down, its really going to go down"** which causes your affiant great concern over the safety of officers executing any search warrant involving Peter J. **SANTIAGO**;

   iv.  Mr. **SANTIAGO** is extremely cautious about allowing persons entry into his apartment until he is sure that he knows who they are and that he wants them inside as evidenced by the information regarding the observations of **CRI 97-0103** as noted in **paragraph 28** of this affidavit.

   v.  The area of **Cliffside Apartments** is a very open area and it would be very difficult to approach and arrive at Mr. **SANTIAGO's** apartment without being first observed which greatly increases the possibility of the destruction of evidence and jeopardizes the safety of officers executing any search warrant.

*Page 31 of 32 of this Affidavit*

A.40

This being the case, any delay in gaining entry into Mr. **SANTIAGO's** apartment could and would allow more than ample time for Mr. **SANTIAGO** to destroy evidence and/or arm himself putting himself and executing police officers in greater jeopardy than if the element of surprise were made available.

**I MAKE OATH THAT THE FOREGOING AFFIDAVIT IS TRUE UNDER THE PAINS AND PENALTIES OF PERJURY, SIGNED THIS TWENTY EIGHTH DAY OF NOVEMBER, 1997**

John W. NEWTON  ID 14
Detective, Narcotics Division
Greenfield Police Department

*SWORN AND SUBSCRIBED TO BEFORE:*

_____
SIGNATURE OF JUSTICE, CLERK MAGISTRATE OR ASSISTANT CLERK

_____
DATE

TRUE COPY (ATTEST)

CLERK MAGISTRATE

*Page 32 of 32 of this Affidavit*

A.41

C39

## COMMONWEALTH OF MASSACHUSETTS
### DEPARTMENT OF THE TRIAL COURT

FRANKLIN, SS                                      SUPERIOR COURT
                                                  Crim. No.97-069

COMMONWEALTH OF MASSACHUSETTS,    ]
                                  ]
                                  ]
vs.                               ]
                                  ]
PETER J. SANTIAGO, JR,            ]
        Defendant                 ]

99 SEP -8 PM 2: 04
FRANKLIN SUPERIOR COURT FILED

### MOTION PURSUANT TO MASS. R. CRIM. PRO. RULE 30

Now comes the defendant Peter J. Santiago, Jr., and respectfully moves this court (Carhart, J.) to release him from confinement which was imposed in violation of the Constitution of the United States and the Constitution and Laws of the Commonwealth of Massachusetts in that the trial and conviction of the Defendant was based upon an Affidavit In Support of Application For Search Warrant dated November 28, 1997, a Search Warrant dated November 26, 1997 and a Return thereunder obtained in violation of chapter 276 of the Laws of the Commonwealth of Massachusetts and the aforesaid Constitutional provisions:

**Chapter 276: Section 1. Complaint; warrant for designated property or articles; search incident to arrest; documentary evidence subject to privilege.**

Section 1. A court or justice authorized to issue warrants in criminal cases may, upon complaint on oath that the complainant believes that any of the property or articles hereinafter named are concealed in a house, place, vessel or vehicle or in the possession of a person anywhere within the commonwealth and territorial waters thereof, if satisfied that there is probable cause for such belief, issue a warrant identifying the property and naming or describing the person or place to be searched and commanding the person seeking such warrant to search for the following property or articles:

. . .

Second, property or articles which are intended for use, or which are or have been used, as a means or instrumentality of committing a crime, including, but not in limitation of the foregoing, any property or article worn, carried or otherwise used, changed or marked in the preparation for or perpetration of or concealment of a crime;

A TRUE COPY ATTEST

*[signature]* CLERK

A.42

Third, property or articles the possession or control of which is unlawful, or which are possessed or controlled for an unlawful purpose; except property subject to search and seizure under sections forty-two through fifty-six, inclusive, of chapter one hundred and thirty-eight;

. . .

