UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2007 MAY -9  P 12: 26

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| PETER J. SANTIAGO, Jr.<br>Petitioner<br><br>v.<br><br>STEVEN O'BRIEN,<br>Respondent | )<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 4:05-CV-40158

## PETITIONER'S REPLY MEMORANDUM

The Respondent contends that the ruling of the Appeals Court affirming the trial court's order barring Santiago from offering evidence of third party guilt was not "contrary to, [and did not] involve[] an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" in *Chambers v. Mississippi*, 410 U.S. 284 (1973), in which the Court held that an accused has a fundamental Sixth Amendment right to present witnesses in his defense. *See* 28 U.S.C. §2254(d)(1). On the contrary, the trial court's denial of Santiago's proffer of this exculpatory evidence was such an unreasonable and egregious error of state evidentiary law as "to amount to a denial of . . . due process of law" that this court can and must issue a writ of habeas corpus. *Brown v. Maloney*, 267 F.3d 36, 44 (1st Cir. 2001).

As discussed at length in Santiago's principal memorandum, the trial court's ruling that Oley Saradeth's extrajudicial admission to his brother Fanta was not against his penal interest because he spoke privately to a trusted confidante was a complete inversion of the law pertaining to statements against penal interest. The effect of this gross error of state evidentiary law was to deprive Santiago of his due process right to present witnesses in his favor. The proffered testimony had all the necessary indicia of

reliability, it was thoroughly comprehensible to a jury, and its admission would not have confused the issues.    There was, in short, no compelling rationale whatsoever for excluding this critical evidence.  The trial court seriously and unreasonably misapplied the law of evidence in this instance, and in so doing unreasonably deprived Santiago of a fundamental Constitutional right as defined by the Supreme Court of the United States. Santiago is therefore entitled to a writ of habeas corpus pursuant to 28 U.S.C. §2254.

> **1.    The Respondent has failed to show that the evidence supported the trial court's finding that Oley Saradeth's extrajudicial confession to his brother lacked sufficient circumstantial corroboration within the meaning of applicable Massachusetts law.**

The requirement of circumstantial corroboration can be satisfied in a number of ways.  "'[T]he judge may consider . . . the timing of the declaration and the relationship between the declarant and the witness . . . the reliability and character of the declarant . . . whether the statement was made spontaneously . . . whether other people heard the out-of-court statement  .  .  .  whether there is any apparent motive for the declarant to misrepresent the matter . . . and whether and in what circumstances the statement was repeated.'"    ***Commonwealth v. Weichell***, 446 Mass. 785, 803 (2006), *quoting from Commonwealth v. Drew*, 397 Mass. 65, 76 (1986).  In other words,    "corroborating circumstances" under Massachusetts law does not necessarily mean that there must be other corroborating trial evidence.    The phrase is, rather, a legal term of art that encompasses all of the traditional circumstantial measures of a declaration's inherent reliability and trustworthiness.  Although the trial judge made no specific findings with respect to the issue of corroboration, the evidence strongly favors admissibility.

2

The familial relationship between Fanta and his brother and the private setting in which Oley spoke is, of course, a strong circumstantial indication of trustworthiness, as discussed in Santiago's principal memorandum. *See* **Commonwealth v. Galloway**, 404 Mass. 204, 209 (1989). Furthermore, the Respondent's contention that Oley cannot be regarded as disinterested because he and Fanta were siblings is patently nonsensical.

The declaration was temporally close to Santiago's arrest. "[T]rustworthiness is present when a declarant's statement is *contemporaneous* with a defendant's arrest or incarceration..." **Commonwealth v. Weichell**, 446 Mass. 785, 804 (2006)(emphasis included).

There was nothing to suggest an ulterior motive on Oley's part, such as a motive to curry favor with law enforcement authorities. The Respondent's assertion that Oley told the police that the drugs came from Santiago is transparently false. Fanta categorically did *not* testify that Oley told the police that "the drugs came from [Santiago]. The testimony clearly indicates that Oley Saradeth admitted to his brother that it was he who placed the drugs in Santiago's apartment, and at *no point* did Fanta Saradeth testify that his brother told him that Santiago was the original source of Oley's drugs. There was no testimony whatsoever as to the origin of the drugs in question. Fanta testified that his brother, Santiago's sometime roommate, told him in private conversation that approximately a week before Santiago's arrest, he had gone to Santiago's apartment and hid the cocaine that the police later seized in their search of Santiago's apartment. Fanta also testified that on the day of his brother's death, while he was being transported to the hospital and in the presence of another witness, Oley asked

Fanta to contact Peter and "tell him he's very, very sorry..." Transcript, Vol. I at 66-71. The Respondent's misstatement of the evidence in this regard is inexcusable.

The mere fact that Oley was arrested for cocaine possession is not a sufficient basis for a finding that Oley was not a credible declarant. If this were the case, then no extrajudicial admissions of guilt by declarants with criminal records would pass the test. Such a standard would likely eliminate virtually all such proffers from consideration. Indeed, the fact that Oley was arrested for possessing cocaine lends *more* credibility to his statement that the cocaine in Santiago's apartment belonged to him. Moreover, unlike, for example, larceny or fraud, the crime of drug possession is not regarded as especially probative of a witness's truthfulness for impeachment purposes. *See Commonwealth v. Kowalski*, 33 Mass.App.Ct. 49, 50 (1992).

Finally, it does not follow, as the Respondent contends, that the fact that other items associated with cocaine distribution were found in Santiago's apartment renders Oley's declaration implausible. Given that Oley was admitting to having placed a large quantity of cocaine in Santiago's apartment, a quantity that is statutorily regarded as indicative of intent to distribute, it stands to reason that such accoutrements of cocaine distribution also belonged to Oley, and not to Santiago. That the box containing some of the cocaine was addressed to "Johnny R. Santiago" is unremarkable. Oley's chosen hiding place was Santiago's apartment, and it is perfectly logical that he would have made use of a box he found there. In any event, since Oley had no discernible motive to fabricate, the Respondent's implausibility argument actually goes to the question of *Fanta's* credibility as a witness, not to Oley's credibility as declarant. The witness's credibility is a jury question, and not a proper focus of inquiry in ascertaining the

4

admissibility of a statement against penal interest. *Commonwealth v. Drew*, 397 Mass. at 79.

   2.   *Stone v. Powell*, **428 U.S. 465 (1976), has outlived its utility and lost its analytical underpinnings in light of the enactment of the AEDPA, and should be overruled. In any event,** *Stone v. Powell* **should not be applied in this case, inasmuch as Santiago's Fourth Amendment claim is accompanied by a claim of actual innocence.**

The Respondent also contends that Santiago's claim that the search of his apartment was conducted pursuant to an invalid warrant is barred under *Stone v. Powell*, 428 U.S. 465 (1976). The key assumption underlying *Stone v. Powell*, however, is no longer operative since the enactment of the AEDPA. The ruling in *Stone v. Powell*, the product of a divided court and controversial even in its day, is premised on the assumption that extremely fact-intensive Fourth Amendment litigation offers greatly diminishing returns in terms of deterrence when it is conducted long after the fact. "[T]here [is no] reason to assume that any specific disincentive already created by the risk of exclusion of evidence at trial or the reversal of convictions on direct review would be enhanced if there were the further risk that a conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring years after the incarceration of the defendant." *Stone v. Powell*, 428 U.S. at 493; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 263 (1973)("[T]he validity of a search-and-seizure claim frequently hinges on a complex matrix of events which may be difficult indeed for the habeas court to disinter especially where, as often happens, the trial occurred years before the collateral attack and the state record is thinly sketched.").

Peter Santiago,
Petitioner,

by his attorney,

8 May 2007

Donald K. Freyleue
BBO# 549822
Six Highland Avenue
Ipswich, MA 01938
(978) 356-4739

### CERTIFICATE OF SERVICE

I, Donald K. Freyleue, attorney for Peter J. Santiago, Jr., hereby certify that on this date I served the foregoing on Susanne G. Reardon, Assistant Attorney General, One Ashburton Place, Boston, MA 02108.

8 May 2007

Donald K. Freyleue

7

# *ExpressO Preprint Series*

*Year* 2006                                              *Paper* 1035

# Enforcing Fourth Amendment Rights through Federal Habeas Corpus

Steven  Semeraro
Thomas Jefferson School of Law

This working paper is hosted by The Berkeley Electronic Press (bepress) and may not be
commercially reproduced without the permission of the copyright holder.

http://law.bepress.com/expresso/eps/1035

Copyright ©2006 by the author.

# Enforcing Fourth Amendment Rights through Federal Habeas Corpus

## Abstract

This article reassesses the use of federal habeas corpus to enforce the Fourth Amendment's protection against unreasonable searches and seizures. In 1976, the U.S. Supreme Court prohibited virtually all substantive review of search-and-seizure claims in federal habeas proceedings. A wave of critical commentary followed, arguing that there was no legitimate reason to distinguish the Fourth Amendment from other constitutional rights. In recent years, however, this anomaly in habeas corpus practice has gone almost entirely unexamined despite dramatic changes in the law governing both the Fourth Amendment and habeas corpus itself.

This article does two things. First, it reviews the history of habeas review of search-and-seizure claims, concluding that the basis for current doctrine was once stronger than its early critics admitted. Second, this article shows that subsequent changes in both the exclusionary rule, and in habeas practice generally, render current doctrine ripe for reassessment. It examines each of the rationales that might have justified exempting search-and-seizure claims from the ordinary scope of habeas review and shows that legal developments since 1976 render them all inadequate to justify current doctrine. The Court itself has come to ground Stone entirely on the assumption that the incremental cost of enforcing the Fourth Amendment exclusionary rule on habeas outweighs the speculative benefits. By adopting a good faith exception to the exclusionary rule; a one-year statute of limitations on habeas petitions; and a reasonableness standard of review in habeas cases, the Court and Congress have now ensured that only the clearest of violations from the most recent cases would give rise to habeas relief. As a result, the cost of applying the writ to search-and-seizure claims is dramatically lowered, and this article thus concludes that Stone should be overruled.

A final section responds to the likely criticism that, because habeas corpus

is governed by statute, one should employ traditional notions of statutory interpretation in assessing the continuing validity of the Stone rule. This article demonstrates that those methods would be indeterminate, and in any event, because Stone purported to be a constitutional decision, rather than one interpreting a statute, it should be reassessed according to the criteria that the Court used to justify it in the first place.

# Enforcing Fourth Amendment Rights Through Federal Habeas Corpus

## by

## Steven Semeraro[*]

[*]    Associate Dean for Academic Affairs and Associate Professor of Law, Thomas Jefferson School of Law.   The author wishes to thank Marjorie Cohn, Teresa Gillis, Scott Howe, and Anders Kaye for their comments and encouragement.  The author also thanks Dorothy Hampton, Hawlee Larson, and June MacLeod for their excellent research assistance.

Hosted by The Berkeley Electronic Press

# Enforcing Fourth Amendment Rights Through Federal Habeas Corpus

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Federal Habeas Corpus Review of Fourth Amendment Claims . . . . . . . . . . . . . . . . . . . . . . . . 7

A. Collateral Review of Fourth Amendment Claims in the Pre-*Mapp* Era . . . . . . . . . . . . . . . . . 8

B. The Impact of the *Mapp* Decision: Constitutionalizing the Exclusionary Rule on Collateral
Search-and-Seizure Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1. The Case in Favor of Federal Habeas Review of Search-and-Seizure Claims . . . . . . . . . . . 10

2. The Case Against Habeas Review of Fourth Amendment Claims . . . . . . . . . . . . . . . . . . . . . 15

C. The Court Rejects Collateral Review of Fourth Amendment Claims . . . . . . . . . . . . . . . . . . 21

D. Collateral Review of Fourth Amendment Claims After *Stone* . . . . . . . . . . . . . . . . . . . . . . . 24

II. Identifying *Stone*'s Grounds for Denying Habeas Review of Fourth Amendment Claims . . 24

A. The Court Rejects the Broad Federal-State Comity Rationale . . . . . . . . . . . . . . . . . . . . . . . 26

B. The Court Rejects the Factual Innocense Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C. The Court Rejects The Prophylactic Rule/Extra-Constitutional Remedy Rationale . . . . . . 30

D. Articulating the Remaining Rationale for Stone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

III. Undermining the Remaining Rationale For Stone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A. The Cost of the Exclusionary Rule is Reduced by The Good Faith Exception . . . . . . . . . . 36

B. Judicial Changes in Habeas Law Reduce the Cost of Applying the Exclusionary Rule
Collaterally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

1. Defaulted Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

2. Successive Petitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3. Retroactivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

4. Harmless Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

C. The Cumulative Effect of Judicial Changes in Habeas Law . . . . . . . . . . . . . . . . . . . . . . . . . . 41

D. Legislative Changes in Habeas Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV. The Statutory Interpretation Critique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A. Focusing on Congressional Intent in Enacting The AEDPA Yields No Determinate Result 44

B. Erroneous Interpretations of the AEDPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1. Easterbrook's Jurisdictional Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

2. Slade's Legislative History Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

3. *Stone*'s Constitutional Underpinnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

bepress Legal Repository

2

http://law.bepress.com/expresso/eps/1035

Nearly 30 years ago, the United States Supreme Court prohibited habeas corpus review of search-and-seizure claims whenever the state provided adequate procedures, no matter how erroneous the substantive decision may have been.[1] A wave of critical commentary followed,[2] but in recent years this anomaly in habeas corpus practice has gone almost entirely unexamined despite dramatic changes in the law governing both the Fourth Amendment and habeas corpus itself.