## Chapter 276: Section 2B. Affidavit in support of application for warrant; contents and form.

Section 2B. A person seeking a search warrant shall appear personally before a court or justice authorized to issue search warrants in criminal cases and shall give an affidavit in substantially the form hereinafter prescribed. Such affidavit shall contain the facts, information, and circumstances upon which such person relies to establish sufficient grounds for the issuance of the warrant. The *person issuing the warrant shall retain the affidavit* and shall deliver it within three days after the issuance of the warrant to the court to which the warrant is returnable. Upon the return of said warrant, the affidavit shall be attached to it and shall be filed therewith, and it shall not be a public document until the warrant is returned.

. . .

## The Fourth, Eighth and Fourteenth Amendments of the United States Constitution:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.*

Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted.

## and Article XIV of the Massachusetts Constitution

Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.

WHEREFORE the DEFENDANT, Peter J. Santiago, Jr., respectfully moves this court for his immediate release from custody, revocation of any record of conviction, a new trial if the interests of justice so require and provided the Commonwealth has any evidence of a violation of law that is admissible against Peter J. Santiago, Jr.

A.43

RESPECTFULLY SUBMITTED,

Date: September 9, 1999          By

Richard M. Howland, BBO # 242540
326 North Pleasant Street
Amherst, MA 01002-1706
413-253-0869
Fax 413-253-2948
howland@crocker.com

*Please Note Correct Address and Telephone Numbers*

### CERTIFICATE OF SERVICE

I certify that a copy of the within appearance was mailed postage prepaid to Mary Lou
Szulborski, ADA, 238 Main Street, Greenfield, MA 01301 on September 9, 1999.

Richard M. Howland

A.44

09/17/03  10:09 FAX                                                    002

(45)

COMMONWEALTH OF MASSACHUSETTS

FRANKLIN, SS.                                    SUPERIOR COURT

                                                 INDICTMENT #97-069-70

COMMONWEALTH

v.

PETER J. SANTIAGO, JR.

MOTION DENIED

01 OCT -2 PM 12: 30
FRANKLIN SUPERIOR COURT
FILED

DEFENDANT'S MOTION FOR RELEASE
FROM UNLAWFUL RESTRAINT

Now comes the Defendant, in the above-entitled
matter pursuant to G.L. c. 278 §33E and Rule 30 (A)
Mass. R. Crim. P., who hereby moves that this Honorable
Court hold an **Evidentiary Hearing** on the instant Motion
and Release Him from further unlawful restraint.

This Court does not have discretion to deny the
instant Motion, due to the fact that the **original pro-
ceedings are infected with constitutional error.** See
Commonwealth v. Sullivan, 385 Mass. 497, 503 (1982)

The Defendant now assert the following claims violated
both the State and Federal Constitutions and entitles him
to immediate release from further unlawful restraint.

**CLAIMS IN SUPPORT:**

I.

PROSECUTORIAL MISCONDUCT BASED
ON THE FOLLOWING:

A) The Greenfield Police Department
knowingly, and willfully conduct-
ed a criminal investigation out-
side of their jurisdiction and
falsified information in their
Affidavit in order to obtain a

A TRUE COPY ATTEST
CLERK

A. 45

search warrant. See **Commonwealth**
**V. Manning**, 373 Mass. 438 (1977).

B) The Greenfield Police deliberate-
ly falsified facts in their Affidavid
in support of a search warrant for
the purpose of obtaining a "No Knock"
provision, in violation of **Commonwealth**
**V. Macias**, 429 Mass. 698 (1999).

C) Deliberate and willful failure to dis-
close the identity of the so called
confidential, reliable Informant
#CRI97-0103, and all statements made
by him/her as assented to and allowed
by the Court, Carhart, J., in violation
of **Rule 14 (a)(1) Mass. R. Crim. P.;**
**Brady V. Maryland**, 373 U.S. 83,87
(1963).