This article does two things. First, it reviews the history of collateral review of search-and-seizure claims,[3] concluding that the basis for current doctrine was once stronger than its early critics admitted. Second, this article shows that subsequent changes in both the exclusionary rule, and in habeas practice generally, render current doctrine ripe for reassessment.

---

[1]    Stone v. Powell, 428 U.S. 465, 474-95 (1976) .

[2]    Numerous scholars have argued that no legitimate basis exists for treating search-and-seizure claims differently from other constitutional claims on collateral review, or that whatever differences may exist do not justify existing doctrine. Barry Friedman, *A Tale of Two Habeas*, 73 Minn L. Rev. 247, 287 (1988); Philip Halpern, Federal Habeas Corpus and the Mapp Exclusionary Rule After Stone v. Powell, 82 Colum. L. Rev.1, 31-34 (1982); Richard A. Michael, The "New" Federalism and the Burger Court's Deference to the States in Federal Habeas Proceedings, 64 Iowa L. Rev. 233, 253 (1979); Brenda Soloff, Litigation and Relitigation: The Uncertain Status of Federal Habeas Corpus for State Prisoners, 6 Hofstra L. Rev. 297, 309-15 (1978); Mark Tushnet, Constitutional and Statutory Analyses in the Law of Federal Jurisdiction, 25 U.C.L.A. L. Rev. 1301, 1316-18 (1978); Larry W. Yackle, The Future of Habeas Corpus: Reflections on Teague v. Lane and Beyond: The Habeas Hagioscope, 66 S. Cal. L. Rev. 2331, 2399-2408, 2417 (1993); *cf.* United States v. Johnson, 457 U.S. 537, 557-60 (1982) (treating Fourth Amendment claims identically to other constitutional claims in considering the retroactive effect of new rules to defendants still in the direct review process when the new rule is announced).

[3]    This article uses the terms *habeas review* and *collateral review* interchangeably to refer to a constitutional challenge to a criminal conviction after it becomes final. The Court has defined a conviction as final where "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987).

Hosted by The Berkeley Electronic Press

Surprisingly, given the rich literature exploring the history of habeas corpus case law,[4] there has been remarkably little historical analysis directed at the judicial treatment of collateral search-and-seizure claims. Part I of this Article observes that habeas review of Fourth Amendment claims has been the exception rather than the rule. Until the early 1960s, the Fourth Amendment exclusionary rule was not treated as a constitutional principle, and thus state prisoners had no basis to raise collateral search-and-seizure claims. *Mapp v. Ohio,*[5] decided in 1961, held that the Constitution does compel a state court to exclude illegally-seized evidence, and for about a decade thereafter, the federal courts entertained habeas challenges grounded in the Fourth Amendment.[6] Had no one dissented, the plain language of the habeas statute may have justified the use of the writ to remedy search-and-seizure errors. Almost immediately, however, dissenters articulated detailed, analytical, and arguably persuasive counter-arguments. Initially, the U.S. Supreme Court brushed off, without fully engaging, these points.[7] But by

---

[4]    *See, e.g.*, Ann Woolhandler, *Demodeling Habeas*, 45 Stan. L. Rev. 575, 582-630 (1993); James S. Liebman, *Apocalypse Next Time?: The Anachronistic Attack on Habeas Corpus/Direct Review Parity*, 92 Colum. L. Rev. 1997, 2057-81 (1992); Gary Peller, *In Defense of Federal Habeas Corpus Relitigation*, 16 Harv. C.R.-C.L. L. Rev. 579, 602 (1982); Paul Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 465-77 (1963).

[5]    Mapp v. Ohio, 367 U.S. 643, 651 (1961).

[6]    Lefkowitz v. Newsome, 420 U.S. 283 (1975); Cardwell v. Lewis, 417 U.S. 583 (1974); Cady v. Dombrowski, 413 U.S. 433 (1973); Adams v. Williams, 407 U.S. 143 (1972); Whiteley v. Warden, 401 U.S. 560 (1971); Chambers v. Maroney, 399 U.S. 42 (1970); Harris v. Nelson, 394 U.S. 286 (1969); Mancusi v. DeForte, 392 U.S. 364 (1968); Carafas v. LaVallee, 391 U.S. 234 (1968); Warden v. Hayden, 387 U.S. 294 (1967); *see* Henry v. Mississippi, 379 U.S. 443, 452-53 (1965) (direct appeal, but suggesting that habeas review would be open to a Fourth Amendment claim that was not waived in state court).

[7]    *See infra* I.C.

http://law.bepress.com/expresso/eps/1035

1976, the dissenting voices had won out, and the Court has rarely looked back.[8]

Although no definitive case emerges, the historical basis for excluding search-and-seizure claims from federal habeas review is stronger than prior commentators have recognized. But this Article does not defend current doctrine. Even assuming that it was once justifiable, a new case has emerged against it. Part II explains that, by the early 1990s, the Court had rejected each of the broad grounds – federal-state comity, potential innocence, and the extra-constitutional nature of the exclusionary remedy – that might have distinguished collateral Fourth Amendment claims from habeas review of other constitutional challenges.

After these decisions, the only potential justification for distinguishing search-and-seizure claims was that collateral enforcement posed especially high costs and low benefits. Part III of this Article shows that changes in both the exclusionary rule and federal habeas corpus doctrine have dramatically altered that cost/benefit analysis. As of 1976, a petitioner could seek the writ at virtually any time[9]; existing law required a federal habeas court to review virtually any constitutional claim de novo[10] and, if the police violated the Fourth Amendment, the court was

---

[8]     *See infra* I.D&E.

[9]     A federal habeas rule enabled a court to dismiss the case if the passage of time had prejudiced the state's ability to respond to the petition. But this rule did not apply to prejudice that might accrue to the state were a re-trial required. *See infra* at n. 116.

[10]    Wainwright v. Sykes, 433 U.S. 72, 87 (1976) ("since Brown v. Allen, 344 U.S. 443 (1953), it has been the rule that the federal habeas petitioner who claims he is detained pursuant to a final judgment of a state court in violation of the United States Constitution is entitled to have the federal habeas court make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings."); Fay v. Noia, 372 U.S. 391, 425-26 (1963) (requiring de novo federal habeas review of defaulted claims unless petition deliberately by-passed an opportunity for state court review in order to preserve the claim for federal court).

Hosted by The Berkeley Electronic Press

compelled to grant the writ unless the error was harmless beyond a reasonable doubt.[11]
Subsequently, the Court has narrowed the scope of the exclusionary rule by adopting a good faith exception,[12] and restricted federal habeas corpus review in several important ways.[13] In addition, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996,[14] (1) imposing a strict one-year statute of limitations[15] and (2) prohibiting federal courts from granting the writ unless the state decision involved an unreasonable application of existing federal law.[16]

These developments significantly lowered the costs of enforcing the exclusionary rule in federal habeas corpus proceedings. The difficulties posed by long-delayed fact-finding have been virtually eliminated. And the good faith exception to the exclusionary rule, combined with the AEDPA's reasonableness standard of review, ensure that the writ would be granted only in those search-and-seizure cases in which police conduct diverges most widely from settled law and is thus most likely to be deterred by the threat of collateral review. This Part thus concludes that *Stone* should be overruled.[17]

---

[11]    Whiteley v. Warden, 401 U.S. 560, 567-69 & n.13 (1971) (applying exclusionary rule on habeas over claim of harmless error even though police officers had obtained a warrant).

[12]    *See infra* III.B.1.

[13]    *See infra* III.B.2.a-d.

[14]    PL 104-132 (S 735) (Apr. 24, 1996). This Article refers to the Anti-terrorism and Effective Death Penalty Act of 1996 interchangeably as the "AEDPA" and the "1996 Act."

[15]    28 U.S.C. § 2244(d).

[16]    28 U.S.C. §2254(d).

[17]    The legislative history of the 1996 Act is silent on whether Congress intended it to alter the *Stone* rule. The case was cited only to support the argument that state courts could competently address federal constitutional issues. See 141 CONG. REC. S7833 (daily ed. June 7, 1995) (statement of Sen. Kyl).

6

Part IV responds to the likely criticism that this Article pays inadequate attention to traditional notions of statutory interpretation. This Part contends that those interpretative methods yield inherently uncertain results, and thus one focusing exclusively on the statutory language and legislative history could reasonably conclude that, in enacting the AEDPA, Congress either did, or did not, intend to disturb current doctrine. Those who claim definitively that the AEDPA preserves the existing rule make serious errors in their reading of either *Stone v. Powell*,[18] the case that prohibited federal habeas courts from reaching most Fourth Amendment claims, or the legislative history of the 1996 Act. More importantly, *Stone* purported to be a constitutional case, not one interpreting the habeas statute. Traditional methods of statutory interpretation should therefore play little, if any, role in assessing *Stone*'s continuing utility and vitality.

## I. Federal Habeas Corpus Review of Fourth Amendment Claims

Collateral review of search and seizure claims has progressed through three distinct periods. Prior to 1961, the Fourth Amendment exclusionary rule did not apply to the states. As a result, a state prisoner had no federal ground to invoke habeas jurisdiction when illegally seized

---

Habeas petitioners have begun to argue as a matter of statutory interpretation that habeas courts should now apply the terms of the 1996 Act, rather than the *Stone* rule, to collateral search-and-seizure claims. Most courts, however, continue to apply *Stone*. Hampton v. Wyant, 296 F.3d 560, 563 (7th Cir. 2002) (holding 1996 Act not intended to overrule *Stone*); Herrera v. LeMaster, 225 F.3d 1176, 1178 n.2 (10th Cir. 2000) (same); Newman v. Hopkins, 6 F. Supp. 2d 1111, 1116 (D. Neb. 1998) (assuming, without discussion, that *Stone* continues to apply); *but see* Carlson v. Ferguson, 9 F. Supp.2d 654, 656 (S.D. W.V. 1998) (holding that standard of review in the 1996 Act replaces *Stone*'s full-and-fair-hearing requirement); Cabrera v. Hinsley, 540 U.S. 873 (2003) (denying certiorari where petitioner argued that *Stone* "should have been understood as permitting relief when state proceedings do not satisfy [the 1996 Act's] standards" 2003 WL 22428412 at *12-26 (Jun. 30, 2003) (petition for *certiorari*).

[18]    428 U.S. 465 (1976).

evidence was used to support a conviction. That changed in 1961 with the Court's decision in *Mapp v. Ohio*,[19] which applied the exclusionary rule to the states.[20] In 1976, the Court prohibited habeas review of Fourth Amendment claims unless the state failed to provide a full and fair opportunity to litigate the claim in the direct criminal process.[21] This Part summarizes the federal courts' specific treatment of Fourth Amendment claims arising in habeas corpus proceedings.

## A. Collateral Review of Fourth Amendment Claims in the Pre-*Mapp* Era

In the late 1800s, the United States Supreme Court first excluded illegally obtained evidence.[22] Not until the early 1920s, however, did the Court definitively hold that the fruits of illegal searches and seizures could not be used to convict.[23]

Although the federal exclusionary rule was well established by the mid-twentieth century, federal habeas review of state court search-and-seizure claims remained entirely unexplored. In 1948, the Court held in *Wolf v. Colorado*[24] that the Fourth Amendment applied to state, as well as federal, law enforcement authorities[25] but that the exclusionary rule did not.[26] To be sure,

---

[19]   367 U.S. 643, 651 (1961).

[20]   *Id.* at 660.

[21]   *See infra* I.D.

[22]   Boyd v. United States, 116 U.S. 616 (1886).

[23]   Gouled v. United States, 255 U.S. 298 (1921); *see* Silverthorn Lumber Co. v. United States, 251 U.S. 385 (1920); Weeks v. United States, 232 U.S. 383 (1914).

[24]   338 U.S. 22 (1949).

[25]   *Wolf*, 338 U.S. at 27-28.

[26]   *Id.* at 33.

bepress Legal Repository

8

many states had their own similar rules.[27] But an error of state law alone could not trigger federal habeas review.[28] As a result, through the 1950s, a state prisoner generally could not bring a collateral search-and-seizure claim.[29]

## B. The Impact of the *Mapp* Decision: Constitutionalizing the Exclusionary Rule on Collateral Search-and-Seizure Claims

In 1961, the Court decided *Mapp v. Ohio*,[30] which required state courts to exclude evidence obtained in violation of the Fourth Amendment.[31] Not surprisingly, by the mid-1960s, state prisoners were filing federal habeas corpus petitions collaterally attacking their detentions on Fourth Amendment grounds.[32] In its 1965 decision in *Linkletter v. Walker*,[33] the Court first

---

[27]     *Id.* at 33-38; Mapp v. Ohio, 367 U.S. 643, 651 (1961).

[28]     The federal habeas statute limits jurisdiction to claims arising under "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254.

[29]     Four years after *Wolf*, the Court held that, wholly apart from the Fourth Amendment exclusionary rule, the Due Process Clause required a state to exclude evidence if the government's conduct "shocked the conscience." Rochin v. California, 342 U.S. 165, 172-73 (1952).

[30]     367 U.S. 643 (1961).

[31]     *Mapp*, 367 U.S. at 655-60.