## II.

IT WAS CONSTITUTIONAL ERROR FOR THE
TRIAL JUDGE TO DENY THE DEFENDANT'S
MOTION TO SUPPRESS WITHOUT A HEARING,
FINDING OF FACT AND RULING OF LAW, BEFORE
SUBJECTING HIM TO TRIAL. See **Rule 13**
**(D)(2)(A), Mass. R. Crim. P.; United**
**States V. Barletta**, 644 F.2d 50,59 (1st.
Cir. 1981).

## III.

INEFFECTIVE ASSISTANCE OF COUNSEL IN
VIOLATION OF **ART. 12**, OF THE MASS. DECL.
OF RIGHTS AND THE **SIXTH AMENDMENT OF THE**
**U.S. CONSTITUTION,** DUE TO THE FOLLOWING:

A) Failure to impeach the Commonwealth's
witnesses with their numerous false
assertion deprived defendant of a

2.

A.46

defense, in violation of
**Commonwealth** v. **Saferian**,
366 Mass. 89, (1974).

B) Failure to obtain the name of
the alleged confidential, re-
liable Informant #97-0103,
after a motion for the same was
assented to and allowed by the
Court, Carhart, J., in violation
of Art. 12 of the Mass. Decl. of
Rights and the Sixth Amendment
of the United States.

C) Failure to properly investigate
and disclose to the Commonwealth
in a timely manner the names of
certain defense witnesses result-
ing in an order from the Court
Carhart, J., excluding that test-
imony which was at the heart of
the defense raised. See **Commonwealth**
v. **Haggerty**, 400 Mass. 437 (1987).

D) Deliberately providing false evidence
to the Court and Assistant District
Attorney that I was guilty and in
the process of making a deal with
the Federal Government, resulting
in my Motion to Suppress illegally
obtained evidence being denied with-
out a hearing, violated both Art.
12 of the Mass. Decl. of Rights and
the Sixth Amendment of the United States
Constitution.

## II. PRIOR PROCEEDINGS:

On December 12, 1997, the Franklin County Grand

Jury returned Indictment #97-069, charging defendant

for Trafficking Cocaine (Over 200 grams) in violation

G.L. c. 94C. §32E(b)(4).

On January 7, 1998, Attorney F. Michael Joseph,

filed his appearance to represent the defendant.

3.

A.47

On February 24, 1998, Defense Counsel filed
the following Motions: (7) for A Bill of Particulars;
and (14) For Informant Information.

On March 4, 1998, Defendant's pre-trial con-
ference Report was filed.

On April 22, 1998, Motions (7) and (14) as
assented to, were allowed by Carhart, J.

On May 18, 1998, Defendant's Motion to Suppress
was filed with supporting Memorandum of Law, (24)
(25).

On June 15, 1998, allegedly after a hearing
the Motion to Suppress was taken under advisement
by Carhart, J.

On August 24, 1998, the Motion to Suppress was
denied by Carhart, J.

On October 6, 1998, Trial began and on October
7, 1998, the Jury returned a verdict of guilty and
on the same day the Defendant was sentenced to not
less than 15 years and no more than 15 years and one
(1) day.

On November 2, 1998, Defendant's notice of
Appeal was filed.

On September 8, 1999, Defendant's first motion
for a New Trial was filed.

4.

A. 48

☒006

On November 2, 1999, the Motion for A
New Trial was denied without a hearing by Carhart,
J.

On April 12, 2000, the Defendant's Brief was
filed in the Appeals Court, #00-P-15.

On May 9, 2001, Defendant's Appeal from his
conviction was affirmed.

On May 31, 2001, Defendant's Application for
Further Appellate Review was filed.

On July 30, 2001, the Defendant's Application
for Further Appellate Review was denied #11933.

III. **CONCLUSION:**

**WHEREFORE,** THE DEFENDANT PRAYS THAT THIS HON-
ORABLE COURT WILL GRANT HIM THE RELIEF PRAYED FOR
HEREIN, AS JUSTICE MANDATES NO LESS.

Respectfully submitted by:

Peter J. Santiago, pro-se
S.B.C.C.
P.O. Box #8000
Shirley, Massachusetts. 01464

Dated: Sept 26    ,2001.

5.

A.49