[32]     *See, e.g.,* Fixel v. Wainwright 492 F.2d 480, 485 (5th Cir. 1974); United States ex rel. Angelet v. Fay, 333 F.2d 12 (2nd Cir. 1964); Kuhl v. United States, 370 F.2d 20, 22 (9th Cir., 1966); Hall v. Warden, 313 F.2d 483 (4th Cir. 1963); Walker v. Peppersack, 316 F.2d 119 (4th Cir. 1963); California v. Hurst, 325 F.2d 891 (9th Cir. 1963); Gaitan v. United States, 317 F.2d 494 (10th Cir. 1963); Linkletter v. Walker, 323 F.2d 11 (5th Cir. 1963), *aff'd*, 381 U.S. 618 (1965); U. S. ex rel. Cabey v. Mazurkiewicz, 312 F.Supp. 11, 14 (D.C.Pa. 1969); U. S. ex rel. Spero v. McKendrick, 266 F.Supp. 718, 723 (D.C.N.Y. 1967); Sisk v. Lane, 331 F.2d 12 (7th Cir. 1964); Painten v. Massachusetts. 252 F.Supp. 851 (D.C.Mass. 1966); Bates v. Dickson 226 F.Supp. 983, 993 (D.C.Cal. 1964); Benson v. People of State of Cal. 336 F.2d 791, 794 (C.A.Cal.1964).

[33]     381 U.S. 618 (1965).

9

addressed such a case, holding that the exclusionary rule did *not* apply retroactively to a state case that had become final before the Court decided *Mapp*.[34]

*Linkletter* did not address whether post-*Mapp* search-and-seizure claims could be attacked collaterally, but for the next decade, the analysis in that opinion provided the ingredients for the arguments on both sides of the debate. Some assumed that Fourth Amendment claims and the exclusionary rule should be treated on habeas like any other constitutional claim and its attendant remedy.[35] Others saw substantial differences in the nature of search-and-seizure claims.[36] The following sub-parts describe the arguments on both sides.

## 1. The Case in Favor of Federal Habeas Review of Search-and-Seizure Claims

By addressing retroactivity without discussing the scope of the writ, the *Linkletter* Court arguably assumed that federal habeas review would be available for post-*Mapp* Fourth Amendment claims. In the early 1960s, the notion that constitutional holdings might not apply retroactively was novel,[37] and the Court arguably would not have created a new body of doctrine if it did not believe that Fourth Amendment claims would otherwise be open to collateral review.

---

[34]     *Id.* at 639-40 (defining a case as final if the U.S. Supreme Court had denied *certiorari* or the time for filing a petition had expired).

[35]     Paul J. Mishkin, The Supreme Court 1964 Term-Forward: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 78 & n.73 (1965).

[36]     The Court quoted *Linkletter* in its decision holding that habeas review would generally be closed to search-and-seizure claims. *Stone*, 428 U.S. at 486 (quoting *Linkletter*, 381 U.S. at 637).

[37]     Before deciding *Linkletter*, "both the common law and [the Court's] own decisions recognized a general rule of retrospective effect for the constitutional decisions of this Court ... subject to [certain] limited exceptions." Robinson v. Neil, 409 U.S. 505, 507 (1973); Linkletter, 381 U.S. at 628 (explaining that "heretofore, without discussion, we have applied new constitutional rules to cases finalized before the promulgation of the rule").

10

Further, the *Linkletter* Court placed great weight on *Mapp*'s breaking with prior precedent.[38] That concern, of course, would not apply to post-*Mapp* petitions in which state courts could not have legitimately relied on *Wolf* in failing to exclude illegally seized evidence.

Federal habeas courts generally assumed jurisdiction over state court search-and-seizure claims without pausing to consider whether Fourth Amendment claims should be treated differently.[39] In 1964, a California Federal District Court expressed the general sentiment well: "Since the exclusionary rule is itself a Constitutional dictate, the question of illegal search and seizure by state authorities of evidence for use in a state criminal trial is cognizable by the federal courts on application for a writ of habeas corpus, unless there is a state post-conviction remedy still available to the prisoner at the time of filing the application in the federal court."[40]

For the most part, the U.S. Supreme Court appears to have adhered to that same reasoning, addressing several Fourth Amendment habeas cases without engaging the analytic arguments for and against collateral review.[41] During this period, *Kaufman v. United States*,[42] stands as the Court's lone significant attempt to grapple with the reviewability issue. There, a

---

[38]    *Id.* at 636 ("The thousands of cases that were finally decided on *Wolf* cannot be obliterated. The 'particular conduct, private and official,' must be considered. Here 'prior determinations deemed to have finality and acted upon accordingly' have 'become vested.' And finally, 'public policy in the light of the nature both of the (*Wolf* doctrine) and of its previous application' must be given its proper weight."); *id.* at 638 (contrasting retroactive overturning of cases involving coerced confessions because rule was well established at the time of those cases).

[39]    *Supra* n. 6.

[40]    *Bates v. Dickson* 226 F.Supp. 983, 993 (D.C.Cal. 1964); Benson v. People of State of Cal. 336 F.2d 791, 794 (9th Cir..1964).

[41]    *Kaufman v. United States*, 394 U.S. 217, 239 (1969) (Black, J., dissenting).

[42]    394 U.S. 217 (1969).

Hosted by The Berkeley Electronic Press

11

criminal judgments at the expense of the interest of each prisoner in the vindication of his constitutional rights."[47] Here, the Court cited cases that had explained the value of collateral review and asserted that "[t]his pholosophy inheres in our recognition of state prisoners' post-conviction claims of illegal search and seizure."[48] But the cited cases involved suspect evidence and, by excluding it, the court could directly address the constitutional violation. In Fourth Amendment cases, by contrast, courts exclude undeniably probative evidence and do not directly remedy the constitutional breach. The *Kaufman* Court never explained why this special character of search-and-seizure claims should not alter its finality/rights-enforcement calculus.

To be sure, Justice Brennan emphasized that the exclusionary rule protects societal interests, not just those of the defendant in a particular case.[49] But that truism does not logically lead to the conclusion that collateral enforcement of the rule sufficiently serves those interests to justify the cost. As Judge Friendly argued two years after *Kaufman*, no unassailable principle of justice compels a federal court to free a guilty state prisoner who had an "opportunity to litigate" his claims on direct review in state court "even though he might have escaped deserved

---

[47]    *Id.* at 228. Justice Brennan, the author of the majority opinion in *Kaufman* was a member of the majority in *Linkletter* where the Court found that finality interests did outweigh the interest in providing a remedy for a search-and-seizure violation. Justice Black, in his dissent in *Kaufman* argued that the same reasoning applied to all collateral relief. *Id.* at 239-40. Justice Brennan disagreed, explaining that "[t]he availability of post-conviction relief serves significantly to secure the integrity of proceedings at or before trial and on appeal. No such service is performed by extending rights retroactively. Thus, collateral relief, unlike retroactive relief, contributes to the present vitality of all constitutional rights whether or not they bear on the integrity of the fact-finding process." *Id.* at 229.

[48]    *Id.* at 228 (citing Fay v. Noia, 372 U.S. 391, 394-96 (1963) (confession case) and Sanders v. United States, 373 U.S. 1, 5-6 91963) (due process concern that petitioner rendered incompetent by involuntarily administered drugs)).

[49]    *Id.* at 229.

13

Hosted by The Berkeley Electronic Press

punishment in the first instance with a brighter lawyer or a different judge."[50] Justice Brennan

may have had the better of this argument, but his opinion in *Kaufman* did not compellingly make

the case.[51]

---

[50]    Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38
U. Chi. L. Rev. 142, 157 (1970).

[51]    Post-*Kaufman* cases add nothing to the analytic argument for habeas review of Fourth
Amendment claims. Two of them, however, confirm that a majority of the Court had accepted
that search-and-seizure claims were, for the purposes of habeas review, indistinguishable from
other constitutional claims. First, in *Whiteley v. Warden*, 401 U.S. 560 (1971), the Court granted
the writ, reversing a state court conviction in which an affidavit supporting an arrest warrant did
not establish probable cause. *Id*. at 579. *Whiteley* stands out from other cases that assume
jurisdiction over collateral search and seizure claims because two of the dissenters in *Kaufmann*,
Justices Harlan and Stewart, joined the *Whiteley* majority. In *Kaufman*, they had dissented,
arguing that federal courts should generally not collaterally review search-and-seizure claims. In
*Whiteley*, Harlan wrote the majority opinion, and Steward signed on, apparently believing that
the fight against collateral review of search-and-seizure claims had been lost. In concurring in
another search-and-seizure case denying habeas relief, Justice Stewart made this point explicitly.
Chambers v. Maroney, 399 U.S. 42, 54-55 (1970) (Stewart, J., concurring) ("I ahere to the view
that the admission at trial of evidence acquired in alleged violation of Fourth Amendment
standards is not of itself sufficient ground for a collateral attack upon an otherwise valid criminal
conviction, state or federal. . . .But until the Court adopts that view, I regard myself as obligated
to consider the merits of the Fourth and Fourteenth Amendment claims in a case of this kind.
Upon that premise I join the opinion and judgment of the Court.") Whether Justice Harlan agreed
that federal habeas should not extend to search-and-seizure claims in state court cases is
uncertain. Harris v. Nelson, 394 U.S. 286, 304 n.1 (1969) (Harlan, J., dissenting).

In *Lefkowitz v. Newsome*, 420 U.S. 283 (1975), the Court granted *certiorari* to decide
whether a federal habeas court should review a Fourth Amendment claim, even though the
defendant had pled guilty. The Court had previously held that federal habeas courts could not
review post-guilty plea constitutional claims. Brady v. United States, 397 U.S. 742 (1970)
(guilty plea entered pursuant to an unconstitutional statute may not be upset on habeas);
McMann v. Richardson, 397 U.S. 759, 771 (1970) (guilty plea influenced by prior coerced
confession may not be attacked on habeas); Parker v. North Carolina, 397 U.S. 790, 797-98
(1970) (guilty plea may not be attacked on habeas despite erroneous advice of counsel that
coerced confession would be admissible). In *Lefkowitz*, however, a state statute specifically
permitted post-plea review in state court, and the Court, in an opinion by Justice Stewart, held
that because state review was permitted, federal collateral review was also available. *Lefkowitz,*
420 U.S. at 291-92. As of 1975, then, the Court would not distinguish between Fourth
Amendment, and other constitutional, claims. As Justice Stewart explained for the Court, in

14

## 2. The Case Against Habeas Review of Fourth Amendment Claims

Just as *Linkletter*'s focus on pre-*Mapp* petitions led courts to assume that post-*Mapp*

search-and-seizure claims fell within the scope of the writ, *Linkletter*'s intricate analysis sowed

the seeds of alternative arguments that arose against federal habeas review of Fourth Amendment

claims. First, by prohibiting collateral review of pre-*Mapp* search-and-seizure claims, *Linkletter*

reinforced that the Court itself largely shaped the scope of habeas review.[52] If it could effectively

bar collateral review of pre-*Mapp* cases, then it could prohibit review of post-*Mapp* claims as

well. Second, key aspects of *Linkletter*'s rationale for denying retroactive reliance on the

exclusionary rule also weighed against prospective collateral attacks:

(1) exclusionary rule claims hinder the truth-seeking process;

(2) collateral review would seriously tax the administration of justice because of the

pervasiveness and fact-intensiveness of search-and-seizure claims; and

(3) re-examination on habeas would add little to the deterrent function of the exclusionary rule.[53]

---

asserting a search-and seizure claim, a petitioner "has satisfied all the prerequisites for invoking
the habeas corpus jurisdiction of the federal courts. He is no less entitled to federal review of his
constitutional claim than is any other defendant who raises his claim in a timely fashion . . ." *Id.*
at 291-92 & nn. 8-9 (footnotes omitted).

[52]     *See infra* nn. 209-16.

[53]     *Id.* at 637 (deterrent purpose of exclusionary rule will not be served by freeing "guilty
victims" of fourth amendment violations); *id.* ("To make the rule of Mapp retrospective would
tax the administration of justice to the utmost. Hearings would have to be held on the
excludability of evidence long since destroyed, misplaced or deteriorated. If it is excluded, the
witnesses available at the time of the original trial will not be available or if located their
memory will be dimmed."); *id.* at 638 (suggesting that reversing convictions based on an error
with "no bearing on guilt would seriously disrupt the administration of justice"); *id.* (contrasting
coerced confession cases that involve the admission of potentially unreliable evidence with
search-and-seizure cases where "there is no likelihood of unreliability"); *id.* at 639 (explaining
that each case in which a constitutional rule had been applied retroactively "went to the fairness

Hosted by The Berkeley Electronic Press

The first courts to question the propriety of collateral attacks on search-and-seizure decisions were lower federal courts that refused to review federal prisoner petitions raising Fourth Amendment claims collaterally that had not been raised in the direct criminal process.[54] Most of these cases rested on the established rule that habeas could not be used as a substitute for appeal.[55]  In *Thornton v. United States*,[56] however, the D.C. Circuit presented a thorough-going argument for denying collateral review to search-and-seizure claims.[57]  Although Judge Leventhal's opinion purportedly limited the court's rationale to federal prisoners,[58] his analysis stands as the most persuasive argument for eliminating virtually all collateral search-and-seizure litigation, whether the case arose in federal or state court.

---

of the trial – the very integrity of the fact-finding process. Here . . . the fairness of the trial is not under attack.").

[54]     Peters v. United States, 312 F.2d 481, 482 (8th Cir. 1963); United States v. Re, 372 F.2d 641 (2nd Cir. 1967); United States v. Jenkins, 281 F.2d 193 (3rd Cir. 1960); Armstead v. United States, 318 F.2d 725 (5th Cir. 1963). Eisner v. Untied States 351 F.2d 55, 57 (6th Cir. 1965) De Weeles v. United States, 372 F.2d 67 (7th Cir. 1967); Williams v. Untied States, 307 F.2d 366, 367 (9th Cir. 1962); *but see* United States v. Sutton, 321 F.2d 221 (4th Cir. 1963); Gaitan v. Untied States, 317 F.2d 494 (10th Cir. 1963); *but see* U.S. v. Sutton, 321 F.2d 221, 222 (4th Cir. 1963) (holding that federal prisoner may collaterally challenge a denial of a search-and-seizure suppression motion despite failing to file an appeal).

[55]     *See, e.g.*, Sunal v. Large, 332 U.S. 174, 179-80 (1947).

[56]     368 F.2d 822, 824 (D.C. Cir. 1966).

[57]     Judge Leventhal's opinion is so persuasive because he convinces the reader that he actually believes in the distinction between direct and collateral review of Fourth Amendment claims. *Id.* at 826-27 (stressing the important purposes of the Fourth Amendment and the courts long standing commitment to effective remedies). In contrast, *Stone* reads as if the exclusionary rule should be discarded entirely were stare decisis not an issue. *Stone*, 428 U.S. at 490-94 (emphasizing costs of exclusionary rule and highlighting "the absence of supportive empirical evidence" of the rule's effectiveness).

[58]     *Thornton*, 368 F.2d at 828-29.

16

http://law.bepress.com/expresso/eps/1035

Citing *Linkletter*, the D.C. Circuit held that absent special circumstances – such as ineffective counsel or an inadequate opportunity to seek relief [59] – a court should not address the merits of a Fourth Amendment claim on habeas.[60] Judge Leventhal explained that "whether a collateral attack is permissible" should turn on three factors:

(1) "the nature of the constitutional claim";

(2) "[t]he effectiveness of the direct remedies"; and

(3) "the need for choices among competing considerations in quest of the ultimate goal of achievement of justice."[61]

In search-and-seizure cases, the court concluded that each factor weighed against collateral review. The exclusionary rule powerfully and effectively enforced the Fourth Amendment pre-trial, at trial, and on direct appeal. Little would be gained from further collateral enforcement.[62] By contrast, habeas review carried a high cost because of the large number of hearings that would be required to examine events about which memories had long faded; that most of these petitions would ultimately fail made the cost that much more unjustifiable.[63]

---

[59]     *Id.* at 829.

[60]     Thornton v. United States, 368 F.2d 822, 824 (D.C. Cir. 1966).  Justice Harlan, joined in dissent by Justice Stewart, made a similar argument in Kaufmann v. United States, 394 U.S. 217, 243 (1969) ("the Court once again . . . this Term imposes a burden on the judiciary and on society at large, which results in no legitimate benefit to the petitioner and does nothing to serve the interests of justice").

[61]     *Id.* at 826.

[62]     *Id.* at 828 (explaining that "collateral attack would be of little if any weight in achieving the pattern of lawful conduct by enforcement officials which is the objective of the exclusionary rule").

[63]     *Id.* at 827.

17

Hosted by The Berkeley Electronic Press

Although these same administrative concerns exist with respect to, for example, collateral claims of ineffective counsel or the failure to disclose evidence, habeas review is needed because courts cannot effectively protect them during the direct proceedings.[64] Perhaps more importantly, a greater individual injustice occurs when adequate counsel is not provided, or exculpatory evidence is withheld, than where a court fails to exclude illegally seized, but truthful and probative, evidence.[65] Under these circumstances, the court held, "there is no imperative to . . . leav[e] no stone unturned, when exploration of all avenues of justice at the behest of individual petitioners may impair judicial administration of the federal courts, as by making criminal litigation interminable, and diverting resources of the federal judiciary."[66]

Justice Brennan's majority opinion in *Kaufman* rejected *Thornton*'s reasoning and explicitly endorsed the opinion of Judge Skelly Wright, who dissented in *Thornton*, that habeas review should be available to both state and federal prisoners for all constitutional claims.[67] But three justices dissented in *Kaufman*, advancing arguments that would soon influence a majority of the Court. Justice Harlan, joined by Justice Stewart, would have adopted the *Thornton* reasoning.[68] Justice Black emphasized that the potential innocence of the petitioner should weigh heavily in determining the availability of habeas relief.[69] Because Fourth Amendment claims,

---

[64]  *Id.*

[65]  *Id.* at 827-28.

[66]  *Id.* at 26 (citing Sunal v. Large, 332 U.S. at 182).

[67]  *Kaufman*, 394 U.S. at 230-31.

[68]  *Kaufman*, 394 U.S. at 242-43 (Harlan, J., dissenting).

[69]  *Id.* at 234  (Black, J. dissenting) ("It is this element of probable or possible innocence that I think should be given weight in determining whether a judgment after conviction and appeal

18

unlike virtually all other constitutional claims, do not help ensure "that the trial would be a reliable means of testing guilt," Black believed that the writ should not reach them.[70]

Four years later, the Court took *certiorari* on a Fourth Amendment federal habeas claim. Although a majority of the Court denied the claim on its merits, four justices argued that collateral review should be foreclosed.[71] Justice Powell began by reviewing the writ's historic purpose, which he contended did not include the re-litigation of issues decided by courts of competent jurisdiction. The modern federal habeas corpus statutes, he argued, were not intended to change that function.[72] Nevertheless, he did not advocate a return to this narrow form of habeas review so long as the petitioner's claim cast doubt on his guilt.[73]

Although Justice Powell, like Justice Black before him, focused on the importance of a

_____

and affirmance should be open to collateral attack, for the great historic role of the writ of habeas corpus has been to insure the reliability of the guilt-determining process."); *id*. at 241 ("In collateral attacks whether by habeas corpus or by § 2255 proceedings, I would always require that the convicted defendant raise the kind of constitutional claim that casts some shadow of a doubt on his guilt."); *Whiteley*, 401 U.S. at 574-75 (Black, J., dissenting).

[70]    *Kaufman*, 394 U.S. at 237-38  (Black, J. dissenting) ("The purpose of the exclusionary rule, unlike most provisions of the Bill of Rights, does not include, even to the slightest degree, the goal of insuring that the guilt-determining process be reliable.").

[71]    Schneckloth v. Bustamonte, 412 U.S. 218, 249 (1973) (Blackmun, J., concurring) (expressing agreement with dissenters in *Kaufman*); *id*. at 250 (Powell, J, concurring) (joined by Chief Justice Burger and Justice Rehnquist and asserting that "federal collateral review of a state prisoner's Fourth Amendment claims . . . should be confined solely to the question of whether the petitioner was provided a fair opportunity to raise and have adjudicated the question in state courts").

[72]    *Id*. at 252-56 (Powell, J., concurring).

[73]    *Id*. at 256 (Powell, J., concurring) (describing expansion of habeas for claims of innocence as a "justifiable evolution of the use of habeas corpus").

19

claim of innocence,[74] he also reiterated much of Judge Leventhal's rationale in *Thornton*, arguing that habeas review (1) clogs the courts[75] and (2) imposes significant costs in terms of judicial effort and the difficulty of delayed fact finding for both the collateral claim and any re-trial.[76] These costs apply to any habeas claim, Powell recognized, but they are likely to be even more pronounced in Fourth Amendment cases, because of the intensely factual nature of most search-and-seizure issues.[77]

Also following *Thornton*, Justice Powell reiterated that extending the exclusionary rule to habeas would have at best an "anemic" incremental benefit. Where a prisoner collaterally attacks a conviction, Powell argued, "the exclusionary rule retains its major liabilities while the asserted benefit of the rule dissolves. For whatever deterrent function the rule may serve when applied on trial and appeal becomes greatly attenuated when, months or years afterward, the claim surfaces

[74]   *Id.* at 256-58. Powell contemplated a wholesale revision of federal habeas, suggesting that a claim of innocence might always be required. *Id.* at 265-66 (Powell, concurring) ("The specific issue before us, and the only one that need be decided at this time, is the extent to which a state prisoner may obtain federal habeas corpus review of a Fourth Amendment claim. Whatever may be formulated as a more comprehensive answer to the important broader issues (whether by clarifying legislation or in subsequent decisions). . ."). On the current Court, Justice Scalia has made the same argument. Withrow v. Williams, 507 U.S. 680, 720 (1993) (Scalia, J., concurring in part and dissenting in part) ("Prior opportunity to litigate an issue should be an important equitable consideration in any habeas case, and should ordinarily preclude the court from reaching the merits of a claim, unless it goes to the fairness of the trial process or to the accuracy of the ultimate result.").

[75]   *Schneckloth*, 412 U.S. at 260-61 (Powell, concurring); Rose v. Mitchell, 443 U.S. 545, 583-84 (1979) (Powell, J., dissenting) ("In the year ending June 30, 1978, almost 9,000 of the prisoner actions filed were habeas corpus petitions.").

[76]   *Schneckloth*, 412 U.S. at 261 (Powell, concurring) (citing Anthony Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U. Pa. L. Rev. 378, 383-84 (1964)).

[77]   *Id.* at 263 (Powell, concurring).

20

for collateral review."[78]

## C. The Court Rejects Collateral Review of Fourth Amendment Claims

In 1976, the Court decided *Stone v. Powell*,[79] in effect adopting Judge Leventhal's argument in *Thornton* that absent special circumstances – which the Court described as the lack of an opportunity for full and fair litigation in state court – search-and-seizure claims should not be open to collateral attack.[80] Justice Powell's majority opinion in *Stone* was not as sweeping as his concurrence in *Schneckloth* had been and, like *Thornton*, placed greater emphasis on the cost of the exclusionary rule and habeas review than on the assumed guilt of a prisoner who relies solely on a search-and-seizure claim.

---

[78]    *Id.* at 268-69 (Powell, concurring). In separate opinions, Powell also added additional grounds for denying collateral review of Fourth Amendment claims, stressing the cost in terms of (1) federal-state relations, *Id.* at 264 (Powell, concurring); *Rose*, 443 U.S. at 584-85 (Powell, J., dissenting), and (2) the educative and rehabilitative functions of the criminal law where finality is long delayed. *Id.* at 584 (Powell, J., dissenting).

After *Schneckloth*, lower courts began to question the continued assumption that exclusionary rule claims should be reviewed collaterally. For example, a New Jersey district court explained that "[t]here is some question . . . whether the exclusion remedy for Fourth Amendment violations ought to be viewed as of constitutional dimension for purposes of collateral attack by petition for a writ of habeas corpus, where the constitutional claim has little or no bearing upon the issue of guilt or innocence or upon the integrity of the fact-finding process, and where the asserted deterrent purposes of the exclusionary rule are likely to be so attenuated as no longer to warrant its application. A majority of the Supreme Court, however, still views the receipt of unconstitutionally-seized evidence at trial to be cognizable by petition for habeas corpus." *U. S. ex rel. Petillo v. State of N. J.* 400 F.Supp. 1152, 1190 (D.C.N.J. 1975)

[79]    428 U.S. 465 (1976).

[80]    *Stone*, 428 U.S. at 481-82 (holding "that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner by granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial").

21

The purpose of the exclusionary rule, the Court held, was to deter police misconduct.[81] Although some language in the Court's opinions had suggested that the rule also preserved the integrity of the judicial process,[82] the Court declared that rationale inconsistent with the many recognized legitimate uses of illegally seized evidence. For example, the Court had refused to exclude evidence from grand jury proceedings or trials in which the defendant's own privacy rights had not been violated.[83] Although the impact on the integrity of the courts in admitting illegally-seized evidence would have required exclusion in these situations, the Court justified exceptions on the ground that the "incremental" deterrent effect of suppressing the evidence would be "uncertain at best."[84] Given the recognized societal cost of excluding truthful, probative evidence, the exclusionary rule, the Court had held, would be unjustifiable in these situations.[85]

*Stone* held that this same rationale applied to collateral proceedings.[86] Habeas review, the Court noted, "often occur[s] years after the incarceration of the defendant."[87] Law enforcement

---

[81]   *Id.* at 486.

[82]   *Id.* at 484-86 (citing cases).

[83]   *Id.* at 484-86.

[84]   *Id.* at 487 (quoting United States v. Calandra, 414 U.S. 338, 351 (1974); *id.* at 488 ("the 'additional benefits of extending the rule' to defendants other than the victim of the search or seizure are outweighed by the 'further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.'" quoting Alerman v. United States, 394 U.S. 165, 174-75 (1969)).

[85]   *Id.* at 490 (holding that the "[a]pplication of the rule thus deflects the truthfinding process and often frees the guilty").

[86]   *Id.* at 489, 493-94.

[87]   *Id.* at 493.

Bepress Legal Repository

22

officers would likely have little fear that this delayed review would uncover illegal activity undetected at trial and on direct appeal.[88] Whatever deterrent effect collateral review might have, the Court concluded, "would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice."[89]

The Court then noted that this balance tipped even further against habeas review in search-and-seizure cases because "in . . . a typical Fourth Amendment claim, asserted on collateral attack, a convicted defendant is usually asking society to redetermine an issue that has no bearing on the basic justice of his incarceration."[90] Because such a habeas proceeding does not help "assure that no innocent person suffers an unconstitutional loss of liberty" it amounts to an entirely unjustifiable intrusion "on values important to our system of government."[91]

## D. Collateral Review of Fourth Amendment Claims After *Stone*

The *Stone* decision significantly narrowed federal habeas review of search-and-seizure claims. Despite conflicting circuit court interpretations of the full-and-fair-hearing standard,[92] the Supreme Court has not heard a Fourth Amendment claim on habeas since *Stone*. The lower courts, while differing as to verbal formulations, have generally interpreted *Stone*'s preclusive effect broadly to block federal consideration of any search-and-seizure claim except in the most

---

[88]    *Id.* at 493.

[89]    *Id.* at 494.

[90]    *Id.* at 491 n. 31.

[91]    *Id.*

[92]    Shoemaker v. Riley, 549 U.S. 948, 948-49 (1982) (White, J., dissenting from denial of *certiorari*) (pointing out that the federal circuit courts had adopted different standards for determining whether state proceedings met the full-and-fair-hearing requirement).

23

extreme situations.[93]

## II. Identifying *Stone*'s Grounds for Denying Habeas Review of Fourth Amendment Claims

Although *Stone*'s holding was clear, its rationale was not.[94] Beginning with Justice

Brennan's dissent,[95] many speculated that the case presaged a dramatic narrowing of the scope of

federal habeas corpus.[96] A post-*Stone* court could reasonably have denied habeas review to any

claim:

---

[93]     Although one commentator has argued that after *Stone* "[t]he enforcement of the exclusionary rule in habeas corpus has ground to a halt," Yackle, *supra* n. 2, at 2400, a handful of habeas courts have reached the merits of claims after concluding that the petitioners before them did not receive a full-and-fair hearing in state court. *See, e.g.*, Herrera v. LeMaster, 225 F.3d 1176, 1178 (10th Cir. 2000) (holding state court failure to apply federal harmless error standard constituted denial of full and fair hearing under *Stone*); Riley v. Gray, 674 F.2d 522, 527 (6th Cir. 1982) (same where state appellate court failed to remand after rejecting claim on ground not litigated in trial court); Doescher v. Estelle, 666 F.2d 285 (5th Cir. 1982) (same were state court failed to address retroactively applicable U.S. Supreme Court precedent on point); Boyd v. Mintz, 631 F.2d 247, 250-51 (3rd Cir. 1980) (same where state provided insufficient time for defense counsel to file motion to suppress); Gamble v. Oklahoma 583 F.2d 1161, 1165-66 (10th Cir. 1978) (same where state failed to apply controlling legal standard). But the standards have not always been consistent. For a systematic review of the lower courts' application of *Stone* see Janet Booth Jones, What Constitutes "An Opportunity for Full and Fair Litigation" in State Court Precluding Habeas Corpus Review under 28 U.S.C.A. § 2254 in Federal Court of State Prisoner's Fourth Amendment Claims, 75 A.L.R. Fed. 9 (2005) (collecting cases); Halpern, *supra* n. 2, at 18-27 (same).

[94]     Soloff, *supra* n. 2, at 303-04 (criticizing the Court for failing to "articulate[] any theory relevant to the purposes of habeas corpus jurisdiction" and suggesting possible rationales).

[95]     *Stone*, 428 U.S. at 516 (Brennan, J., dissenting) (describing *Stone* "as a harbinger of future eviscerations of the habeas statutes . . .").

[96]     Yackle, *supra* n. 2, at 2401 (explaining that many habeas scholars "worried at the time [*Stone* was decided] that other claims, too, would soon receive the same treatment – at least claims that, like the exclusionary rule, were subject to being recast as nonconstitutional prophylactics, serving interests other than protecting the innocent from wrongful conviction"); Robert M. Cover & T. Alexander Aleinikoff, Dialectical Federalism: Habeas Corpus and the Court, 86 Yale L.J. 1035, 1086 (1977) (suggesting that *Stone* presaged a limitation on all habeas review of claims unrelated to factual innocence).

24

(1) in which the state provided an opportunity for a full and fair hearing because federal review

of such a case would offend comity interests;[97]

(2) that did not undermine confidence in the guilt determination because denying review could

cause no *injustice;*[98] or

(3) where the remedy constituted a prophylactic devise designed to protect constitutional values

rather than directly remedy a constitutional violation.[99]

A narrower reading interpreted *Stone* as limiting habeas review only when its costs significantly

outweighed its benefits, a rationale that would be unlikely to extend beyond search-and-seizure

claims.[100]

---

[97]     *Id.* at 474-82, 491 n.31 (reviewing history of habeas review and arguing that it had been much more deferential to the decision of state courts); Louis M. Seidman, Factual Guilt and the Burger Court: An Examination of Continuity and Change in Criminal Procedure, 80 Colum. L. Rev. 436, 458-59 (1980) (reading *Stone*'s full-and-fair-hearing requirement as supportive of the view that "the legal judgment of a federal judge [should not be substituted] for that of a state judge in the absence of reason to think that the federal judgment is any more likely to be free from error").

[98]     *Stone*, 428 U.S. at 491 (noting that habeas is intended to provide a remedy for those "'grievously wronged,'" while in "a typical Fourth Amendment claim, asserted on collateral attack, a convicted defendant is usually asking society to redetermine an issue that has no bearing on the basic justice of his incarceration"); *id.* at 494 n. 37 (quoting Justice Black's argument that "ordinarily the evidence seized can in no way have been rendered untrustworthy . . . and indeed often . . . alone establishes beyond virtually any shadow of a doubt that the defendant is guilty."); Yackle, *supra* n. 2, at 2400.

[99]     *Id.* at 482-94 (explaining that "[t]he exclusionary rule was a judicially created means of effectuating the rights secured by the Fourth Amendment" and that it is "not a personal constitutional right"); Yackle, *supra* n. 2, at 2400; Halpern, *supra* n. 2, at 38-39 (explaining that "*Stone* provides a doctrinal basis for limiting or banning habeas review of claims asserted under the *Miranda* or *Wade* rule" though arguing that the Court should not do so).

[100]    Allen v. McCurry, 449 U.S. 90, 103 (1980) ("This Court in *Stone* assessed the costs and benefits of the judge-made exclusionary rule within the boundaries of the federal courts' statutory power to issue writs of habeas corpus, and decided that the incremental deterrent effect that the

25

In a series of cases decided over the decade and a half following *Stone*, the Court ruled out each of the broad rationales for the *Stone* rule, leaving only the narrow, Fourth-Amendment-specific, reading.[101]

## A. The Court Rejects the Broad Federal-State Comity Rationale

In *Jackson v. Virginia*,[102] the Court considered whether a federal habeas court could review a claim that the evidence in a state criminal trial was insufficient to permit a jury to find the defendant guilty beyond a reasonable doubt. Relying on *Stone*, the state argued that federal habeas review should be denied. Permitting collateral review, it contended, would "duplicate the work of the state appellate courts, . . .disserve the societal interest in the finality of state criminal proceedings, and . . . increase friction between the federal and state judiciaries."[103]

The Court rejected the state's argument, and thus the broad comity-based reading of *Stone*, explaining that federal review will always impact comity interests. A state must point to a specific problem arising from federal review of a particular type of claim to limit the scope of habeas. Search-and-seizure issues are fact-specific and involve subtle application of a variety of Fourth Amendment rules. By contrast, sufficiency of the evidence claims can be resolved on a

---

issuance of the writ in Fourth Amendment cases might have on police conduct did not justify the cost the writ imposed upon the fair administration of criminal justice."); Yackle, *supra* n. 2, at 2400.

[101]    The Court has repeatedly cited to a final footnote in *Stone* – declaring that its "decision ... [was] *not* concerned with the scope of the habeas corpus statute as authority for litigating constitutional claims generally," *Stone*, at 395 n.7, – to reject efforts to extend its holding beyond search-and-seizure claims. *Kimmelman*, 477 U.S. at 376; *Rose*, 433 U.S. at 560.

[102]    443 U.S. 307 (1979).

[103]    *Id.* at 321.

http://law.bepress.com/expresso/eps/1035

written record and turn on a single, well understood principle. A federal court would thus rarely overturn a state court judgment on such a claim, and the review process would be only minimally intrusive.[104]

The *Jackson* Court left open the possibility that *Stone* might still limit habeas review of a claim that did *not* cast doubt on the defendant's guilt. "The constitutional issue presented in this case is far different," the Court explained, "from the kind of issue that was the subject of the Court's decision in *Stone* . . .[because t]he question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence."[105] Three days later, the Court had rejected that rationale as well.[106]

## B. The Court Rejects the Factual Innocence Rationale

In *Rose v. Mitchell*, the defendant challenged his conviction on the ground that the state had discriminated in the selection of his grand jury forum.[107] Two years earlier, Justice Powell had suggested in a concurring opinion that *Stone* should control grand jury discrimination claims.[108] In *Rose*, the state followed Justice Powell's suggestion, arguing that, because a collateral grand jury discrimination claim did not undermine the reliability of the guilt

---

[104]    *Id.* at 322.

[105]    *Id.* at 322.

[106]    *Jackson,* 443 U.S. 307 was decided on June 29, 1979, and *Rose v. Mitchell*, 443 U.S. 545 (1979), came down on July 2, 1979.

[107]    443 U.S. 545, 547 (1979).

[108]    Castaneda v. Partida, 430 U.S. 482, 508 n.1 (1977) (Powell, J., dissenting) (arguing that a "strong case may be made that claims of grand jury discrimination are not cognizable on federal habeas corpus after *Stone*" because they go only to the "moot determination by the grand jury that there was sufficient cause to proceed to trial [rather than to some] flaw in the trial itself").

27

determination, it should not be cognizable on habeas review. Like the exclusionary rule, the benefits of reversing a conviction for discrimination in the selection of a grand jury, the state argued, were "outweighed by the acknowledged costs to other values vital to a rational system of criminal justice."[109]

Not surprisingly, Justice Powell, in an opinion joined only by Justice Rehnquist, agreed with the state's argument.[110] "Properly understood," he asserted, "the rationale of our decision in *Stone* . . . actually presages . . . a limitation on habeas corpus" relief for grand jury discrimination claims.[111] Like illegal searches and seizures, grand jury discrimination has nothing "to do with the guilt or innocence of the prisoner."[112]

A majority of the Court disagreed, explaining that *Stone* rested on the "minimal utility" of applying "the judicially created exclusionary rule" in a federal habeas corpus proceeding.[113] Grand jury discrimination claims, the Court held, were "fundamentally" different.[114] Search-and-seizure claims challenge police conduct. But the state court itself is responsible for grand jury

[109] *Rose*, 443 U.S.. at 559-60 (quoting Castaneda v. Partida, 430 U.S. 482, 508 n.1 (1977) (Powell, J., dissenting)).

[110] *Id.* at 580-88 (Powell, J., dissenting).

[111] *Id.* at 588 n. 10.

[112] *Id.* Powell continued to make this argument after *Rose*. Vasquez v. Hillary, 474 U.S. 254, 279 n.10 (1986) (Powell, J., dissenting).

[113] *Rose*, 443 U.S. at 560; *id.* at 561 ("whereas the Fourteenth Amendment by its terms always has been directly applicable to the States, the Fourth Amendment and its attendant exclusionary rule only recently have been applied fully to the States."); *id.* at 562 (explaining that in *Stone* the Court "found that the deterrent value of the exclusionary rule was not enhanced by the possibility that a 'conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often years after the incarceration of the defendant'").

[114] *Id.*

bepress Legal Repository

28

selection.[115]  While police might not be deterred by an extra level of habeas review of their conduct, state courts would likely perceive a significant deterrent to continued discrimination by the threat of federal review.[116]

Rose has been read to reject the broad claim that *Stone* presaged a general rule that habeas review was appropriate only for petitioners claiming factual innocence.[117]  The Court left open the possibility, however, that *Stone* might still apply to constitutional claims that would require the exclusion of probative evidence of guilt.  The integrity of the judicial system is challenged when a discrimination claim is filed, the *Rose* Court stressed, in a way that it is not when a court simply admits reliable, albeit illegally obtained, evidence.[118]  Moreover, because no evidence is suppressed when a conviction is reversed for jury discrimination, the Court emphasized that the defendant is more likely to be convicted on re-trial.[119]

In *Kimmelman v. Morrison*,[120] the Court held that habeas review was appropriate even where granting the writ would require a new trial without certain probative evidence.  The

---

[115]   *Id*. at 561.  The Court also stressed that the equal protection values at stake in *Rose* could be applied to the states without the concerns about federal intervention the accompany the exclusionary rule.  *Id*. at 562, 564.

[116]   *Id*. at 563 ("Federal habeas review is necessary to ensure that constitutional defects in the state judiciary's grand jury selection procedure are not overlooked by the very state judges who operate that system.").

[117]   Louis M. Seidman, Factual Guilt and the Burger Court: An Examination of Continuity and Change in Criminal Procedure, 80 Colum. L. Rev. 436, 454 (1980) (reading *Rose* "as a firm and explicit repudiation of a restructuring of habeas jurisdiction along guilt and innocence lines").

[118]   *Rose*, 443 U.S. at 563.

[119]   *Id*. at 564.

[120]   477 U.S. 365 (1986).

29

Hosted by The Berkeley Electronic Press

defendant argued that trial counsel was constitutionally ineffective for failing to file a meritorious suppression motion, and the state countered that *Stone* precluded such a claim on habeas.[121] The Court rejected that argument, explaining that *Stone* rested on the exclusionary rule's character as a judicially created structural remedy to deter police misconduct.[122] Given the Court's history of applying the rule to particular circumstances based on the costs and benefits of doing so, *Stone* stands for the narrow proposition that the use of the exclusionary rule in collateral proceedings – like its use in grand jury proceedings – would impose costs far exceeding any incremental benefits.[123] Since the right to counsel is the most vital of personal trial rights, the Court explained, it stood on a much different ground.[124] And the possibility that federal enforcement of that right could require re-trial without probative evidence, the Court emphasized, did not limit the scope of habeas review.[125]

## C. The Court Rejects The Prophylactic Rule/Extra-Constitutional Remedy Rationale

Almost as soon as *Stone* was decided, speculation began about whether the Court would impose similar limits on habeas review of *Miranda* claims.[126] The similarities between *Mapp*

---

[121]   *Id.* at 375.

[122]   *Id.* at 375-76.

[123]   *Id.* at 376.

[124]   *Id.* at 375-76.

[125]   *Id.* at 379-80.

[126]   The Court's 1966 decision had held that the Fifth Amendment's prohibition on compelled self-incrimination applied to pre-trial interrogation and imposed a new rule that the police must warn a suspect subjected to custodial interrogation of his right to remain silent and to an attorney. Miranda v. Arizona, 384 U.S. 436 (1966). Shortly after *Stone* was decided, states began to argue that the *Miranda* rules, like the Fourth Amendment exclusionary rule, should not be enforced collaterally. Wainwright v. Sykes, 433 U.S. 72, 87 n,11 (1977) (flagging issue but not reaching

30

and *Miranda* were obvious – both the Fourth and Fifth Amendment exclusionary rules were extra-constitutional doctrines designed to serve a Constitutional value other than reliably determining guilt or innocence in a particular case.[127] Indeed, in some ways, the *Miranda* rule was an even stronger candidate for limited habeas review. The Fourth Amendment exclusionary rule only applied where the police had in fact conducted an illegal search or seizure. The *Miranda* rule applied whenever the police failed to provide the required warnings, even if the excluded statements were voluntary and the police therefore did not violate the Self-incrimination Clause.[128]

After waiting 17 years to address the issue, the Court refused to extend *Stone* to *Miranda* claims.[129] Writing for the Court in *Withrow v. Williams,*[130] Justice Souter delimited the continuing scope of *Stone*: "We simply concluded . . . that the costs of applying the exclusionary

---

it because *Miranda* claim procedurally defaulted); Richardson v. Stone, 421 F. Suppp. 577, 578-79 (N.D. Cal. 1976) (applying *Stone* to a *Miranda* claim).

[127]    Justice O'Connor articulated the argument for applying the *Stone* rule to *Miranda* claims in two opinions. Duckworth v. Eagan, 492 U.S. 195, 206-12 (1989) (O'Connor, J., concurring) (arguing that same cost benefit analysis with respect to enforcing the exclusionary rule on habeas applied to both types of cases); *Withrow*, 507 U.S. at 702 (O'Connor, J., dissenting).

[128]    *Withrow*, 507 U.S. at 702-03 (O'Connor, J., dissenting); *see* Michigan v. Tucker, 417 U.S. 433, 444 (1974) ("The Court recognized that these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected."); *but see* Dickerson v. United States, 530 U.S. 428, 438 (2000) (holding that Miranda rule is constitutionally based).

[129]    Duckworth v. Eagan, 492 U.S. 195, 201 n.3 (1989); Wainwright v. Sykes, 433 U.S. 87 n. 11 (1977).

[130]    507 U.S. 680, 683 (1993).

31

rule on collateral review outweighed any potential advantage to be gained by applying it there."[131]
The Fourth Amendment exclusionary rule does not remedy the unconstitutional invasion of
privacy, and it virtually always undermines the truth-seeking process. By contrast, the *Miranda*
rules (1) directly address a constitutional concern with the use of compelled testimony at trial,
and (2) systemically improve the truth-seeking process by discouraging coerced, and therefore
unreliable, statements.[132] Although in particular cases, *Miranda* undoubtedly requires the
exclusion of reliable, probative statements, the system's reliability is enhanced by careful
safeguards against involuntary confessions.[133] The Court thus rejected the last broad rationale for
*Stone*.

## D. Articulating the Remaining Rationale for Stone

In *Withrow*, the last decision interpreting *Stone*, the Court explained that habeas review of
Fourth Amendment claims was inappropriate because applying the exclusionary rule collaterally

---

[131]    *Id.* at 686. In Reed v. Farley, 512 U.S. 339, 347-48 (1994), a plurality of the Court, in a
portion of the opinion that was not criticized by any of the other opinions, echoed this view:
"Our opinion in *Stone* concentrated on 'the nature and purpose of the Fourth Amendment
exclusionary rule.' The Court emphasized that its decision confined the exclusionary rule, not the
scope of §§ 2254 generally." Emphasizing that it had "repeatedly declined to extend the rule in
*Stone* beyond its original bounds," the Court refused to rely on *Stone* in holding habeas relief
inapplicable to a non-constitutional claim. *Id.* at 348.

[132]    *Id.* at 691-92.

[133]    *Id.* at 692 ("[A] system of criminal law enforcement which comes to depend on the
confession will, in the long run, be less reliable and more subject to abuses than a system relying
on independent investigation." (internal quotations deleted) quoting Michigan v. Tucker, 417
U.S. 433, 488 n. 23 (1974)). The Court also concluded that addressing Miranda claims on
habeas did little to expand the burdens of the federal courts or insult state courts because habeas
challenges based on the voluntariness of the confession would continue. *Id.* at 693-95.

32

would "only marginally advance" the rule's deterrent function.[134] By contrast, Justice Souter wrote, "the costs of applying the exclusionary rule on habeas were comparatively great."[135] In addition to the costs always incurred when excluding reliable evidence of guilt, applying the rule on habeas would "intrude upon the public interest in '(i) the most effective utilization of limited judicial resources, (ii) the necessity of finality in criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded.'"[136]

This litany is an accurate reflection of the *Stone* opinion, but incredibly short on particulars. Each factor is a relevant concern with any federal habeas claim, and even taken together they cannot explain why habeas review should be open to all constitutional claims except for those arising under the Fourth Amendment. The *Stone* majority conceded that the exclusionary rule's costs, though high, were justified during the direct criminal process.[137] As Justice Brennan pointed out in his *Stone* dissent, collateral review would not increase those costs, because they "[s]hould already have been incurred . . . if the state court had not misapplied federal constitutional principles."[138]

---

[134]   *Id.* at 686.

[135]   *Id.* at 686-87.

[136]   *Id.* at 687 (quoting *Stone*, 428 U.S. at 491 n. 31, and *Schneckloth*, 412 U.S. at 259 (Powell, J., concurring)).

[137]   *Stone*, 428 U.S. at 493 ("We adhere to the view that these considerations support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state-court convictions.").

[138]   *Stone*, 428 U.S. at 512 n.10 (Brennan, J., dissenting).

33

Hosted by The Berkeley Electronic Press

As of 1976, however, there were reasons to conclude that search-and-seizure claims would impose significantly greater costs on habeas than at trial or on direct appeal. The benefits of the exclusionary rule are likely to be reduced in collateral proceedings because the type of meritorious Fourth Amendment claim most likely to survive direct review would have been the least likely to deter illegal police conduct. The *Stone* Court did not explore this reduced benefit, relying instead on a conclusory assertion that the incremental deterrent effect of excluding evidence on collateral review would be too small to justify the social costs.[139] In *Schneckloth*, however, Justice Powell had explained that "[s]erious fourth amendment infractions" would likely be identified by state courts or the U.S. Supreme Court on direct review.[140] The claims that remain for habeas, he argued, "are most likely to be in [a] grey, twilight area, where the law is difficult for courts to apply, let alone for the policeman on the beat to understand. This is precisely the type of case where the deterrent function of the exclusionary rule is least efficacious, and where there is the least justification for freeing a duly convicted defendant."[141]

These costs of exclusion also increase on collateral review because of the difficulty of engaging in the specific fact-finding necessary to resolve a search-and-seizure claim long after the original suppression hearing.[142] *Stone* makes only a passing reference to this cost in stating

[139]    *Stone*, 428 U.S. at 493-94.

[140]    *Schneckloth*, 412 U.S. at 269-70 (Powell, concurring).

[141]    *Id.* at 269-70 (Powell, concurring).

[142]    Justice Brennan does address the temporal distinction between direct and collateral review, arguing that it is insufficient to support distinct constitutional rules "particularly in light of the differential speed with which criminal cases proceed even on direct appeal." *Stone*, 428 U.S. at 509 n.8. Still, habeas review holds the potential for extremely long delays that raise special problems in factually intensive Fourth Amendment cases. Michael, *supra* n. 2, at 255-56

34

cause.[149] In 1984, the Court held that the exclusionary rule was not constitutionally required when the executing officers acted in objectively reasonable good faith reliance on a validly issued warrant.[150] Subsequent cases extended the rule to warrantless police intrusions that were authorized in advance by a statute subsequently held unconstitutional[151] and by an expired warrant that, because of a court clerk's error, reasonably appeared valid to the arresting officers.[152] By excluding some good faith police miscues, these decisions limited the cost of the exclusionary rule by focusing it on cases in which police engaged in more-readily-deterrable illegal conduct.

## B. Judicial Changes in Habeas Law Reduce the Cost of Applying the Exclusionary Rule Collaterally

Even more significantly, after *Stone*, the Court restricted the scope of federal habeas review. As of 1976, courts addressed all claims defaulted in state court, unless the petitioner deliberately bypassed an avenue for relief, and successive petitions if the interests of justice would be served by granting relief. Many new cases applied retroactively, and all constitutional

---

[149]    Whiteley v. Warden, 401 U.S. 560 (1971); Spinelli v. United States, 393 U.S. 410 (1969); United States v. Ventresca, 380 U.S. 102 (1965); Aguilar v. Texas, 378 U.S. 108 (1964); Rugendorf v. United States, 376 U.S. 528 (1964); Jones v. United States, 362 U.S. 257 (1960); Giordenello v. United States, 357 U.S. 480 (1958).

[150]    United States v. Leon, 468 U.S. 897, 922 (1984) (concluding "that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."); *see* Massachusetts v. Sheppard, 468 U.S. 981 (1984) (applying good faith exception where officers acted in reasonable good faith on a search warrant that was defective because the reviewing judge failed to make necessary clerical corrections).

[151]    Illinois v. Krull, 480 U.S. 340 (1987).

[152]    Arizona v. Hicks, 514 U.S. 1 (1995).

37

errors required reversal unless the state could prove that the error was harmless beyond a reasonable doubt. Twenty years later, all of this law has changed in ways that dramatically limit the scope of habeas review. The following subsections briefly explain each change.

## 1. Defaulted Claims

In *Fay v. Noia*, the Court held that a federal habeas court must reach the merits of a constitutional claim unless the defendant deliberately by-passed an avenue for relief in state court.[153] Beginning in the late 1970s, the Court altered that standard, holding that a federal court should as a prudential matter decline to reach defaulted claims unless the defendant could demonstrate both (1) cause attributable to the state for the failure to raise the claim;[154] and (2) actual prejudice as a result of the alleged constitutional error.[155] A narrow exception was also recognized for petitioners who could show that they were probably innocent.[156]

## 2. Successive Petitions

In *Sanders v. United States*,[157] the Court held that a federal habeas court could issue the writ on a successive petition whenever the "ends of justice demand."[158] A 1966 amendment to

---

[153]    *Fay*, 372 U.S. at 438.

[154]    Murray v. Carrier, 477 U.S. 478, 491-92 (1986); Isaac v. Engle, 456 U.S. 107, 129-34 (1982).

[155]    *Carrier*, 477 U.S. at 494; United States v. Frady, 456 U.S. 152, 170 (1982).

[156]    *Carrier*, 477 U.S. at 496 ("where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default"). The Court has been quite strict in interpreting these tests to prevent federal habeas courts from reaching defaulted claims. Dugger v. Adams, 489 U.S. 401, 406-10 & n.6 (1989).

[157]    373 U.S. 1 (1963).

[158]    *Id.* at 18.

38

the habeas statute eliminated any reference to the ends of justice and purported to require the dismissal of successive petitions where the petitioner "deliberately withheld the newly asserted ground or otherwise abused the writ."[159] Congress, however, never defined the concept of abuse of the writ, and courts continued to recognize an ends-of-justice exception.[160]

In 1991, the Court abandoned its flexible approach to successive petitions and adopted the same cause-and-prejudice standard that it had previously applied to defaulted claims.[161] A narrow actual-innocence exception was deemed adequate to replace *Sanders* broad ends-of-justice inquiry.[162]

## 3. Retroactivity

Beginning with *Linkletter* in 1965, the Court decided whether a new rule of constitutional law would apply retroactively by considering (1) the purposes of the exclusionary rule, (2) the state's reliance on an old rule, and (3) the effect of applying the new rule on the administration of the criminal justice system.[163] These decisions limited the retroactive effect of the Court's most sweeping decisions,[164] but many cases were applied retroactively either because they merely

[159] 28 U.S.C. § 2244(a)-(c); *see* S.Rep. No. 1797, 89th Cong., 2d Sess., 2 (1966); see also H.R.Rep. No. 1892, 89th Cong., 2d Sess., 5-6 (1966), U.S.Code Cong. & Admin.News 1966, pp. 3663, 3664.

[160] *See* Kuhlman v. Wilson, 477 U.S. 436 (1986) (recognizing continuing validity of ends-of-justice exception and addressing merits of second petition).

[161] McClesky v. Zant, 499 U.S. 467, 490-96 (1991).

[162] *Id.* at 495.

[163] *E.g.,* Stovall v. Denno, 388 U.S. 293, 297 (1967).

[164] Solem v. Stumes, 465 U.S. 638 (1984) (refusing to apply retroactively rule requiring police questioning to stop if suspect requests an attorney); U.S. v. Peltier, 422 U.S. 531 (1975) (refusing to apply retroactively decision overturning statute permitting roving border patrol

39

interpreted prior law,[165] or because they enhanced the truth-seeking process.[166]

In the late 1980s, the Court revised its retroactivity rules to prevent federal habeas courts from applying virtually any case retroactively.[167] The Court accomplished this by adopting a bright-line rule prohibiting the retroactive application of all "new rules" and defining the concept of a new rule expansively to include virtually any new decision that was not strictly dictated by prior law.[168]

searches without probable cause); Desist v. U.S., 394 U.S. 244 (1969); (refusing to apply retroactively new rule prohibiting electronic surveillance without a warrant); De Stefano v. Woods, 392 U.S. 631 (1968) (refusing to apply new federal right to jury trial retroactively); Johnson v. New Jersey, 384 U.S. 719, 727 (1966) (refusing to apply *Miranda* rule retroactively); Stovall v. Denno, 388 U.S. 293, 297 (1967) (refusing to apply right to counsel at line-ups retroactively); Tehan v. U.S. ex rel. Shott, 382 U.S. 406 (1966) (refusing to apply retroactively rule that prosecutor or judge may not comment on defendant's failure to testify); Linkletter v. Walker, 381 U.S. 618, 636-40 (1965) (refusing to apply Fourth Amendment exclusionary rule retroactively).

[165]   Yates v. Aiken, 484 U.S. 211, 216-17 (1988) (applying decision retroactively because it applied the existing rule of Sandstrom v. Montana, 442 U.S. 510 (1979)); Francis v. Franklin, 471 U.S. 307, 309 (1985) (same); Whiteley v. Warden, 401 U.S. 560, 561, 564 (1971) (applying a 1969 decision on habeas to case that became final in 1966); *id.* at 574 n.4 (Black, J., dissenting) (chastising majority for applying recent decision retroactively); *see also Desist*, 394 U.S. at 262-63 (Harlan, J., dissenting) (explaining that decisions merely applying existing standards do not raise retroactivity concerns); United States v. Johnson, 457 U.S. 537, 549 (1982) (stating that Dunaway v. New York, 442 U.S. 200 (1979), would apply retroactively because it merely applied prior law with respect to the dissipation of the taint of an unlawful seizure).

[166]   *See, e.g.*, Hankerson v. North Carolina, 432 U.S. 233 (1977) (applying retroactively rule that state must prove each element of a crime beyond a reasonable doubt); Ivan V. V. City of New York, 407 U.S. 203 (1972) (applying requirement of proof beyond a reasonable doubt retroactively); Roberts v. Russell, 392 U.S. 293 (1968) (applying *Burton* rule retroactively); Witherspoon v. Illinois, 391 U.S. 510, 522 n. 22 (1968) (applying juror-exclusion rules for death penalty cases retroactively).

[167]   Teague v. Lane, 489 U.S. 288, 310 (1989) (plurality opinion).

[168]   *Teague*, 489 U.S. at 301; *id.* at 333 (Brennan, J., dissenting) ("Few decisions on appeal or collateral review are *'dictated'* by what came before. Most such cases involve a question of law that is at least debatable, permitting a rational judge to resolve the case in more than one way.

40

## 4. Harmless Error

In 1967, the Court first recognized that a court need not reverse a conviction whenever

the trial was plagued with federal constitutional error if the government could demonstrate

beyond a reasonable doubt that the defendant would have been convicted absent the violation.[169]

For many years, the Court assumed that this standard applied on collateral review.[170]  In the

1990s, the Court adopted a broader harmless error standard for habeas cases, holding that a

federal court could grant the writ only if the constitutional violation "had substantial and

injurious effect or influence in determining the juries' verdict."[171]

## C. The Cumulative Effect of Judicial Changes in Habeas Law

All of the changes in habeas corpus law between 1976 and the mid-1990s, combined with

the Court's adoption of the good faith exception, reduced the costs of applying the Fourth

---

Virtually no case that prompts a dissent on the relevant legal point, for example, could be said to be *'dictated'* by prior decisions."). For applications of this new rule doctrine see Butler v. McKellar, 494 U.S. 407 (1990), Saffle v. Parks, 494 U.S. 484, 488 (1990), and Sawyer v. Smith, 497 U.S. 227, 228 (1990). The *Teague* Court did purport to recognize two exceptions to its non-retroactivity rule for decisions that place conduct beyond the power of the criminal law to proscribe and for bedrock principles of criminal procedure. Since *Teague* was decided, however, the Court has never recognized a new rule that falls within these exceptions. *Teague*, 489 U.S. at 312-14.

[169]    Chapman v. California, 386 U.S. 18, 24 (1967).

[170]    See, *e.g.,* Yates v. Evatt, 500 U.S. 391 (1991); Rose v. Clark, 478 U.S. 570 (1986); Milton v. Wainwright, 407 U.S. 371 (1972); Anderson v. Nelson, 390 U.S. 523 (1968) (*per curiam* ).

[171]    Brecht v. Abrahamson, 507 U.S. 619, 627 (1993). *Compare* O'Neal v. McAninch, 513 U.S. 432 (1995) (permitting habeas court to grant the writ only if constitutional error "had substantial and injurious effect or influence in determining the juries' verdict") *with Chapman,* 386 U.S. at 24 (treating constitutional error as harmless on direct review only if prosecution bears burden of showing error harmless beyond a reasonable doubt).

41

Hosted by The Berkeley Electronic Press

Amendment exclusionary rule in federal habeas corpus proceedings. Despite these innovations, in 1995 habeas petitions could still be filed years after a conviction became final,[172] and de novo review could still lead to the exclusion of evidence in warrantless search-and-seizure cases, even if the police acted in good faith. To be sure, the doctrinal changes ensured that there would be fewer successful claims. But one could still make the case that the potential for significant costs, and the questionable prospect for meaningful benefits, still justified the *Stone* rule.

## D. Legislative Changes in Habeas Law

In 1996, Congress effectively dealt a death blow to whatever was left of *Stone*'s rationale in enacting the Anti-terrorism and Effective Death Penalty Act. The new amendments to the habeas statute imposed significant additional restrictions on collateral review. First, Congress adopted a strict one-year statute of limitations, thereby preventing virtually all old cases with stale facts from arising on habeas.[173] This amendment significantly reduced the cost of

---

[172]   In 1989, for example, Justice O'Connor argued that the Court should apply *Stone* to *Miranda* claims reasoning that "[e]xcluding probative evidence years after trial, when a new trial may be a practical impossibility, will often result in the release of an admittedly guilty individual who may pose a continuing threat to society." *Duckworth*, 492 U.S.. at 211 (O'Connor, J., concurring).

[173]   The new language read: "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of – (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1). The one-year limitation period is tolled during properly filed state collateral review proceedings. 28 U.S.C. § 2244(d)(2).

ひ‐じ‐れ‐じ‐じ   ‐じ‐じ‐じ‐じ   ‐じ‐じ‐じ‐じ‐れ‐り

42

potentially erroneous decisions granting the writ that could result from faded memories and unavailable witnesses.

Second, the amendments prohibited a federal habeas court from granting the writ unless "the state court judgment resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented."[174] By replacing the *de novo* standard of review with this reasonableness standard in all cases, the amendment ensured that habeas review would lead to the suppression of evidence only when the police conduct violated clearly established law.[175] Those cases would be precisely the ones in which the added threat of collateral review would be

---

The amendments limited the scope of the writ in other significant ways as well. (1) State court fact findings are presumed correct unless the applicant can rebut the finding by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). (2) The applicant's failure to develop a claim in state court will bar an evidentiary hearing unless the claim is based on a new, retroactively applicable rule of constitutional law or the factual predicate could not reasonably have been discovered through due diligence. 28 U.S.C. § 2254(e)(2)(A). The only exception to this rule is for situations in which facts would be sufficient to show by clear and convincing evidence that but for constitutional error, "no reasonable fact-finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).

[174]    28 U.S.C. § 2254(d).

[175]    This interpretation of the AEDPA was not the only plausible one. In Williams v. Taylor, 529 U.S. 362 (2000), the Court split 5-4 on what this language meant. The majority held the new amendment limited the federal courts' authority to grant the writ to cases in which state courts "unreasonably appl[y]" federal law in an objective sense to be determined by the federal courts according "to the facts of the prisoner's case." *Id.* at 414. The four justices in the minority concluded that the 1996 Amendment required federal courts to "give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails." *Id.* at 387 (Steven, J., concurring in judgment). For a fuller defense of the minority view see Larry W. Yackle, A Primer on the New Habeas Corpus Statute, 44 Buffalo L. Rev. 381, 411-13 (1996).

Berkeley Legal Repository

43

most likely to pose a significant incremental deterrent for the police.

## IV. The Statutory Interpretation Critique

The argument advanced in this Article for overturning *Stone,* and placing Fourth Amendment claims on the same footing as other federal constitutional claims on habeas review, does not take account of traditional notions of statutory interpretation.  One might reasonably criticize this argument on the ground that Congress has set the federal courts' jurisdiction in habeas cases since 1789,[176] and therefore any change in doctrine should assess Congressional intent.  This Part responds to that criticism in three ways, by showing that: (1) traditional notions of statutory interpretation do not yield a determinate answer to the question whether Congress intended the AEDPA to overturn *Stone*; (2) those who interpret the statute to retain *Stone* rely on an erroneous reading of the case itself or the legislative history of the 1996 Act; and (3) given that the *Stone* Court saw itself as interpreting the Constitution, new habeas legislation that does not mention *Stone* should not preclude judicial reconsideration of the case.

## A. Focusing on Congressional Intent in Enacting The AEDPA Yields No Determinate Result

A court seeking in good faith to determine Congress's intent in enacting the AEDPA with respect to *Stone* could reasonably decide the issue either way.  A conscientious judge could reason that the act's plain language permits a federal court to grant the writ if it finds that a state court applied established federal constitutional law in an unreasonable way.  Although the legislative history did not address the *Stone* rule, Congress was aware of the full-and-fair-hearing

---

[176]   1 Stat. 73, 81-82.

44

http://law.bepress.com/expresso/eps/1035

standard.[177] Where the plain language of a statute precludes the application of a pre-amendment rule – in this case the *Stone* rule – a court can reasonably interpret the statute to overturn the rule.[178]

A judge expanding the inquiry beyond the plain meaning of the statutory language could reach a similar result. As Larry Yackle has persuasively shown in his primer on the AEDPA, Congress focused squarely on the subsection of the statute defining the limits of federal power to grant the writ, vigorously debating the appropriate level of deference that federal courts should pay to state constitutional decisions.[179] By omitting any reference to either the *Stone* rule, or some other form of special treatment for Fourth Amendment claims, a judge could reasonably interpret the Act to overturn *Stone* in favor of the general standard it imposed.

A judge willing to investigate the purpose behind the 1996 Act could also reasonably conclude that Congress did not intend to overrule *Stone*. The overriding purpose of Section (d) of the habeas statute was to increase the deference that federal court's must pay to state court decisions. Given the lack of specific consideration of the *Stone* rule in the legislative history, a judge might reason, Congress's decision to *increase* the deference paid to state court judgments generally should not be interpreted to *reduce* the deference already paid to Fourth Amendment

---

[177]     Yackle, *supra* n. 185, at 401-02.

[178]     *Cf.* Exxon Mobile v. Allapattah Services, Inc., 125 S. Ct. 2611 (2005) (holding that supplemental jurisdictional statute's unambiguous text overrules prior judge-made rule limiting supplemental jurisdiction over diversity claims not meeting amount-in-controversy requirement); Dewsnup v. Timm, 502 U.S. 410, 419-20 (1992) (explaining that Congress may be presumed to legislate with knowledge of prior judicial practice and ambiguous language should not be interpreted to alter settled practice, but "where the language is unambiguous, silence in the legislative history cannot be controlling").

[179]     Yackle, *supra* n. 185, at 433-443.

45

decisions.

## B. Erroneous Interpretations of the AEDPA

Judge Frank Easterbrook, in an opinion for the Seventh Circuit,[180] and Michael Slade, in a Harvard Journal on Legislation article,[181] have interpreted the AEDPA to preserve the *Stone* rule. Judge Easterbrook's approach is faulty because he interprets *Stone* as a jurisdictional case, although the Court itself explicitly rejected that interpretation. Slade fails to recognize that his analysis is indeterminate because he fails to take full account of the legislative history, which makes clear that Congress rejected the type of deference required by *Stone* in favor of the alternative approach adopted in the 1996 Act.

## 1. Easterbrook's Jurisdictional Analysis

Judge Easterbrook reads *Stone* as interpreting Section (a) of the habeas statute, which grants jurisdiction to the federal courts when a state prisoner is held "in custody in violation of the Constitution . . .."[182] In his view, *Stone* held that using evidence obtained pursuant to an illegal search or seizure, while unconstitutional under *Mapp*, does not render the subsequent custody unconstitutional under Section (a).[183] "The *seizure* may have violated the Constitution," he wrote, "but the *custody* does not, because the exclusionary rule is a social device for deterring

---

[180]    Hampton v. Wyant, 296 F.3d 560, 563 (7th Cir. 2002).

[181]    Michael B. Slade, Democracy in the Details: A Plea for Substance Over Form in Statutory Interpretation, 37 Harv. J. Leg. 187, 223-35 (2000).

[182]    *Hampton*, 296 F.3d at 562-63 (quoting 28 U.S.C. § 2254(a)).

[183]    *Id.*

46

official wrongdoing, not a personal right of defendants."[184] Following this reasoning,
Easterbrook concludes that the 1996 Act did not overrule *Stone* because the language limiting
review to unreasonable applications of federal law was placed in section (d) and thus applied
only to cases cognizable under Section (a). If *Stone* limited the scope of section (a), the 1996 Act
should not affect it.[185]

Judge Easterbrook's attempt to save *Stone* fails because the *Stone* Court unequivocally
noted that its "decision does not mean that the federal court lacks jurisdiction over" a collateral
Fourth Amendment claim.[186] Ignoring the language of *Stone* itself, Easterbrook cites – curiously
with a "see also" signal though he cites nothing else – the Court's pre-1996-Act decision in *Reed
v. Farley*.[187] But *Reed* too flatly contradicts Easterbrook's reading of *Stone* by emphasizing that
the case "confined the exclusionary rule, not the scope of § 2254 generally."[188]

The jurisdictional interpretation of *Stone* is also inconsistent with the case's holding. If
the Court lacked habeas jurisdiction to hear exclusionary rule claims, *Stone*'s attempt to create an
exception where the state failed to provide a full and fair hearing would have been

---

[184]    *Id.* at 562-63.

[185]    *Id.* at 563 (concluding that *Stone* "treats inaccurate administration of the exclusionary rule
as outside the scope of th[e habeas] statute").

[186]    *Stone*, 438 U.S. 495 n.37.

[187]    *Id.* at 563 (citing Reed v. Farley, 512 U.S. 339, 347-48 (1994)).

[188]    Reed v. Farley, 512 U.S. at 347-48 (quoting *Stone*, 428 U.S. at 495 n.37: "Our decision
today is Not [sic] concerned with the scope of the habeas corpus statute as authority for litigating
constitutional claims generally."). The Court made the same observation about *Stone* at least
twice before *Reed. Kimmelman*, 477 U.S. at 376; *Rose*, 433 U.S. at 560.

47

Hosted by The Berkeley Electronic Press

impermissible.[189] Yet, lower courts have occasionally exercised jurisdiction in these cases, and

neither the Court nor Congress has ever questioned it.[190]

## 2. Slade's Legislative History Analysis

Michael Slade's defense of *Stone* takes a different approach. His article is generally

critical of a purely textual approach to statutory interpretation.[191] Unlike Easterbrook, Slade does

not try to show that *Stone* is consistent with the plain meaning of the 1996 Act's text. Instead, he

argues that to preserve the important deliberative character of legislation, a court should look

beyond the text and "go through the background of the doctrine, describe why Congress

---

[189]   *Stone*, 428 U.S. at 494.

[190]   *See, e.g.*, Herrera, 225 F.3d 1176, 1178 (10th Cir. 2000); Riley v. Gray 674 F.2d 522, 527 (6th Cir. 1982); Doescher v. Estelle, 666 F.2d 285 (1982); Boyd v. Mintz, 631 F.2d 247, 250-51 (3rd Cir. 1980); Gamble v. Oklahoma 583 F.2d 1161, 1165-66 (1978).

Although the jurisdictional interpretation of *Stone* is indefensible, two other explanations for the result fit comfortably with both the language and the holding of the case. First, as Robert Cover and Alexander Aleinikoff have observed, *Stone* can be seen as a preclusion case in which federal courts respect state court judgments on Fourth Amendment claims when the issue was, or could have been, litigated in state court. Cover & Aleinikoff, *supra* n. 105, at 1076. Alternatively, *Stone* can be read as one of a line of habeas decisions dating back to the exhaustion-of-state-remedies rule in 1886 in which the Court declined to exercise its jurisdiction for prudential reasons. *See infra* nn. 214-16. With respect to procedural defaults in state court, for example, the Court has explained that its "decisions have uniformly acknowledged that federal courts are empowered under 28 U.S.C. § 2254 to look beyond a state procedural forfeiture and entertain a state prisoner's contention that his constitutional rights have been violated. . . . The more difficult question . . . is: What standards should govern the exercise of the habeas court's equitable discretion in the use of this power?" Reed v. Ross, 468 U.S. 1, 9 (1984). As it did with *Stone*, in each of these situations the Court decided the standards that it would use to determine when a federal court should – as opposed to *could* – reach the merits of a particular claim. Congress sometimes adopted the Court's rules in subsequent amendments to the statute, but often not until decades after the Court announced the rules. For example, in 1948 Congress codified the exhaustion doctrine 60 years after the Court announced it. 62 Stat. 967.

[191]   Slade, *supra* n. 191, at 187-96.

48

addressed the issue and the goals it desired to accomplish . . . ."[192] The members of Congress voted overwhelmingly in favor of granting additional deference to the state courts. Because the full-and-fair-hearing rule requires federal deference to state courts, he concludes that the "collective wisdom that produced" the Act dictates that Congress intended to retain *Stone*.[193]

One might criticize Slade's method as overly subjective. But even accepting it as an appropriate way to interpret statutes, he undervalues the evidence that Congress intended precisely what the plain language of the AEDPA says. First, Congress had been considering habeas reform legislation for many years, and virtually all of the recent proposals sought to expand the *Stone* full-and-fair-hearing rule to other constitutional violations.[194] The failure of those bills to become law may have led the proponents of the 1996 Act to change their proposal from the *Stone* rule's focus on a fair *hearing* to the Act's requirement of a *result* that is reasonably consistent with federal law.[195] Second, even within the debate leading up to the 1996 Act itself, the Senate considered proposals that would have required both more and less

---

[192]    *Id.* at 225.

[193]    *Id.* at 235-36.

[194]    Yackle, *supra* n. 185, at 401-02 ("Both the Reagan and Bush Administrations proposed that the federal courts should be barred from awarding habeas relief with respect to a claim that has been "'fully and fairly adjudicated' previously in state court.").

[195]    Larry Yackle carefully tracked the debate over habeas reform legislation, showing how its proponents moved away from bills that would have limited federal review to cases in which states failed to provide the opportunity for a full and fair hearing and settled instead on the language of the 1996 Act which preserved substantive review. Yackle, *supra* n. 185, at 427-33. Although the Supreme Court has interpreted the 1996 Act to require less deference to state court decisions than Yackle believed was required, given the compromises made to achieve passage, *id.* at 411-13, his basic point that Congress rejected a purely procedural form of habeas review in favor of one retaining substantive content remains correct.

49

deference than the language in the final bill.[196] The proposal for less deference would have effectively precluded federal habeas review whenever the state provided the sort of fair procedure required by *Stone*. As Slade recognizes, neither alternative to the originally proposed language was accepted.[197] Congress's deliberations thus show that it chose a particular form of deference, one that *Stone* did not require: review of the substantive reasonableness of a state court decision. By contrast, *Stone* explicitly prohibited all substantive review whenever the state provided a fair procedure in which to litigate Fourth Amendment claims.

## 3. *Stone*'s Constitutional Underpinnings

Even if Easterbrook's or Slade's interpretations of the AEDPA were more persuasive, they still would not save *Stone* because a traditional focus on Congressional intent is not an appropriate means to test the continuing validity of a judge-made rule like that announced in *Stone*. Habeas corpus legislation obviously existed in 1976 when the Court decided *Stone*,[198] but the majority opinion failed to mention the statute,[199] except to note that "it [was] unnecessary to consider" its scope.[200] Instead, the Court treated its cost/benefit analysis as a matter of

---

[196]    *Id.* at 433-43.

[197]    *Id.* at 233; *see* Yackle, *supra* n. 185, at 401 (recognizing that the more deferential proposal was rejected on a vote of 68 to 31).

[198]    The relevant section read: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254.

[199]    *Stone*, 428 U.S. at 503-04 (Brennan, J., dissenting) (pointing out that the majority "significantly [did] not even mention" the habeas statute).

[200]    *Id.* at 482 n.17.

50

Constitutional interpretation – concluding that "the Constitution does not require that a state
prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an
unconstitutional search or seizure was introduced at his trial."[201]

Many have criticized *Stone* for breaking with established practice without Congressional
authorization.[202] In 1966, after *Mapp* and *Linkletter*, Congress amended the habeas statute,
limiting the federal habeas courts' discretion to hold evidentiary hearings, but not restricting the
scope of collateral review of Fourth Amendment claims.[203] Over the next decade, the Court
regularly reviewed search-and-seizure claims on habeas, and Congress, despite considering
reform legislation, did not interfere.[204]

However unwise it may be, the Court's practice of developing doctrine untethered to
anything in the language of the habeas statute has been par for the course.[205] Despite the

---

[201]    *Id.* at 482.

[202]    *See supra* n. 2.

[203]    28 U.S.C. § 2244(a)-(c); *see* S.Rep. No. 1797, 89th Cong., 2d Sess., 2 (1966); see also
H.R.Rep. No. 1892, 89th Cong., 2d Sess., 5-6 (1966), U.S.Code Cong. & Admin.News 1966, pp.
3663, 3664.

[204]    For a detailed discussion of proposed habeas reform legislation from the 1940s through
the early 1990s see Yackle, *supra* n. 2, at 2344-2373.

[205]    Wright v. West, 502 U.S. 277 (1992) (Justice Thomas's lead opinion and Justice
O'Connor's concurrence debate the standard of review); Wainwright v. Sykes, 433 U.S. 72, 78-
85 (1977) (describing the Court's changing approach to the standard of review over time); Fay v.
Noia, 372 U.S. 391, 411-12 (1963) (explaining that the Court had not "always followed an
unwavering line in its conclusions as to the availability of the Great Writ. Our development of
the law of federal habeas corpus has been attended, seemingly, with some backing and filling.");
Jordan Streiker, *Innocence and Federal Habeas*, 41 UCLA L. Rev. 303, 310-11 (1993)
(explaining that the Court has long defined the scope of its jurisdiction on habeas without
reference to the statutory language).

51

jurisdictional statute's clear, unequivocal, and functionally stable language,[206] the Court has repeatedly limited its scope on a variety of often-changing prudential grounds. During the nineteenth and early twentieth century, the Court regularly asserted that federal courts should review state cases on habeas only when the state court lacked jurisdiction.[207] Through the first half of the twentieth century, the Court gradually expanded the scope of its review, though the statutory language never changed.[208] Finally, in 1953, it held that all constitutional claims must be reviewed *de novo*.[209]

In addition to the evolving scope of the writ, the Court adopted specific doctrines to limit its jurisdiction in particular situations. In 1886, the Court began this process of defining the

---

[206]    *Compare* Stat. 385 (original 1867 language granting federal courts the "power to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States."), *with* 28 U.S.C. § 2254 (the current statutory language granting the federal courts power to grant "a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."); *see* Ex Parte McCardle, 73 U.S. 318, 325 (1868) ("This legislation is of the most comprehensive character. It brings within the *habeas corpus* jurisdiction of every court and of every judge every possible case of deprivation of liberty contrary to the national Constitution, treaties, or laws. It is impossible to widen this jurisdiction.").

[207]    McNally v. Hill, 293 U.S. 131, 138 (1934); Ash v. United States ex rel. Valotta, 270 U.S. 424, 426 (1926); Knewel v. Egan, 268 U.S. 442, 446 (1925); Henry v. Henkel, 235 U.S. 219, 228-29 (1914).

[208]    *See, e.g.*, Walker v. Johnston, 312 U.S. 275 (1941); Moore v. Dempsey, 261 U.S. 86 (1923).

[209]    Wainwright v. Sykes, 433 U.S. 72, 87 (1976) ("since Brown v. Allen, 344 U.S. 443 (1953), it has been the rule that the federal habeas petitioner who claims he is detained pursuant to a final judgment of a state court in violation of the United States Constitution is entitled to have the federal habeas court make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings."). See *supra* n. 4 for several different takes on the Court's practice during these time periods.

52

scope of its own jurisdiction through prudential doctrines, holding that although federal jurisdiction existed to remove state criminal cases to federal court, a habeas court ordinarily should require a prisoner first to exhaust state court remedies.[210] The Court subsequently defined prudential limits on habeas review of procedurally defaulted constitutional claims[211] and non-constitutional federal law claims.[212]

Given that *Stone*, like many prior cases, ignored the text of the habeas statute, the costs and benefits of the exclusionary rule and habeas corpus review – *i.e.* the considerations that animated *Stone* – rather than traditional canons of statutory construction, are the more appropriate ones in evaluating *Stone*'s continuing validity.

## Conclusion

In the quarter century between *Mapp* and the AEDPA, the argument for distinguishing collateral Fourth Amendment claims from the full gamut of constitutional claims had an historical and logical basis that was stronger than *Stone*'s critics recognized. Whether *Stone* was then correctly decided has now become a moot point. This Article shows that judicial and legislative changes in the law have now undermined the old grounds for distinguishing search

---

[210]    Ex parte Royal,117 U.S. 241 (1886).

[211]    *Compare* Fay v. Noia, 372 U.S. 391, 425-26 (1963) (recognizing federal jurisdiction despite state law procedural bar to review, but permitting federal courts to refrain from exercising jurisdiction where petitioner deliberately bypassed state proceeding in order to secure federal court review); *with Sykes*, 433 U.S. at 87-88 (recognizing federal jurisdiction despite state law procedural bar to review, but requiring federal courts to refrain from exercising jurisdiction unless petitioner demonstrates cause for the default and actual prejudice resulting from the lack of federal review).

[212]    United States v. Timmreck, 441 U.S. 780, 783-84 (1979) (reserving judgment on jurisdiction and refusing to address non-constitutional violation of a federal rule of criminal procedure).

Electronic Paper Repository

53

and seizure claims. And *Stone* should thus be overruled.

The number of cases affected by this result would no doubt be small. Nevertheless, in a time of high concern about security, and Patriot-Act-like responses, the ideological impact of reaffirming what Judge Leventhal described as "the magnitude of the Fourth Amendment in our constitutional constellation"[213] could hardly be more significant.

---

[213] *Thornton*, 368 F.2d at 826.

54